**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

AVANGRID NETWORKS, INC.; and
AVANGRID SERVICE COMPANY;

Plaintiffs,

v.

SECURITY LIMITS, INC., and PAULO SILVA,

Defendants.

---

Case No. 22 Civ. 9622

**COMPLAINT**

**[DEMAND FOR JURY TRIAL]**

<u>**COMPLAINT**</u>

Plaintiffs Avangrid Networks, Inc. and Avangrid Service Company (together, "Avangrid"), by and through their undersigned counsel, allege as follows:

<u>**NATURE OF THE ACTION**</u>

1.      This is a case about a theft and a hold-up. Plaintiffs are sustainable energy companies that deliver power to millions of customers in New England and elsewhere. Defendants Security Limits Inc. ("SLI"), a former subcontractor to Avangrid, and SLI's principal Paulo Silva, disappointed and disgruntled that they did not obtain certain contracts to work for Avangrid, have unlawfully retained an email database with approximately 150 GB of data, have refused to give it back, and have repeatedly threatened to accuse Plaintiffs of assorted and unspecified wrongdoing in public and to government regulators—unless they are paid off by Plaintiffs.

2.      Defendants' extortion—committed both directly and through their attorneys—has been blatant. If paid, they have offered to withhold voluntary cooperation with regulators. They have threatened to make false statements to regulators if they are not paid. While Silva may now

call himself a "whistleblower" (even though he has identified no actual wrongful conduct), he has repeatedly conveyed that Defendants would obstruct justice for the right price.

3.      Defendants also continue in their refusal to comply with their basic obligation to return data they wrongfully took and retained, and instead attempt to exercise leverage by their possession of the data, all in an attempt to extort Plaintiffs.

4.      Plaintiffs, unsurprisingly, have refused to accede to Defendants' demands, many of which potentially implicate illegal conduct. Plaintiffs bring this action to require Defendants to return what they wrongfully took and retained and to seek other appropriate relief.

## PARTIES

5.      Plaintiff Avangrid Networks, Inc. is a corporation organized under the laws of the State of Maine with its principal place of business in Maine. Avangrid Networks, Inc. is the parent of Plaintiff Avangrid Service Company and various operating power company entities that utilize the Avangrid Secure Domain ("ASD"), a central physical- and cyber-security architecture for Avangrid's network operations.

6.      Plaintiff Avangrid Service Company ("ASC") is a corporation organized under the laws of the State of Delaware with its principal place of business in Maine.

7.      Plaintiffs are wholly owned subsidiaries of non-party Avangrid, Inc. Avangrid, Inc. is a publicly traded company, with approximately 81.6% of its stock owned by non-party Iberdrola, S.A., a corporation organized under the laws of the Kingdom of Spain.

8.      Defendant Security Limits Inc. is a corporation organized under the laws of the State of New York with its principal place of business is in Jessup, Pennsylvania. SLI previously held itself out as being headquartered at 954 Lexington Avenue, New York, New York.

9.      Defendant Silva is an individual who is a citizen of the Commonwealth of Pennsylvania and resides in Jessup, Pennsylvania. He is the principal, CEO, and owner of Defendant Security Limits Inc., and he acted, with respect to the conduct alleged in this Complaint, on behalf of Defendant Security Limits Inc., and in turn Defendant Security Limits Inc.'s conduct was at all times directed and controlled by Defendant Silva.

## JURISDICTION AND VENUE

10.     This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332 because no plaintiff has the same citizenship as any defendant, and the amount in controversy exceeds $75,000. To the extent necessary, this Court also has subject matter jurisdiction under 28 U.S.C. § 1367 because the claims are so related to the diversity jurisdiction claims that they form part of the same case or controversy.

11.     This Court has personal jurisdiction over Defendant SLI because it is incorporated in New York, it contractually agreed in its subcontract with Plaintiffs' contractor Unlimited Technology, Inc. ("UTI") to exclusive jurisdiction in any New York state or federal court, and it committed torts in and directed at the State of New York.

12.     This Court has personal jurisdiction over Defendant Silva because, as alleged in greater detail below, he transacted business in the State of New York, committed tortious acts in the State of New York, and committed tortious acts outside of the State of New York that caused injury in the State of New York.

13.     Silva personally engaged in the acts alleged in the complaint in or targeting New York. Silva personally signed the subcontract at issue here on behalf of SLI that contains New York exclusive forum provisions and a notice provision giving notice to an address in Manhattan with Silva's email address and holding SLI out to be located in Manhattan.

3

14.     In addition, Silva personally worked in a Rochester, New York office while working on the on the project, signed SLI's subcontract in Rochester, and was principally supervised by Avangrid personnel located in Rochester.

15.     Further, the misappropriation of Avangrid contractor data took place in Rochester. After SLI's termination, Silva hired attorneys based in this District and they transmitted the communications alleged herein from New York City to Avangrid personnel, with the principal recipient of many of the threats being located in Rochester. Silva also caused SLI to file and then voluntarily dismiss a related complaint in the Southern District of New York and thus voluntarily submitted himself to this Court's jurisdiction in a related matter.

16.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) or (3) because a substantial part of the conduct alleged herein occurred in this District. Further, in Section 12 of the subcontract between UTI and SLI, which was signed by Silva, UTI and SLI agreed to exclusive jurisdiction in any court in New York: "Any action brought to enforce or to interpret the terms and provisions of this Agreement shall be brought exclusively within the state or federal courts of the State of New York." Plaintiffs now seek to do just that.

## GENERAL ALLEGATIONS

### SLI's Work As an Avangrid Subcontractor and Its Failed Bid.

17.     SLI was a subcontractor on certain Avangrid projects for a total of about 18 months—from around February 2018 to December 2018 as a subcontractor of SNC, Ltd., and from January 2019 to September 2019 as a subcontractor of Unlimited Technology, Inc. ("UTI"). UTI contracted to pay SLI approximately $350,000 for his services and approximately $294,000, plus expenses, for the services of another SLI employee.

18.   SLI performed its subcontracting work as part of the ASD project, which built out a central physical- and cyber-security architecture for Avangrid's network operations. Silva worked on the design of these technological security measures, including by developing a network capable of handling the increased number of video camera feeds required to comply with stricter security requirements for the power grid, and working on software to prioritize items picked up by the cameras for human review.

19.   UTI's subcontract with SLI provided, among other things, that:

- It was terminable at any time without cause (¶ 9);

- Any provision or obligation that the Prime Contract required UTI to impose on its subcontractors would be incorporated and the Prime Contract would be a Contract Document that was binding on SLI (¶ 11); and

- SLI would preserve the confidentiality of both UTI's and ASC's information and not disclose any information received in the course of providing services under the subcontract without prior written consent from UTI (¶¶ 15-16).

20.   In turn, the Prime Contract that was incorporated into the subcontract provided that:

- Unless otherwise agreed, if UTI used a subcontractor, "the provisions of this Agreement shall apply to such sub-contractor and its officers, agents and employees in all aspects as if they were employees of [UTI] (¶ 2.3);

- Data, information, and work product generated in the course of the services would belong to ASC, along with any related intellectual property (¶ 8);

- All information about Avangrid acquired in the course of providing the services would be confidential (*Id.*); and

- UTI would comply with Avangrid's security requirements, data privacy requirements, and acceptable use requirements for Avangrid computer networks, which were attached as schedules to the contract.

21.     Unsurprisingly, neither contract provided SLI with any right or reasonable expectation that it would receive future contracts with UTI or with any Avangrid entity.

22.     SLI's scope of work for UTI was completed in September 2019, when Phase 1 of the ASD project ended (Phase 1 consisted of the design of the system and physical installation of the hardware pursuant to that design).

23.     The SLI-UTI relationship apparently did not end well. Plaintiffs understand that Silva and SLI claimed that UTI had underpaid SLI, that UTI had retained technology that Silva and SLI claimed belonged to SLI, and that UTI should not have continued to use that technology after non-renewal of SLI's services. UTI has disputed those claims.

24.     In addition, in 2019, the relationship between SLI and Avangrid began to deteriorate. This resulted from, among other things, Mr. Silva's tendency to exaggerate SLI's role in the ASD project and Silva's control over the project. For instance, Mr. Silva claimed that he was "running Avangrid's project management office," called other contractors "my staff," and asserted that SLI had ownership over open-source software used on the project.

25.     Phase 1 of the ASD project was coming to a close in mid-to-late 2019. Defendants hoped to win a contract for IT support for Phase 2, which generally related to certain work necessary to connect disparate Avangrid sites to the central secure network.

26.     Although SLI bid on Phase 2 work, Avangrid determined not to award a single Phase 2 contract, and, SLI learned that others got certain Phase 2 work.[1]

**Defendants Reveal Their Theft of 150 GB of Data and Begin Their Extortion Attempts**

27.     Having not immediately received an award for any Phase 2 work, Silva began sending lengthy emails to UTI and Avangrid repeatedly asking about being able to bid for Phase 2 work and at the same time raising various concerns about the bidding process, data security, and other wrongdoing he was alleging on the part of UTI and Avangrid. In due course, Avangrid investigated and examined each of these allegations and found them to be meritless. For example, at one point, Silva claimed that UTI's contract for its portion of Phase 2 work was sole-sourced, when it had in fact been competitively bid, with SLI being one of the bidders for the work.

28.     As pertinent to this matter, one alleged issue that Defendants raised in their post-subcontract tenure emails was the claim that they had been improperly tasked with "safeguarding 150GB of sensitive data" from a "data repository" that "includes many emails and confidential information relating to the implementation of Phase I of the Security Program" and "considerable private personal information." It should be noted that 150GB of data fits easily on a $35 thumb drive, a portable hard-drive, or laptop hard-drive. Accordingly, copying, deleting, or

---

[1] Subsequent information Avangrid has discovered strongly suggests that SLI's bids may not have been valid because they may have contained material misrepresentations. For example, Defendants stated that SLI was a WBE—a woman-owned business enterprise—owned by one Maire Conaghan. But, in a recent court filing in another proceeding, Security Limits and Silva stated that Silva "is the Chief Executive Officer of SLI and the owner of its outstanding common stock." The bid also did not disclose that Maire Conaghan's full name is, upon information and belief based on recent public records searches, Sorcha Maire Conaghan Silva, Silva's spouse. Because WBE status generally requires that a business be owned, operated, and controlled on a day-to-day basis by a woman, Silva's ownership of all of SLI's stock and the claim that Maire Conaghan controlled the business when Silva actually did would render the statement that SLI was a WBE a disqualifying misrepresentation.

transferring that amount of data requires little effort. This issue was not communicated contemporaneously to Plaintiffs.

29.     Defendants acknowledged that this "data does not belong to SLI, it belongs to AVANGRID." However, Defendants have refused to return it to Avangrid because "UTI is refusing to accept responsibility for paying for its safekeeping and return to AVANGRID."

30.     Silva forwarded emails he had sent to UTI's legal department where he had similarly threatened to retain the data unless UTI paid him more than $150,000 for this service that would not have been valued at that amount, and that UTI had indeed not contracted with Silva to perform, nor was it related to his contractual scope for his UTI work in 2019. Again, Defendants' grievance of having to do extra-contractual work was not communicated to Plaintiffs contemporaneously.

31.     Silva also told UTI that he had changed passwords for the account, and threatened them with "a computer-crime act" if anyone from UTI attempted to access the data repository.

32.     Avangrid investigated Defendants' allegations and determined that Defendants were significantly overstating the sensitivity of the information contained therein. The data was from an e-mail domain (first "avangrid.org" then "ictprivatecloud.com") created during Phase 1 of the project as a project management tool so that Avangrid, UTI, and a number of subcontractors could more easily share their email, schedules, and meetings. For example, contractors from different hardware or software vendors would be given an "ictprivatecloud.com" email address so they could access a common Microsoft Outlook domain to communicate and schedule meetings more easily.

33.     Consistent with Avangrid policy (which was attached to and incorporated into the prime contract with UTI, and thus SLI's subcontract too), Avangrid does not believe that the

domain was used for keeping or exchanging critical energy infrastructure information, personally identifying information, or other types of information kept only on restricted internal systems. UTI—working at Avangrid's direction—was tasked with ensuring at the end of Phase 1 of the ASD project that any potentially sensitive data had been removed from the e-mail domain.

34.     Later in 2020, Defendants escalated their threats. On September 29, 2020, Defendants, through an attorney, stated that unless the spurious "issues" were "remediated"— which Defendants made clear included paying SLI substantial sums for the return of the data— "Mr. Silva intends to report these issues to appropriate regulatory authorities."

35.     On January 28, 2021, Defendants, through counsel, transmitted additional threats and again demanded to be paid to give back the data. A few weeks later, on February 19, 2021, Defendants' counsel sent a separate letter reiterating the prior, false allegations, claiming that everyone involved in awarding the contract to the lower bidder was conspiring against him (including, inexplicably, other unsuccessful bidders and companies that did not submit a bid at all), and threatening unspecified litigation.

36.     Defendants reiterated their threats through counsel on March 6, 2021, including again demanding payment before SLI would return the data. This time, Defendants attached a recording and translation from Portuguese of Silva's own phone call with an associate in which Silva reiterated his allegations and indicated that Silva intended to make assorted civil and criminal legal threats if SLI did not get the contract:

- "It is like I have said, it is a legal matter on my end and I'm in good shape. So, Avangrid at this time, the conversation with John Allen shall be as follows: John Allen, [S]ecurity [L]imits must remain primary on the bid, if it is not, there will be lawsuit I will protest it and everything stops."

9

- "And there will be lots of information added to it, should we take this path? In short, this is it. Ok[,] [t]he same way they do not want me there and they still playing a game outside [Slang- dirty game],[2] now I'm going to be very direct, I'll start being very direct, ok? *If I do not win this contract, there'll be lawsuits everywhere.*"

- "[A] lot of people making money in this hardware cesspool at Avangrid, do you see what I mean, *everyone loses, I'm telling you, it's not even losing, it's going to jail, do you get me*?"

37.    Apparently not satisfied with their lawyer's threats, on March 19, 2021, Defendants sent a rambling, false email claiming, among other things, that Avangrid's refusal to give them everything they wanted was a violation of "New York's Legal Professional Code of Conduct," demanded $178,000 for the return of the 150 GB of data, and furthermore, made explicit threats to make matters public unless Avangrid complied with a settlement demand to be forwarded by his lawyers, who were copied on the email. Defendants threatened:

- "*Failure to provide 'answers' in good-faith or continued deliberate actions to further 'delay due process' will result in formal complaints being filed; consequently, all allegations made to date may become a matter of 'Public Record'. This could result in further reputational damage to both our institutions because of a few bad apples.*"

- "Jack Griem [Silva's attorney] and Sarah have been authorized to make recommendations towards resolution. Should AVANGRID be interested in

---

[2] This bracketed text is original, from the translation Silva attached.

hearing them, please contact Carter & Ledyard. *The reputation of AVANGRID's and IBERDROLA's Board of Directors alongside my reputation will be severely damaged should this information become available in the court systems in Spain, Brazil, and U.S.*"

38.     Defendants also attached an email indicating that they were making similar extortionate threats to UTI, including threats to harm UTI's reputation and to accuse it of crimes if they were not paid. Upon information and belief, UTI refused to offer Defendants an amount Defendants deemed sufficient in response to their threats.

39.     Defendants' scheme continued to expand. Apparently having learned the email addresses of several executives of Avangrid's largest shareholder, Iberdrola, S.A., they sent another lengthy and incoherent screed to them on March 26, 2021. Again, they included numerous threats if their demands were not met:

- "My Attorney's contact information (Jack Griem) has been included on several communications enclosed herein. *I demand a position at this point, if not from AVANGRID, it must come from its Parent Company 'Iberdrola S.A.'. I believe Iberdrola S.A. shareholders and key stakeholders at Security Limits Inc. have most to lose at this stage should this information become public via court systems in the U.S.*"

- "*This matter specifically will be reported to the NY District Attorney's Office and the Public Utility Commission of Several States that have funded the AVANGRID Secure Domain, a.k.a. Ironclad®, via rate-case funding should guidance not be provided immediately.*"

11

40.    On November 21, 2021, SLI filed a lawsuit, asserting various claims, including under the RICO statute, in the U.S. District Court for the Southern District of New York against Avangrid, Inc., Avangrid Networks, Iberdrola, S.A., and a laundry list of other parties.[3] SLI apparently blamed these parties for SLI's failure to win the Phase 2 project bid, alleging that the only way that SLI could have lost the contract was if assorted competitors acted unlawfully. Although SLI went to the media to announce the filing of the lawsuit and the exorbitant sum it alleged in damages, SLI never even served lawsuit on Avangrid, Inc., Avangrid Networks, Iberdrola, S.A., or any of the defendants. A few months later, SLI voluntarily dismissed the lawsuit. Defendants have threatened Plaintiffs directly and through the media that they will refile the suit, but have yet to do so.

41.    The undisguised extortion has since resumed.[4] In August 2022, Defendants, through counsel, wrote to Plaintiffs' counsel and said:

---

[3] *Security Limits Inc. v. Avangrid Networks, Inc., Avangrid, Inc., Iberdrola S.A., Prosegur Gestión De Activos, S.L., Unlimited Technology, Inc., Cipher Security, LLC, Prosegur Security Monitoring, Inc. f/k/a Viewpoint CRM, Inc., Black & Veatch Corporation, David Lathrop, John Allen, Tom Fitzgerald, Enrique Victoreo, Antonio Asenjo Martin, Ed Boucas, Andre Viera Rolim, Bill Reilly, and John Does 1 to 100*, No. 21-CV-10124-GHW (S.D.N.Y.).

[4] This is not the first time Defendants have engaged in this sort of improper conduct. On information and belief, in approximately 2013, Philadelphia Electric Company ("PECO"), a regional power utility owned by Exelon in the Philadelphia, PA area hired Silva as a contractor for PECO to aid in their efforts to achieve cybersecurity compliance. When PECO determined to end his contract, Mr. Silva informed PECO that if PECO were to terminate his contract, he would inform the Pennsylvania Public Utility Commission (PUC) of concerns that he alleged were lapses in either compliance or cybersecurity preparedness. An Exelon security strategist determined that the specific technical issues that Mr. Silva identified as allegedly problematic constituted neither non-compliance nor an insecure configuration and believed that Silva was attempting to extort the company for continued contract work by communicating a threat of reporting information he incorrectly perceived to be damaging to PECO if his contract were to be terminated. PECO then demonstrated to the PUC that the methods and steps PECO and its parent company Exelon used to protect the company and its assets were compliant with cybersecurity requirements, despite any allegations by Mr. Silva to the contrary.

Checking in on when we can expect a concrete response to SLI's settlement proposal. My client is getting impatient and has been digging into the ictprivatecloud.com database. He says he is finding [purported misstatements and inflated charges].

In addition, he is getting repeated requests for information from the special examiner (John Fillyaw) hired by the Maine regulators, who are looking into Avangrid's activities there. He has put off responding, but can't much longer.

I hope that new management at Avangrid sees the wisdom of putting the SLI issues behind them, so they can focus on the ongoing improvements in management and operations in their existing businesses and a renewed proposal next year to acquire [Public Service Company of New Mexico] in New Mexico.

42.     As this email makes plain, Defendants were not speaking to the regulators in good faith to identify legitimate issues, but instead were doing so in bad faith and in the hope of extorting Plaintiffs into paying protection money to make Defendants go away.

43.     On a subsequent call, Defendants' counsel said that Silva was receiving inquiries from an investigator acting on behalf of a Maine government official as a result of the allegations made in his withdrawn RICO suit. During the call, Defendants, through counsel, unequivocally offered not to cooperate with regulators if he was paid off, saying that he needed to know by the end of August "if we can make a deal" because of the deadline the Maine regulator had asked

---

And, in August 2021, Silva emailed senior Avangrid and Iberdrola executives, including Iberdrola's chairman and chief executive officer, saying that Silva and Security Limits intended to intervene in a proposed merger transaction that was then being heard by the New Mexico Public Regulation Commission ("NMPRC") to file critical, false comments about Avangrid, Inc. Silva then said, "Should you have any questions, please do not hesitate to contact us." In case that threat was too subtle, Silva followed his threat to testify by saying "[p]lease see email chain below," referring to certain emails inquiring about the status of the pending Phase 2 tender and potential work for Avangrid. The implication was clear: If SLI did not get new work from Avangrid, Silva and SLI would attempt to harm the reputation of Avangrid, Inc. to interfere with its merger effort in New Mexico. Silva and Security Limits then proceeded, among other things, to defame Avangrid, Inc. in front of the NMPRC. In response, Avangrid, Inc. filed an action against Silva and Security Limits alleging torts for this conduct in New Mexico. That action is presently on appeal, having been dismissed by the New Mexico court after it determined that the allegations were not actionable under New Mexico law. *Avangrid, Inc., Plaintiff-Appellant, v. Security Limits, Inc. and Paulo Silva, Defendants-Appellees*, No. A-1-CA-40560 (N.M. Ct. App.).

for. "In terms of settlement," Defendants' counsel said, "if we were to reach one, then Paulo would keep confidential the terms of the settlement and it would also cover any documents or information related to the settlement." A few minutes later, Silva's counsel "propose[d] that you tell me in this phone call how much money Avangrid is willing to pay." That was a clear offer to obstruct what Defendants described as an inquiry by the Maine regulator if Avangrid paid him. Defendants continued to make threats through his counsel, saying that "the regulators' interest was piqued by the allegations in the RICO complaint, and that this email repository is not really on their radar. And eventually it would be. That's something to consider."

44.     Concerningly, Defendants' counsel indicated during this call (and also in the email described above) that Silva—and his counsel—had been reading the emails he stole, despite his claims that he was keeping them for safekeeping. Defendants and their counsel used the repository as a threat, stating that, "As far as I know, we haven't shared it with regulators, and I don't want to speculate on what we would do if we didn't get this resolved because I'm confident that we will get it resolved."

45.     Defendants' counsel reiterated the threat to make accusations to regulators if Defendants were not paid off: "I gotta tell you, our client is extremely zealous, and has been chomping at the bit to cooperate with regulators but has been holding off based on our ongoing discussions and has not disclosed this private domain, which I don't think anyone in Avangrid or Iberdrola wishes to come to light for a variety of reasons." He later continued: "[I]f we fail to reach a settlement, then he has very little incentive not to make regulators aware of emails like the one we provided to you and little incentive not to disclose the existence of this private email domain." As he put it, "the genie is not out of the bottle yet."

14

46.     Making clear that what was being discussed was a threat to disclose information, not the resolution of good-faith legal claims, Defendants' counsel stated, "[w]e'd prefer not to debate the merits of claims or defenses." The whole point of the conversation was to convey a threat to create negative publicity if Silva's demands were not met. Defendants' statements with respect to providing information to regulators were in bad faith and for the purposes of extortion, not to inform the regulators of anything.

47.     Also in August 2022, Silva's attorney forwarded a message from his client that contained repeated threats to publicize information or make reports to regulators if Silva was not paid. They again emphasized that Silva continued to access information he admitted belongs to Avangrid:

- "*Avangrid management needs to make an informed decision since our settlement window is closing very fast and at this point, I have nothing to lose. I am fully vested. This can become a long-term national issue that may transcend policy, state investigations, and fines.*"

- "A lot has happened since then, don't you agree? We have obtained support from Litigation Funders, pulled back my RICO complaint to comply with feedback received, and exercised my first amendment rights in front of the Public Regulations Commissioners in New Mexico. *And a lot more is to come... It is up to Avangrid where we go from here. As I said: I am fully vested and will not stop until some justice is served. Be advised that should we not receive a written response to our settlement offer immediately, we are moving on. You need to also present a very realistic number, or don't even bother . . . .*"

15

- Silva attached screenshots of images apparently taken from the information he had stolen that appear to be a price quote provided by UTI for a project and an internal document from another contractor, Cipher, indicating its desire not to be dependent on SLI.

48.     If Defendants were in fact public-spirited whistleblowers, they would have gone to the regulators long ago (and those regulators would have found their claims meritless). Defendants' attempts to extort money out of Avangrid in exchange for promises of non-cooperation is illegal. Regulators or other government actors could obtain the data Defendants stole if they chose to do so (Plaintiffs have nothing to fear from it), regardless of whether it remains in Defendants' possession.

49.     Silva and SLI are not victims of some vast conspiracy, as they claim to be. They hoped to turn a subcontractor job into a dramatically larger contract with Avangrid. Ultimately, they did not win that subsequent bid, and so have tried to extract as much money as possible from Avangrid through thievery and blackmail instead. In doing so, however, they have violated both their contractual duties and the law.

**COUNT I**
**BREACH OF CONTRACT**
**Against All Defendants**

50.     Plaintiffs repeat and reallege each and every allegation set forth in paragraphs 1 through 49 as though fully set forth herein.

51.     SLI entered into a valid and binding subcontract with non-party UTI, which expressly incorporated by reference Plaintiff Avangrid Services Company's rights against UTI under the prime contract. Plaintiffs are entitled to enforce the contract as parties and/or as intended third party beneficiaries.

16

52.     Specifically, the subcontract provides as follows:

In this Agreement, (1) "Owner" means Avangrid Services Company; and (2) "Contract Documents" means (i) this Agreement, (ii) any Schedules to this Agreement; and (iii) any approved change orders; (iv) the Prime Agreement (as defined hereafter), attached hereto, all of which are incorporated by reference in this Agreement and made a part hereof

53.     The subcontract further provides:

**11.     Prime Contract:** UTI has entered into, or will enter into, a Contract (as may be amended from time to time, referred to herein as "Prime Contract") with the Owner for the furnishing of labor, materials, equipment and services in connection with the Work. The Contractor shall be bound to UTI by each and all of the terms and provisions of the Prime Contract and the other Contract Documents and assume toward UTI all of the duties, obligations and responsibilities that UTI assumes toward the Owner pursuant to the Prime Contract and each of the other Contract Documents, and the Contractor agrees further that UTI shall have the same rights and remedies as against the Contractor as the Owner under the terms and provisions of the Prime Contract and the other Contract Documents has against UTI with the same force and effect as though every such duty, obligation, responsibility, right or remedy were set forth herein in full. To the extent the Prime Contract requires UTI to include certain provisions in this Agreement, or impose certain obligations on the Contractor, such applicable terms and conditions are incorporated herein. The Prime Contract is available for review by the Contractor upon request, including prior to the execution of this Agreement. The Prime Contract shall continue to be a Contract Document and, as such, is incorporated herein and made a part hereof, and Contractor shall continue to be bound by the Prime Contract, notwithstanding any termination, expiration or cancellation of the Prime Contract, or the assignment or reassignment of the Prime Contract by UTI or the Owner.

54.     The Prime Contract between UTI and Avangrid Services Company requires that both the prime contractor and subcontractors are liable for violations of the Prime Contract:

2.3     Subcontractors. Customer must give its written approval before Supplier uses any subcontractors in the performance of any Services.  Unless otherwise agreed to by the parties, if Supplier shall cause any part of the Services to be performed by a sub-contractor, the provisions of this Agreement shall apply to such sub-contractor and its officers, agents or employees in all aspects as if they were employees of Supplier, and Supplier shall not thereby be discharged from any of its obligations and liability hereunder, but shall be liable hereunder for all acts and omissions of the sub-contractors. Nothing shall create any contractual relationship between Customer and any sub-subcontractor.

55.     The Prime Contract provides for obligations of confidentiality, acceptable use of computer systems, security, and ownership of information and intellectual property, and requires that its provisions be binding on subcontractors.

56.     The Prime Contract provides, both in the main contract and in the attached schedules, that Avangrid Services Company will own all information, work product, and

intellectual property developed in the course of providing the services, and it must be returned upon termination or completion. The main contract provides:

> **8.     Proprietary Information.**   Data or information generated or acquired during this Agreement relating to Customer which is not otherwise publicly available, shall belong to and be proprietary to Customer and shall be kept secret by Supplier, although Supplier may use it to the extent necessary to perform the Services.  Drawings, specifications, calculations, reports, Services in process, models, or other work product, if any, prepared by Supplier pursuant to the scope of work detailed in Schedule B shall become the property of Customer when prepared and shall be delivered to Customer upon request and, in any event, upon the termination of this Agreement for any reason.  Supplier may keep copies or samples thereof for its internal use (but not disclosure to others), but Customer shall retain all intellectual property therein.  Supplier hereby irrevocably assigns to Customer all right, title and interest in such items, and, at Customer's option and expense, shall execute any documents reasonably requested by Customer for the assignment, registration, or other protection of any related proprietary right. Notwithstanding anything in the foregoing, Supplier shall retain all right, title and interest in any work product prepared by Supplier that falls outside the scope of work detailed in Schedule B, unless otherwise agreed to by the parties.

57.     Similarly, the schedules provide:

> **ARTICLE 34 - OWNERSHIP OF PLANS**
>
> All drawings, plans, specifications, reports, designs, design data, technical and scientific data, findings, recommendations and memoranda of every description whether furnished to or prepared by Supplier under this Agreement and pursuant to the scope of work detailed in Schedule B shall (x) be delivered to Company upon completion of the work or termination or cancellation of this Agreement, (y) be deemed to

> have been prepared by Supplier for Company on a work-made-for-hire basis, and (z) shall be the property of Company and may be used by Company for any purpose whatsoever without any claim on the part of Supplier for additional compensation.  To the extent any of the foregoing are not deemed a work for hire by operation of law, Supplier hereby irrevocably assigns, transfers, and conveys to the Company without further consideration all of its right, title, and interest in such drawings, plans, specifications, reports, designs, design data, technical and scientific data, findings, recommendations and memoranda of every description, including all rights of patent, copyright, trade secret or other proprietary rights in such materials.
>
>         Except as specifically authorized by this Agreement, or as otherwise authorized in writing by Company, information and other data developed or acquired by or furnished the Supplier in the performance of this Agreement shall be used only in connection with the work under this Agreement. Notwithstanding anything in the foregoing, Supplier shall retain all right, title and interest in any work product prepared by Supplier that falls outside the scope of work detailed in Schedule B, unless otherwise agreed to by the parties.

58.     SLI violated these provisions by retaining Avangrid property after it was terminated and refusing to return it unless paid.

59.     SLI further violated these provisions to the extent it claims a right to prevent

Avangrid from awarding contracts on Phase 2 to other bidders by claiming property rights in the

work it did on the project.

60.     Both the Subcontract and the Prime Contract provide for confidentiality

obligations. The Subcontract provides:

> **16.2.**    Contractor acknowledges that Contractor's duties on behalf of UTI will require Contractor to have access to confidential information and material belonging to UTI and its customers, including, without limitation, tax and financial information, trade secrets and proprietary information. Contractor agrees that Contractor will not at any time utilize or divulge this information and/or material except on behalf of UTI in a duly authorized manner. Such information shall be subject to mutual non-disclosure agreement (NDA) signed on 01/29/2019; Professional Security Broadband Inc. (PSB).

61.     The Prime Contract provides:

> **9.     Confidentiality.**    Supplier, its employees and agents, shall treat any information, (including any technical information, experience or data) regarding Customer or its Affiliates plans, programs, plants, processes, costs, equipment, operations, or customers, which may be disclosed to, or come within the knowledge of, Supplier its employees and agents in the performance of this Agreement, as confidential, and will not use or disclose this information to others, during the term of this Agreement, and for three (3) years thereafter, except as is necessary to perform the Services hereunder, without Customer's prior written consent.  The provisions of this Article shall not apply to any information referred to in this Section which (i) has been published and has become part of the public knowledge through no effort by Supplier, its employees, or agents, (ii) has been furnished or made known to Supplier or Supplier's Affiliates by third parties (other than those acting directly or indirectly for or on behalf of Customer or Customer Affiliate) as a matter of legal right and without restriction on disclosure, (iii) was in Supplier's possession prior to disclosure by Customer or its Affiliates and was not acquired by Supplier or Supplier's Affiliates, its employees and agents directly or indirectly from Customer or its Affiliates or, (iv) is required by law or by any other governmental regulatory authority to be disclosed.
>
> Any information, which is supplied by the Supplier to Customer or a Customer Affiliate under this Agreement, will be similarly restricted.  Customer and Customer Affiliate will not disclose such information to others or publish it in any form at any time; provided, however, that notwithstanding the foregoing, Customer may disclose any such information to its Affiliates, employees, and consultants, to any regulatory agencies or instrumentality's when such disclosure is necessary, or otherwise required by law. Customer will cooperate with the Supplier in an effort to minimize the amount of such information, which will be disclosed in any such case, and to make reasonable efforts to secure confidential treatment of such information.
>
> In no event shall Customer's or its Affiliates' names and/or logo or the name and/or logo of it's parent company be used, whether written or verbal, duplicated, reproduced by any means whatsoever without the prior written permission of the Customer.
> All inquiries by any governmental, business, or other entity, including media, regarding any Services performed or to be performed by Supplier for Customer shall be directed by Supplier to Customer for response.

62.     Similarly, the schedules to the Prime Contract provide:

**ARTICLE 38 – CONFIDENTIALITY**

Supplier, its employees and agents, shall treat any information, (including any technical information, experience or data) regarding Company or Company's plans, programs, plants, processes, costs, equipment, operations, of Company (or Affiliates), which may be disclosed to, or come within the knowledge of, Supplier its employees and agents in the performance of this Agreement, as confidential, and will not use or disclose this information to others, during the term of this Agreement, and for three (3) years thereafter, except as is necessary to perform the services hereunder, without Company's prior written consent. The provisions of this Article shall not apply to any information referred to in this Section which (i) has been published and has become part of the public knowledge through no effort by Supplier, its employees, or agents, (ii) has been furnished or made known to Supplier or Supplier's Affiliates by third parties (other than those acting directly or indirectly for or on behalf of Company) as a matter of legal right and without restriction on disclosure, (iii) was in Supplier's possession prior to disclosure by Company and was not acquired by Supplier or Supplier's Affiliates, its employees and agents directly or

indirectly from Company or, (iv) is required by law or by any other governmental regulatory authority to be disclosed.

Any information, which is supplied by the Supplier to Company will be similarly restricted, including clauses (i) through (iv) in the paragraph above. Company will not disclose such information to others or publish it in any form at any time; provided, however, that notwithstanding the foregoing, Company may disclose any such information to its Affiliates, employees, and consultants, to any regulatory agencies or instrumentality's when such disclosure is necessary, or otherwise required by law.

Each party agrees that they will cooperate with the other in an effort to minimize the amount of such information, which will be disclosed in any such case, and to make reasonable efforts to secure confidential treatment of such information.

In no event shall Company's name and/or logo or the name and/or logo of its Affiliates be used, whether written or verbal, duplicated, reproduced by any means whatsoever without the prior written permission of the Company.

All inquiries by any governmental, business, or other entity, including media, regarding any work performed or to be performed by Supplier for Company shall be directed by Supplier to Company for response.

63.     SLI violated these provisions by improperly using confidential information,

including the data he unlawfully retained and continues to retain, for purposes other than

providing the services, including for the purpose of extorting Plaintiffs.

64.     The Prime Contract further provided for extensive physical security,

cybersecurity, and acceptable use policies that SLI was contractually required to abide by, in

addition to requiring that SLI return the material upon request and otherwise comply with all

applicable laws.

65.     Those policies provided, among other things, that SLI was required to return data in its possession for which it no longer had a need or upon termination or Avangrid's request and was required to allow Avangrid to inspect the data on request.

66.     None of these policies provide for Avangrid to reimburse subcontractors for costs they incur in storing data—indeed, Avangrid has no payment obligation whatsoever to subcontractors, whose payment is a matter between them and the prime contractor.

67.     Silva is also bound by the subcontract. Having executed the subcontract, Silva had full knowledge of its provisions. Further, Silva engaged in conduct with Plaintiffs that demonstrated and confirmed his and Plaintiffs' intent to be bound by the confidentiality provisions of the subcontract. Among other things, he personally provided services to Plaintiffs under the subcontract, and received confidential information from Plaintiffs knowing such information was subject to the confidentiality and related provisions. Silva undertook this conduct knowing that Plaintiffs would understand his conduct as an agreement to be bound by the confidentiality provisions of the subcontract.

68.     Plaintiffs justifiably relied upon the constellation of contractual protections detailed above in deciding to enter into such contracts and in deciding to provide confidential material.

69.     Defendants committed breach of contract by refusing to return the data it retained and refusing to allow Avangrid to inspect the data and by demanding payment for the return of data.

70.     Defendants further violated the provisions of the Prime Contract requiring compliance with applicable laws by engaging in the conduct alleged herein, which constitutes larceny by withholding in violation of New York Penal Law § 155.05(1), attempted larceny by

extortion in violation of New York Penal Law § 155.05(e), attempted Hobbs Act extortion in

violation of 18 U.S.C. § 1951, unauthorized use of a computer in violation of New York Penal

Law § 156.05, computer trespass in violation of New York Penal Law § 156.10, unlawful

duplication of computer related material in the first degree in violation of New York Penal Law

§ 156.30, and violations of the similar laws of other states where portions of the conduct may

have occurred.

71.     Plaintiffs have suffered damages in an amount in excess of $75,000 as a result of

Defendants' conduct.

72.     Additionally, because Plaintiffs' remedy at law is inadequate, Plaintiffs seek, in

addition to damages, temporary, preliminary, and permanent injunctive relief as well as specific

performance as to the return of such materials, all in order to recover and protect its confidential

information.

**COUNT II**
**BREACH OF IMPLIED COVENTANT OF GOOD FAITH AND FAIR DEALING**
**Against All Defendants**

73.     Plaintiffs repeat and reallege each and every allegation set forth in paragraphs 1

through 72 as though fully set forth herein.

74.     SLI entered into a valid and binding subcontract with non-party UTI, which

expressly incorporated by reference Plaintiff's ASC's rights against UTI under the prime

contract. Plaintiffs are entitled to enforce the contract as parties and/or as intended third party

beneficiaries.

75.     The implied covenant of good faith and fair dealing required SLI to exercise its

discretion or power under the contract in good faith, consistent with the purposes of the contract,

and not for any illegitimate purpose or to deprive Plaintiffs of the benefits of the contract.

76. SLI breached the implied covenant of good faith and fair dealing by, among other things, retaining data belonging to Avangrid and attempting to extort Avangrid into giving him further contracts or cash payments, which was bad faith conduct, for an illegitimate purpose, and intended to deprive Plaintiffs of the benefits of the contract (including, in addition to its confidentiality and related provisions, without limitation, its limited scope of work, intended to allow it to use different contractors for Phase 2 if it chose).

77. Defendants breached the implied covenant of good faith and fair dealing by, among other things, retaining data belonging to Avangrid and attempting to extort Avangrid into giving SLI further contracts or cash payments, which was bad faith conduct, for an illegitimate purpose, and intended to deprive Plaintiffs of the benefits of the contract. Plaintiffs have suffered damages in an amount in excess of $75,000 as a result of Defendants' conduct.

78. Additionally, because Plaintiffs' remedy at law is inadequate, Plaintiffs seek, in addition to damages, temporary, preliminary, and permanent injunctive relief to recover and protect its confidential information.

## COUNT III
## TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS (UNLAWFUL, IMPROPER, OR PREDATORY MEANS/BAD FAITH)
### Against Defendant Silva

79. Plaintiffs repeat and reallege each and every allegation set forth in paragraphs 1 through 78 as though fully set forth herein.

80. Defendant Silva knew that Defendant SLI was party to the valid contractual provisions discussed in Count I.

81. Defendant Silva intentionally and improperly caused SLI to breach those contractual provisions.

82.     While Silva is SLI's principal, his conduct constituted independent crimes and torts and/or predatory or improper conduct and/or was in bad faith.

83.     Among other things, Silva engaged in the conduct alleged herein, which constitutes larceny by withholding in violation of New York Penal Law § 155.05(1), attempted larceny by extortion in violation of New York Penal Law § 155.05(e), attempted Hobbs Act extortion in violation of 18 U.S.C. § 1951, unauthorized use of a computer in violation of New York Penal Law § 156.05, computer trespass in violation of New York Penal Law § 156.10, unlawful duplication of computer related material in the first degree in violation of New York Penal Law § 156.30, and violations of the similar laws of other states where portions of the conduct may have occurred.

84.     Plaintiffs have suffered damages in an amount in excess of $75,000 as a result of SLI's conduct.

85.     Silva's conduct as alleged herein was wanton, willful, oppressive, and egregious, warranting an award of punitive damages.

## COUNT IV
## REPLEVIN
## Against All Defendants

86.     Plaintiffs repeat and reallege each and every allegation set forth in paragraphs 1 through 85 as though fully set forth herein.

87.     Plaintiffs own and are entitled to immediate possession of the data taken or wrongfully retained by Defendants.

88.     Defendants have admitted that the data is owned by Plaintiffs but refuse to return it despite proper demand by Plaintiffs.

89.     Plaintiffs are thus entitled to an order directing that they immediately be restored to possession of the data, including all copies or other material taken from or reflecting the data.

90.     Plaintiffs are thus entitled to an order directing that they immediately be restored to possession of the data and an order directing defendants to destroy and / or delete any copies of same.

91.     Plaintiffs are further entitled to interim relief enjoining Defendants from using Plaintiffs' property *pendente lite*.

**COUNT V**
**CONVERSION**
**Against All Defendants**

92.     Plaintiffs repeat and reallege each and every allegation set forth in paragraphs 1 through 91 as though fully set forth herein.

93.     Plaintiffs own and are entitled to immediate possession of the data taken or wrongfully retained by Defendants.

94.     Defendants have admitted that the data is owned by Plaintiffs but refuse to return it despite proper demand by Plaintiffs.

95.     In the alternative to replevin, Plaintiffs are entitled to compensatory and punitive damages.

**COUNT VI**
**PRIMA FACIE TORT/COMMON LAW EXTORTION**
**Against All Defendants**

96.     Plaintiffs repeat and reallege each and every allegation set forth in paragraphs 1 through 95 as though fully set forth herein.

97.     Defendants intentionally inflicted harm on Plaintiffs, causing damages in an amount in excess of $75,000 as alleged above, without lawful excuse or justification.

98. Because Defendants used independently unlawful means, any profit motivation does not justify their conduct.

99. Plaintiffs have been damaged by all of the foregoing and are entitled to an award of compensatory and exemplary damages.

## COUNT VII
## DECLARATORY AND INJUNCTIVE RELIEF—END USER LICENSE AGREEMENT
### Against All Defendants

100. Plaintiffs repeat and reallege each and every allegation set forth in paragraphs 1 through 99 as though fully set forth herein.

101. An actual controversy has arisen between Plaintiffs and Defendants because Defendants have repeatedly asserted unspecified limitations on Plaintiffs' use of the Ironclad software that Defendants licensed to them at no further cost in perpetuity without termination, in an apparent attempt to prevent Plaintiffs from awarding contracts to other bidders.

102. Upon information and belief based on communications between Defendants and UTI that Defendants later sent to Plaintiffs, Defendants have threatened baseless litigation against other bidders to attempt to deter them from bidding for contracts with Plaintiffs, on the apparent assertion that Avangrid cannot contract with anyone else for Phase 2 of the ASD project without Defendants' permission.

103. The End User License Agreement provides as follows:

**GRANT**

For the purpose of this Agreement, the term "Product" shall mean "Ironclad®", the product name given by Security Limits Inc. for its Intellectual Property, a collection of "Procedural Artifacts, Architectural Material(s) and Design Specifications Utilized in Building a Secure Hyper-Converged Virtualized Infrastructure, specifically Designed for Hosting Industrial Control Systems".

**TERMINATION**

Licensed to AVANGRID and its subsidiaries in perpetuity WITHOUT termination". Security Limits Inc. All copyrights® reserved.

104.     The End User License Agreement further provides:

*AVANGRID INC. has unrestricted rights to utilize and modify the design for its own benefit or for the benefit of its operating companies, subsidiaries,*

105.     Plaintiffs are operating companies or subsidiaries of Avangrid Inc. and are thus express beneficiaries of the license.

106.     Accordingly, Plaintiffs are entitled to a declaration that they and their employees, agents, independent contractors, subcontractors, and anyone else acting for their benefit are entitled to use and modify Ironclad, or otherwise exercise any right licensed under the End User License Agreement, provided that they do not allow third parties to copy or use Ironclad for their own benefit.

107.     Plaintiffs are further entitled to a declaration that any threat by Defendants against Avangrid or its employees, agents, independent contractors, subcontractors, and anyone else acting for their benefit from using or modifying Ironclad, or otherwise exercising any right licensed under the End User License Agreement, constitutes copyright, patent, or trademark misuse insofar as those threats are designed to secure a monopoly in violation of the End User License Agreement.

108.     Further, Defendants' threats against Avangrid and those acting on its behalf and for Avangrid's benefit would deprive Plaintiffs of the benefit of the agreement—the right to use Ironclad forever without termination—and thus also violate the implied covenant of good faith and fair dealing.

109.     Because Plaintiffs' remedy at law is inadequate, Plaintiffs seek, in addition to damages, temporary, preliminary, and permanent injunctive relief to recover and protect its confidential information and to restrain Defendants from threatening other bidders or otherwise refusing to honor the license it granted.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs prays for relief and judgment as follows:

(A)     Awarding actual damages in an amount to be determined at trial;

(B)     Awarding exemplary damages;

(D)     Awarding costs of suit;

(E)     Awarding prejudgment and post-judgment interest;

(F)     Awarding replevin of the data stolen by Defendants;

(G)     Awarding the requested declarations;

(H)     Awarding preliminary and permanent injunctive relief against the use of the misappropriated data; and

(I)     For such other and further relief as the Court may deem just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand a trial by jury on all issues so triable of right.

Dated: November 10, 2022

Respectfully submitted,

STEPTOE & JOHNSON LLP


By: /s/ Robert W. Mockler
Robert W. Mockler
Joseph M. Sanderson
1114 Avenue of the Americas
New York, NY 10036
rmockler@steptoe.com
josanderson@steptoe.com
(212) 506-3900

-and-

Thomas Watson (pro hac vice to be filed)
633 West Fifth Street, Suite 1900
Los Angeles, CA 90071
twatson@steptoe.com
(213) 439-9417

Counsel for Plaintiffs AVANGRID
NETWORKS, INC.; and AVANGRID
SERVICE COMPANY