UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
======================================

AVANGRID NETWORKS, INC; and
AVANGRID SERVICE COMPANY;
                              Plaintiffs,

                                                Docket: 22-CIV-09622 (AT)

                -against-

                                                **AMENDED ANSWER WITH
                                                AFFIRMATIVE DEFENSES
                                                AND COUNTERCLAIMS**

SECURITY LIMITS, INC.[1] and PAULO SILVA.
                              Defendants.
======================================

The defendants, Security Limits Inc., and Paulo Silva, (hereinafter, "SLI" and "Silva",

respectively) responding to the plaintiffs' complaint, through their attorneys, The Law Offices of

Edward J. Troy respectfully states as follows:

### NATURE OF THE ACTION[2]

1.  Deny those allegations contained in paragraph 1 of the plaintiffs' complaint, except admit

    SLI was a former subcontractor to UTI and SLI'S principal is Paulo Silva.

2.  Deny those allegations contained in paragraph 2 of the plaintiffs' complaint.

3.  Deny those allegations contained in paragraph 3 of the plaintiffs' complaint.

4.  Deny those allegations contained in paragraph 4 of the plaintiffs' complaint.

### PARTIES

5.  Deny knowledge or information sufficient to form a belief as to those allegations

    contained in paragraph 5 of the plaintiffs' complaint.

6.  Deny knowledge or information sufficient to form a belief as to those allegations

    contained in paragraph 6 of the plaintiffs' complaint.

7.  Deny those allegations contained in paragraph 7 of the plaintiffs' complaint.

8.  Deny those allegations contained in paragraph 8 of the plaintiffs' complaint, except admit

    that SLI's agent for service of process listed with the New York State Department of State

---

[1] The name on file with New York's Department of State does not include a comma.

[Type here]

was located at 954 Lexington Avenue, New York, NY.

9.  Deny those allegations contained in paragraph 9 of the plaintiffs' complaint, except admit that Paulo Silva is a citizen of the Commonwealth of Pennsylvania.

## JURISDICTION AND VENUE

10. Deny knowledge or information sufficient to form a belief as to those allegations contained in paragraph 10 of the plaintiffs' complaint and respectfully refer all questions of law to the Court.

11. Deny those allegations contained in paragraph 11 of the plaintiffs' complaint, except admit

that this Court has personal jurisdiction over the defendant SLI because it was incorporated in New York.

12. Deny those allegations contained in paragraph 12 of the plaintiffs' complaint, except admit

that this Court has personal jurisdiction over the defendant Silva since he transacts business in the State of New York.

13. Deny those allegations contained in paragraph 13 of the plaintiffs' complaint.

14. Deny those allegations contained in paragraph 14 of the plaintiffs' complaint, except admit

that Mr. Silva is a resident in the State of Pennsylvania and signed the SLI-UTI contract in that state.

15. Deny those allegations contained in paragraph 15 of the plaintiffs' complaint, except admit

that Silva had SLI file and withdraw a complaint in the Southern District of New York with the intent to refile once the New Mexico litigation was concluded

2

[Type here]

16. Admit those allegations contained in paragraph 16 of the plaintiffs' complaint.

## **GENERAL ALLEGATIONS**

17. Admit those allegations contained in paragraph 17 of the plaintiffs' complaint, but state

that SLI and Mr. Silva operated as the design and engineering company without a

contract..

18. Admit those allegations contained in paragraph 18 of the plaintiffs' complaint.

19. Admit those allegations contained in paragraph 19 of the plaintiffs' complaint.

20. Admit those allegations contained in paragraph 20 of the plaintiffs' complaint and state

UTI's acknowledgement that Contractor exclusively owns all intellectual property rights in

the work it has already performed for the Owner; under Security Limits Inc.'s SEC20.001-

U.S. Provisional Patent Application No. 62/818,390 entitled "Integrated Secure Platform-

Filed in USPTO. (a.k.a. ASD Runbook). UTI further acknowledged that it did not receive

any license or rights to such intellectual property under this Agreement or otherwise as a

result of Contractors prior involvement with Owner.

21. Deny those allegations contained in paragraph 21 of the plaintiffs' complaint.

22. Admit those allegations contained in paragraph 22 of the plaintiffs' complaint.

23. Deny knowledge or information sufficient to form a belief as to those allegations
    contained

in paragraph 23 of the plaintiffs' complaint.

24. Deny those allegations contained in paragraph 24 of the plaintiffs' complaint, except
    admit

that the "relationship between SLI and Avangrid began to deteriorate".

[Type here]

25. Deny knowledge or information sufficient to form a belief as to those allegations contained

in paragraph 25 of the plaintiffs' complaint, except admit that the defendants hoped to

secure a contract as part of "Phase 2".

26. Deny those allegations contained in paragraph 26 of the plaintiffs' complaint (including the

footnote) except admit that SLI did bid on the Phase 2 work.

27. Deny those allegations contained in paragraph 27 of the plaintiffs' complaint.

28. Deny knowledge or information sufficient to form a belief as to those allegations contained

in paragraph 28 of the plaintiffs' complaint.

29. Deny those allegations contained in paragraph 29 of the plaintiffs' complaint, except admit
that defendants made multiple tenders to return the referenced data, which were denied.

[Type here]

I also note that Avangrid still has not provided SLI with an address for the return of approximately 150 GB of sensitive Avangrid data left on the ICTPrivateCloud.com data repository following the conclusion of Phase I. This is a separate email repository created for the management of operations of a PUC approved rate-case program. SLI has made several requests from UTI and Avangrid for information needed to return this data repository. As explained in my January 29, 2021 letter, the data does not belong to SLI, it belongs to Avangrid and must be retained in accordance with corporate records management requirements for the performance of a rate-case program. It is our understanding that proper safekeeping of this data is required by federal and regulatory recordkeeping requirements and UTI's contract with Avangrid. SLI has incurred significant expenses to preserve and keep this information as required on behalf of Avangrid and requires prompt reimbursement.

Finally, please find attached a copy of the litigation hold memorandum referenced in my February 19, 2021 letter. We look forward to promptly receiving a detailed response.

Jack Griem.

John M. Griem, Jr., Esq.
**Carter Ledyard & Milburn LLP**
2 Wall Street | New York, NY 10005
Direct 212.238.8659 | Fax 212.732.3232
griem@clm.com | www.clm.com

**Keeping You Informed** | COVID-19 Resource Center

---

**From:** Rosenbloom, Jeffrey <jeffrey.rosenbloom@avangrid.com>
**Sent:** Friday, February 26, 2021 10:06 AM
**To:** Griem, Jack <Griem@clm.com>
**Subject:** Attachment

Please see the attached letter.



30. Deny knowledge or information sufficient to form a belief as to those allegations contained

in paragraph 30 of the plaintiffs' complaint.

31. Deny those allegations contained in paragraph 31 of the plaintiffs' complaint.

32. Deny knowledge or information sufficient to form a belief as to those allegations contained

in paragraph 32 of the plaintiffs' complaint.

33. Deny knowledge or information sufficient to form a belief as to those allegations contained

[Type here]

in paragraph 33 of the plaintiffs' complaint.

34. Deny knowledge or information sufficient to form a belief as to those allegations contained

in paragraph 34 of the plaintiffs' complaint.

35. Deny knowledge or information sufficient to form a belief as to those allegations contained

in paragraph 35 of the plaintiffs' complaint, except admit that defendants had retained

counsel by the date in question.

36. Deny knowledge or information sufficient to form a belief as to those allegations contained

in paragraph 36 of the plaintiffs' complaint.

37. Deny those allegations contained in paragraph 37 of the plaintiffs' complaint, Additionally,

as determined by the New Mexico State Appels Court, Judge's opinion: Avangrid fails to

satisfy the heightened pleading standard, which requires "more than conclusory allegations

in the complaint." Avangrid's #37 cursorily describes the public comments that Silva –

Avangrid does not attach to the complaint the summary of the comments referenced in the

email, nor does the complaint describe the content of that summary.

38. Deny those allegations contained in paragraph 38 of the plaintiffs' complaint.

39. Deny those allegations contained in paragraph 39 of the plaintiffs' complaint, except admit

that the defendants did possess information regarding plaintiffs which would be of interest

to public utility commissions in several states.

40. Deny knowledge or information sufficient to form a belief as to those allegations

contained in paragraph 40 of the plaintiffs' complaint, except admit that defendants filed an

[Type here]

action in the S.D.N.Y., that was voluntarily dismissed that case before service of process on the instant plaintiffs.

41. Deny knowledge or information sufficient to form a belief as to those allegations contained

in paragraph 41 (including the footnote) of the plaintiffs' complaint., except admit that defendant Silva was being solicited for information regarding Avangrid by the investigator retained by the public service commission in Maine and admit that Mr. Silva did appear before the New Mexico Public Regulation Commission. While plaintiffs confirm that the New Mexico District Court did dismiss Avangrid's suit, against the same defendants as herein, under the special motion procedures of the New Mexico Anti-SLAPP (Strategic Litigation Against Public Participation) Law. The District Court also awarded SLI and Sliva attorney fees. Furthermore, on December 16, 2024, the New Mexico Court of Appeals unanimously affirmed the District Court's judgment of dismissal and the award of fees. Finally, the New Mexico Supreme Court denied plaintiffs' writ for certiorari, remanding the matter to the Court of Appeals to calculate costs and fees.

42. Deny knowledge or information sufficient to form a belief as to those allegations contained

in paragraph 42 of the plaintiffs' complaint, except admit that any statements made by Mr. Silva at the NMPRC were found by the New Mexico courts to be "not objectively baseless." The New Mexico decisions are annexed hereto for ease of reference.

43. Deny knowledge or information sufficient to form a belief as to those allegations contained

in paragraph 43 of the plaintiffs' complaint, except admit that the information supplied by Mr. Silva to the New Mexico regulatory commission was found not to be "objectively baseless" and formed the partial basis for the NMPRC's decision to prohibit Avangrid from

[Type here]

consummating an $8.5 billion merger with New Mexico's energy company. Additionally, defendants admit that the New Mexico courts found Mr. Silva's participation was protected speech under the New Mexico anti-SLAPP law. On January 9, 2025, the New Mexico Supreme Court, on a Writ for Mandamus, denied Avangrid's request that the NMPRC's determination to withhold its consent to the merger be stricken.

44. Deny knowledge or information sufficient to form a belief as to those allegations contained

in paragraph 44 of the plaintiffs' complaint, except admit that the information supplied by Mr. Silva to the New Mexico regulatory commission was found not to be "objectively baseless" and formed the partial basis for the NMPRC's decision to prohibit Avangrid from consummating an $8.5 billion merger with New Mexico's energy company. Additionally, defendants admit that the New Mexico courts found Mr. Silva's participation was protected speech under the New Mexico anti-SLAPP law.

45. Deny knowledge or information sufficient to form a belief as to those allegations contained

in paragraph 45 of the plaintiffs' complaint, except admit that the information supplied by Mr. Silva to the New Mexico regulatory commission was found not to be "objectively baseless" and formed the partial basis for the NMPRC's decision to prohibit Avangrid from consummating an $8.5 billion merger with New Mexico's energy company. Additionally, defendants admit that the New Mexico courts found Mr. Silva's participation was protected speech under the New Mexico anti-SLAPP law.

46. Deny those allegations contained in paragraph 46 of the plaintiffs' complaint

47. Deny those allegations contained in paragraph 47 of the plaintiffs' complaint, except admit

[Type here]

that the last bullet point Cipher admits in writing working in collusion with Avangrid. (e.g. "while we show Avangrid/Iberdrola that we are progressively reducing Paulo dependency and taking control." And that the information supplied by Mr. Silva to the New Mexico regulatory commission was found not to be "objectively baseless" and formed the partial - basis for the NMPRC's decision to prohibit Avangrid from consummating an $8.5 billion merger with New Mexico's energy company. Additionally, defendants admit that the New Mexico courts found Mr. Silva's participation was protected speech under the New Mexico anti-SLAPP law.



B

**Menu**

**Next Steps:**

1.   Out of the 3 scenarios, we focus (initially) in **"Plan A" (Subcontract Scenario)**. Leaving "Plan B" (Joint Venture "LLC" Scenario) and "Plan C" (M&A Scenario) as potential future alternatives. "Plan A" give us the ability to comply w/ current tender.
      a.   Action: Need to build an **argument document and Q&A** that supports the rationale behind "Plan A" (Subcontract Scenario) and that we all can use in a coordinated way internally and more important w/ Avangrid and Iberdrola. Focus in the positive reasons behind it. **Owner: Andre (w/ Legal and Troy)**

2.   MoU - **APPENDIX A - SCOPE OF SERVICES ALLOCATION:** Not sure if best approach is an allocation based in % of services and instead based in the type of services. We should be able to **show a ramp-up and ramp-down of Paulo in the project.** That way we "lock" Paulo to the project (till the end) while we show Avangrid/Iberdrola that we are progressively reducing Paulo dependency and taking control.
      a.   Action: **Analyze type of services (Presales analysis) and optimal allocation** based in Cipher services current capabilities (day 1) and "SL". Progressive transition till a % that we feel comfortable. **Owner: Troy**

48.  Deny those allegations contained in paragraph 48 of the plaintiffs' complaint, except admit

that the information supplied by Mr. Silva to the New Mexico regulatory commission was found not to be "objectively baseless" and formed the partial basis for the NMPRC's decision to prohibit Avangrid from consummating an $8.5 billion merger with New Mexico's energy company. Additionally, defendants admit that the New Mexico courts found Mr. Silva's participation was protected speech under the New Mexico anti-SLAPP

[Type here]

law. Furthermore, the defendant did cooperate with the investigator in Maine, who

declared that Mr. Silva was not seeking any money if the investigation resulted in a *qui tam*

suit. A copy of the Maine regulator's report is annexed hereto for ease of reference.

49.  Deny those allegations contained in paragraph 49 of the plaintiffs' complaint.

## ANSWERING COUNT I OF THE PLAINTIFFS' COMPLAINT

50. As to those allegations contained in paragraph 50 of the plaintiffs' complaint, the

defendants repeat the answers to those allegations contained in paragraphs 1 through 49

with the same force and effect as if more fully set out herein.

51.  Deny those allegations contained in paragraph 51 of the plaintiffs' complaint, except admit

that SLI contracted with UTI, a necessary non-party.

52. Deny those allegations contained in paragraph 52 of the plaintiffs' complaint and

respectfully refer all questions of law to the Court.

53. Deny those allegations contained in paragraph 53 of the plaintiffs' complaint and

respectfully refer all questions of law to the Court.

54. Deny knowledge or information sufficient to form a belief as to those allegations contained

in paragraph 54 of the plaintiffs' complaint and respectfully refer all questions of law to the

Court.

55. Deny knowledge or information sufficient to form a belief as to those allegations contained

in paragraph 54 of the plaintiffs' complaint and respectfully refer all questions of law to the

Court.

[Type here]

56. Deny knowledge or information sufficient to form a belief as to those allegations contained

in paragraph 56 of the plaintiffs' complaint and respectfully refer all questions of law to the

Court.

57. Deny knowledge or information sufficient to form a belief as to those allegations contained

in paragraph 57 of the plaintiffs' complaint and respectfully refer all questions of law to the

Court.

58. Deny those allegations contained in paragraph 58 of the plaintiffs' complaint.

59. Deny those allegations contained in paragraph 59 of the plaintiffs' complaint.

60. Deny knowledge or information sufficient to form a belief as to those allegations contained

in paragraph 60 of the plaintiffs' complaint and respectfully refer all questions of law to the

Court.

61. Deny knowledge or information sufficient to form a belief as to those allegations contained

in paragraph 61 of the plaintiffs' complaint and respectfully refer all questions of law to the

Court.

62. Deny knowledge or information sufficient to form a belief as to those allegations contained

in paragraph 62 of the plaintiffs' complaint and respectfully refer all questions of law to the

Court.

63. Deny those allegations contained in paragraph 63 of the plaintiffs' complaint.

64. Deny knowledge or information sufficient to form a belief as to those allegations contained

in paragraph 64 of the plaintiffs' complaint except state that all relevant material was

[Type here]

repeatedly offered to the plaintiffs with a request for delivery instructions, and further state

that all material has been returned.

65. Deny knowledge or information sufficient to form a belief as to those allegations
    contained

in paragraph 65 of the plaintiffs' complaint except state that all relevant material was

repeatedly offered to the plaintiffs with a request for delivery instructions, and further state

that all material has been returned.

66. Deny knowledge or information sufficient to form a belief as to those allegations
    contained

in paragraph 66 of the plaintiffs' complaint except admit that there was never a contract

between plaintiffs and defendants, which defendants contracted with UTI, rendering UTI a

necessary and indispensable party.

67. Deny those allegations contained in paragraph 67 of the plaintiffs' complaint.

68. Deny knowledge or information sufficient to form a belief as to those allegations
    contained

in paragraph 68 of the plaintiffs' complaint.

69. Deny those allegations contained in paragraph 69 of the plaintiffs' complaint.

70. Deny those allegations contained in paragraph 70 of the plaintiffs' complaint.

71. Deny those allegations contained in paragraph 71 of the plaintiffs' complaint.

72. Deny those allegations contained in paragraph 72 of the plaintiffs' complaint except
    admit

that, since the information was returned, the issue of future injunctive relief is moot.

## ANSWERING COUNT II OF THE PLAINTIFFS' COMPLAINT

73. As to those allegations contained in paragraph 73 of the plaintiffs' complaint, the

[Type here]

defendants repeat the answers to those allegations contained in paragraphs 1 through 72

with the same force and effect as if more fully set out herein.

74. Deny those allegations contained in paragraph 74 of the plaintiffs' complaint, except
admit

that plaintiff had a contract with UTI and that "[p]laintiffs are entitled to enforce the

contract against UTI".

75. Deny those allegations contained in paragraph 75 of the plaintiffs' complaint and

respectfully refer all questions of law, including the question of Plaintiffs' standing, to the

Court.

76. Deny those allegations contained in paragraph 76 of the plaintiffs' complaint, except
admit

that plaintiff had a contract with UTI and that UTI is a necessary and indispensable party to

this suit.

77. Deny those allegations contained in paragraph 77 of the plaintiffs' complaint, except
admit

that plaintiff had a contract with UTI and that UTI is a necessary and indispensable party to

this suit.

78. Deny those allegations contained in paragraph 78 of the plaintiffs' complaint except
admit

that, since the information was returned, the issue of future injunctive relief is moot.

## ANSWERING COUNT III OF THE PLAINTIFFS' COMPLAINT

79. As to those allegations contained in paragraph 79 of the plaintiffs' complaint, the

defendants repeat the answers to those allegations contained in paragraphs 1 through 78

with the same force and effect as if more fully set out herein.

13

[Type here]

80. Deny those allegations contained in paragraph 80 of the plaintiffs' complaint, except admit

that defendants had a contract with UTI (not Avangrid) and that UTI is a necessary and

indispensable party to this suit.

81. Deny those allegations contained in paragraph 81 of the plaintiffs' complaint.

82. Deny those allegations contained in paragraph 82 of the plaintiffs' complaint.

83. Deny those allegations contained in paragraph 83 of the plaintiffs' complaint.

84. Deny those allegations contained in paragraph 84 of the plaintiffs' complaint.

85. Deny those allegations contained in paragraph 85 of the plaintiffs' complaint.

### ANSWERING COUNT IV OF THE PLAINTIFFS' COMPLAINT

86. As to those allegations contained in paragraph 86 of the plaintiffs' complaint, the

defendants repeat the answers to those allegations contained in paragraphs 1 through 85

with the same force and effect as if more fully set out herein.

87. Deny those allegations contained in paragraph 87 of the plaintiffs' complaint and

respectfully submit that all materials were previously returned to plaintiffs.

88. Deny those allegations contained in paragraph 88 of the plaintiffs' complaint and

respectfully submit that all materials were previously returned to plaintiffs.

89. Deny those allegations contained in paragraph 89 of the plaintiffs' complaint and

respectfully submit that all materials were previously returned to plaintiffs.

90. Deny those allegations contained in paragraph 90 of the plaintiffs' complaint and

respectfully submit that all materials were previously returned to plaintiffs.

91. Deny those allegations contained in paragraph 91 of the plaintiffs' complaint and

respectfully submit that all materials were previously returned to plaintiffs, rendering this

claim moot.

[Type here]

## ANSWERING COUNT V OF THE PLAINTIFFS' COMPLAINT

92. As to those allegations contained in paragraph 92 of the plaintiffs' complaint, the defendants repeat the answers to those allegations contained in paragraphs 1 through 91 with the same force and effect as if more fully set out herein.

93. Deny those allegations contained in paragraph 93 of the plaintiffs' complaint and respectfully submit that all materials were previously returned to plaintiffs, rendering this claim moot.

94. Deny those allegations contained in paragraph 94 of the plaintiffs' complaint and respectfully submit that all materials were previously returned to plaintiffs, rendering this claim moot.

95. Deny those allegations contained in paragraph 95 of the plaintiffs' complaint and respectfully submit that all materials were previously returned to plaintiffs, rendering this claim moot.

## ANSWERING COUNT VI OF THE PLAINTIFFS' COMPLAINT

96. As to those allegations contained in paragraph 96 of the plaintiffs' complaint, the defendants repeat the answers to those allegations contained in paragraphs 1 through 95 with the same force and effect as if more fully set out herein.

97. Deny those allegations contained in paragraph 97 of the plaintiffs' complaint.

98. Deny those allegations contained in paragraph 98 of the plaintiffs' complaint.

99. Deny those allegations contained in paragraph 99 of the plaintiffs' complaint.

## ANSWERING COUNT VII OF THE PLAINTIFFS' COMPLAINT

[Type here]

100.    As to those allegations contained in paragraph 100 of the plaintiffs' complaint, the

defendants repeat the answers to those allegations contained in paragraphs 1 through 99

with the same force and effect as if more fully set out herein.

101.    Deny those allegations contained in paragraph 101 of the plaintiffs' complaint.

102.    Deny those allegations contained in paragraph 102 of the plaintiffs' complaint and

refer all questions of law to the Court.

103.    Deny those allegations contained in paragraph 103 of the plaintiffs' complaint and

refer all questions of law to the Court.

104.    Deny those allegations contained in paragraph 104 of the plaintiffs' complaint and

refer all questions of law to the Court.

105.    Deny those allegations contained in paragraph 105 of the plaintiffs' complaint and

refer all questions of law to the Court.

106.    Deny those allegations contained in paragraph 106 of the plaintiffs' complaint and

refer all questions of law to the Court.

107.    Deny those allegations contained in paragraph 107 of the plaintiffs' complaint and

refer all questions of law to the Court.

108.    Deny those allegations contained in paragraph 108 of the plaintiffs' complaint and

refer all questions of law to the Court.

109.    Deny those allegations contained in paragraph 109 of the plaintiffs' complaint and

refer all questions of law to the Court.

## AFFIRMATIVE DEFENSES

## FACTS COMMON TO ALL AFFIRMATIVE DEFENSES

110.    The plaintiffs herein have commenced a suit against the same defendants in the

[Type here]

District Court of the State of New Mexico, entitled *AVANGRID, INC. v. Security Limits, Inc. and Paulo Silva*, D-101-CV-2021-02544

111.    That New Mexico state court action arises out of the same transactions being raised in this action.

112.    The plaintiff in the New Mexico action complained about the same allegedly improper conduct by the defendants herein.

113.    The District Court of the State of New Mexico dismissed Avangrid's action with prejudice and without leave to replead in an amended complaint in New Mexico, finding that the public comments made by Mr. Silva were protected under the New Mexico Anti-SLAPP statute.

114.    The Court, having found Avangrid's suit to be Specific Litigation Against Public Participation (a SLAAP suit) gave SLI and Silva a expedited motion schedule.

115.    After reading the papers and hearing oral arguments, the New Mexico District Court found that Mr. Silva's comments were not actionable.

116.    Rather, the New Mexico District Court found the Mr. Silva's comments were protected under the *Noerr- Pennington* doctrine.

117.    Having dismissed the Avangrid suit, the District Court of New Mexico issued a judgment with an award of attorney fees to SLI and Silva.

118.    The Avangrid plaintiffs sought appellate review in the New Mexico Court of Appeals. Both parties briefed the issues and requested an oral argument.

119.    On December 16, 2024, the New Mexico Court of Appeals affirmed the District Court's associated with SLI's and Silva's successful defense of the appeal. Subsequently,

[Type here]

the New Mexico Supreme Court denied plaintiffs' writ for certiorari.

## AS AND FOR A FIRST AFFIRMATIVE DEFENSE

120.    The plaintiff's complaint against the defendants must be dismissed under numerous preclusive rules, including *res judicata,* collateral estopple, issue preclusion, or claim preclusion.

121.    The factual issues allegedly supporting plaintiffs' claims herein have been resolved in favor of SLI and Silva in an earlier action before a Court of competent jurisdiction. Under the Full Faith and Credit Clause of the United States' Constitution, this Court should uphold the resolution of the New Mexico Courts

## AS AND FOR A SECOND AFFIRMATIVE DEFENSE

122.    Under the Colorado River doctrine, the Rooker- Feldman doctrine, and the abstention doctrine, this Court may not exercise subject matter jurisdiction over the issues previously decided in New Mexico.

123.    Under the Colorado River doctrine, the Rooker- Feldman doctrine, and the abstention doctrine, this Court should not exercise subject matter jurisdiction over the issues previously decided in New Mexico.

124.    Under the Colorado River doctrine, the Rooker- Feldman doctrine, and the abstention doctrine, this Court should not exercise subject matter jurisdiction over any issues or disputes between the instant parties that should or could have been raised in the New Mexico litigation.

## AS AND FOR A THIRD AFFIRMATIVE DEFENSE

125.    As alleged in the complaint, and as known by all interested parties, Silva always

[Type here]

acted as a disclosed principal of SLI and may not be held personally liable for any alleged

breach of contract by SLI.

126.    Silva was never a third-party beneficiary of any designated contract.

127.    Silva was never a personal signatory of any contract(s) designated in the complaint.

128.    Silva never provided any personal guaranty on any contract designated in the

complaint.

129.    Based on these facts, Silva is an improper party to this litigation.

## AS AND FOR A FOURTH AFFIRMATIVE DEFENSE

130.    The third count of plaintiffs' complaint which alleges that Silva committed tortious

interference by allegedly causing his own company SLI to breach a contract fails to state a

cause of action for which relief can be granted.

## AS AND FOR A FIFTH AFFIRMATIVE ACTION

131.    The third count of plaintiff's complaint must be dismissed as time barred.

132.    The statute of limitations in New York for tortious interference with contract is

three (3) years.

133.    Plaintiffs allege that their relationship with the defendants ended in September

2019.

134.    That would be the date, one assumes, on or before which the contract was being

tortiously interfered.

135.    The complaint in this action was filed on November 11, 2022, beyond the three-

year limit.

## AS AND FOR A SIXTH AFFIRMATIVE DEFENSE

136.    Plaintiffs concede in their complaint that the defendant SLI entered into a contract

[Type here]

with UTI.

137.    UTI is not a party to this action, which alleges a breach of that contract.

138.    Plaintiffs were not signatories to the subject contract.

139.    As a party to the contract, UTI must be named as a party to this action.

140.    In the absence of UTI, this action may not proceed, UTI being a necessary and

indispensable party to this litigation.

### AS AND FOR A SEVENTH AFFIRMATIVE DEFENSE

141.    By failing to join UTI as a party plaintiff to this breach of contract action, the

action must be dismissed for failure to join a necessary and indispensable party.

142.    However, if UTI is joined as a plaintiff in this suit, complete diversity is destroyed

as UTI and Silva are both citizens of Pennsylvania.

143.    In the absence of complete diversity, this Court would lack jurisdiction to hear this
matter.

### AS AND FOR AN EIGHTH AFFIRMATIVE DEFENSE

144.    Count IV of the plaintiffs' complaint seeks damages for *prima facie* tort.

145.    New York law requires that a party alleging *prima facie* tort must allege that the

defendant acted with malicious intent or disinterested malevolence as the defendant's sole

motivation.

146.    The plaintiff's complaint makes no such allegations and has failed to plead the

elements of the claim.

147.    The plaintiffs' complaint has failed to plead any factual allegations to support the

claim contained in Count VI.

148.    Count VI of the plaintiffs' complaint must be dismissed.

[Type here]

[THE BALANCE OF THIS PAGE WAS INTENTIONALLY LEFT BLANK]

[Type here]

## COUNTERCLAIMS

149.    Counterclaimants, SLI and SILVA, as and for their countercomplaint against AVANGRID, INC. and AVANGRID NETWORK, INC. (hereinafter "AVANGRID" and "NETWORK", respectively, and "AVANGRID PARTIES" or "UTILITIES", collectively) allege as follows:

## INTRODUCTION

150.    In the United States, through the use of permissive grants of monopoly control to private companies in various markets, allows electrical power to be distributed throughout the county by use of electric grid. The grid contains electric currents that can be generated by hydroelectric plants, wind powered generators, Solar paneled farms, coal fired plants, other fossil fuel (LNG) plants, and nuclear plants. (There are 54 commercially operated nuclear plants with 94 nuclear reactors, located in 28 states, that provide 20% of the nation's electricity. See, U.S. ENERGY INFORMATION ADMINISTRATION, *ENERGY REVIEW, 2023*)

151.    An electrical grid is an interconnected network for electricity delivery from producers to consumers. Electrical grids consist of power generation stations, electrical substations to step voltage up or down, electric power transmission to carry power over long distances, and finally electric power distribution to customers.

152.    On or about April 16, 2013, the first confirmed report of a "ballistic" (bullet) attack was reported against an electric substation. Each year the number of assaults or acts of vandalism increased. In November 2022 there were physical attacks on several substations

22

[Type here]

in the Pacific Northwest. On December 3, 2022, confirmed ballistic attacks on substations in Monroe County, NC resulted in substantial damage. The damage left 45,000 electric outages. The 45,000 electric outages may have had a greater impact since one unit with one meter may have 4 residents.

153.    With the growing awareness of the vulnerability, in order to protect the electric grid and to provide reasonable assurance that customers would not suffer outages, United States Department of Energy and the Cybersecurity and Infrastructure Security Agency directed that steps be taken to improve security at the various facilities that supply the electric grid.

154.    The actual physical facilities are generally owned and operated by private entities ("public utilities") on a licensed monopoly plan. To protect consumers and to comply with industry security protocols, the monopoly entities are regulated by Public Service Commissions ("PSC") or Public Utilities Commissions (PSC) in each of the various states. The PSCs are directed to ensure a safe and reliable energy supply, by permitting the setting of the rates that the public utilities may charge their customers. The rates are calculated and controlled by guaranteed returns on capital expenditures (CAPEX) and depreciation and "cost plus" guaranteed returns on operating expenses (OPEX).

155.    This countercomplaint alleges that the named defendants engaged in a course of conduct, across multiple states, to improperly and illegally increase CAPEX and OPEX through a continuous course of conduct that included, but were not limited to, the filing of false proxy statements, the filing of fraudulent insurance claims, charging multiple PSCs with the costs associated with one expenditure, theft of trade secrets and corporate espionage.

156.    Each of these acts were done to obtain the results of a concerted effort to illegally and improperly increase the profits earned by the common actors.

[Type here]

## JURISDICTION AND VENUE

157.    Jurisdiction and venue have already been established in the case. SLI and SILVA

are required by Rule 13(b) of the Fed. R. Civ. P. to assert the counterclaims herein as

compulsory counterclaims. The inclusion of a RICO claim grants the Court jurisdiction

over the federal question.

## PARTIES

### COUNTERCLAIMANTS

158.    Security Limits Inc. is a New York corporation having a principal place of business

at 50 Alberigi Drive, Jessup, Pennsylvania.

159.    Paulo Silva is a citizen of the United States and a citizen of the Commonwealth of

Pennsylvania.

## PLAINTIFFS/DEFENDANTS ON COUNTERCLAIMS

160.    Avangrid Networks, Inc. is a New York corporation having a principal place of

business at 89 East Ave, Rochester, New York.

161.    Avangrid, Inc. is a New York corporation having a principal place of business at 80

Marsh Hill Road, Orange, Connecticut.

## TRANSACTIONAL AND RELEVANT PARTIES NOT NAMED IN SUIT

162.    Iberdrola, S.A. is a utility conglomerate incorporated under the laws of the

Kingdom of Spain, with headquarters in Bilbao, Spain.

163.    In September 2008, Iberdrola acquired the U.S. utility holding company Energy

East Corporation ("Energy East") in an all-cash transaction. The *pro forma* company was

reorganized as Iberdrola USA.

164.    In 2015, Iberdrola (through Iberdrola USA) acquired UIL Holdings Corp. ("UIL")

[Type here]

in a mixed cash and stock transaction. After the transaction closed, the combined company was renamed Avangrid, and UIL shareholders maintained an 18.5% minority interest in the company. That *pro forma* company was renamed Avangrid, Inc.

165.    Subsequently, Iberdrola secured ownership of the remaining 18.5% minority interest in Avangrid by purchase of those shares.

166.    During the negotiations between Iberdrola and Avangrid, Avangrid named a three person "Unaffiliated Committee" to protect the interest of the shareholders of Avangrid stock. The committee was to be a fiduciary for the shareholders to assure the selling shareholders that they were receiving the best offer for the sale of their shares.

167.    John Balducci was Governor of Maine from 2003 to 2011, and was named as a member of the Unaffiliated Committee.

168.    Another member of the Unaffiliated Committee was Robert Duffy, the former Lieutenant Governor of New York between 2011 to 2014.

169.    The third member of the committee was Patricia Jacobs, a former congressional aide to Senator Edward Markey, D-MA.

170.    There were also several individuals who worked for IBERDROLA, AVANGRID, or subsidiaries of these companies. Some such individuals are David Lathrop, John Allen, Henrique Victorero, and José Manuel Villarejo.

## FACTUAL ALLEGATION

### AVANGRID'S FALSE
### AND MISLEADING PROXY

171.    The procurement of total control over AVANGRID was accomplished by the acts of the culpable persons AVANGRID and IBERDROLA in the naming and negotiation with the "unaffiliated committee", a deliberate misnomer.

25

[Type here]

172.    Through these negotiations by nondisclosed insiders, the enterprise was able to secure 100% ownership of power facilities in multiple states, which were engaged in interstate commerce through the purchase of electricity from the grid.

173.    The improper use of the committee as proxy was a violation of section 14a of the Security Exchange Act of 1934. However, it was just the continuation of the enterprise's activities to abuse the oversight of the various PSC and the SEC (activities involved in providing electrical power at a reasonable price.) *see 17 CFR Part 250*

174.    The Board's Vice Chairman was Baldacci, who Avangrid claimed was independent during the Buyout but was explicitly identified by Avangrid in its annual proxy statements as *non*-independent until 2022. Those statements were false:

[THE BALANCE OF THIS PAGE WAS INTENTIONALLY LEFT BLANK]

[CONTENT CONTINUES ON NEXT PAGE]

[Type here]

## STATEMENT 1



### John Baldacci
Director since 2014
*Vice Chair of the Board*
*Standing NECEC Committee Chair*
*Unaffiliated Committee*

Mr. Baldacci, 70, served as Senior Advisor for Economic Development & Government Relations at Pierce Atwood LLP from 2012 until May 2021. Mr. Baldacci served as the 73rd Governor of the State of Maine from 2003 until 2011. He previously served as Director of the U.S. Department of Defense's Military Health Care Reform Initiative from 2011 to 2012, and U.S. Representative for Maine's 2nd Congressional District from 1995 to 2003. Mr. Baldacci earned a B.A. in History from the University of Maine at Orono.

Among other qualifications, Mr. Baldacci brings senior leadership experience to the Board, including his service as the Governor of the State of Maine, along with extensive experience in economic development and government relations.

Selected directorships and memberships
Board of Directors, Jobs for America's Graduates

## STATEMENT 2

## Unaffiliated Committee

The Unaffiliated Committee was established in accordance with the shareholder agreement, dated December 15, 2015, between Avangrid and Iberdrola, (the "Shareholder Agreement") and, among other things, is responsible for reviewing and approving all transactions entered into between the Company and Iberdrola, or its affiliates, and ensuring that such transactions are entered into on an arms' length basis. The Unaffiliated Committee operates under a written charter adopted by the board, which is available on the Company's website at www.avangrid.com. Ms. Jacobs and Mr. Baldacci currently serve on, and during 2023, served on the Unaffiliated Committee, with Mr. Duffy serving as the chair. The Unaffiliated Committee is comprised solely of "independent" directors. The Unaffiliated Committee held six meetings during 2023, with each of the committee members attending all of the meetings.

## STATEMENT 3

## Interests of Avangrid's Directors and Executive Officers in the Merger

In considering the recommendation of the Board that you vote to adopt the Merger Agreement, you should be aware that aside from their interests as shareholders of Avangrid, Avangrid's directors and executive officers have interests in the Merger that may be different from, or in addition to, those of other shareholders of Avangrid generally. The members of the Unaffiliated Committee were aware of and considered these interests, among other matters, in evaluating and negotiating the Merger Agreement and the Merger, and in making it recommendations to the Board, which was also aware of and took into account these interests, among other matters, when making its recommendation to the shareholders of Avangrid that the Merger Agreement be adopted. See "*Special Factors—Background of the Merger*" beginning on page 43, "*Special Factors—Reasons for the Merger; Recommendation of the Unaffiliated Committee; Fairness of the Merger*" beginning on page 63 and "*Special Factors—Recommendation of the Board*" beginning on page 71.

[Type here]

## STATEMENT 4
## Interests of Avangrid's Directors and Executive Officers in the Merger

In considering the recommendation of the Board that you vote to adopt the Merger Agreement, you should be aware that aside from their interests as shareholders of Avangrid, Avangrid's directors and executive officers have interests in the Merger that may be different from, or in addition to, those of other shareholders of Avangrid generally. The members of the Unaffiliated Committee were aware of and considered these interests, among other matters, in evaluating and negotiating the Merger Agreement and the Merger, and in making it recommendations to the Board, which was also aware of and took into account these interests, among other matters, when making its recommendation to the shareholders of Avangrid that the Merger Agreement be adopted. See "*Special Factors—Background of the Merger*" beginning on page 43, "*Special Factors—Reasons for the Merger; Recommendation of the Unaffiliated Committee; Fairness of the Merger*" beginning on page 63 and "*Special Factors—Recommendation of the Board*" beginning on page 71.

## STATEMENT 5
## Director Independence

Due to Avangrid's status as a "controlled company," we rely on certain exemptions from the rules of the NYSE that would otherwise require that our Board be comprised of a majority of "independent" directors as defined under the rules of the NYSE. Avangrid is required to have an "independent" audit committee under the NYSE's listed company requirements. See the section entitled "*Corporate Governance Items—Audit Committee*" for additional information.

The Board has undertaken a review of the independence of each director nominee. Based on this review, the board has determined that each of Mmes. Báñez García, Herbert, Jacobs, and Joseph Varlack and Messrs. Baldacci, Duffy, Lahey, and Solomont do not have a material relationship with the Avangrid group of companies (either directly or as a partner, shareholder, or officer of an organization that has a relationship with the Avangrid group of companies) and that each of these nominees is "independent" under the rules of the NYSE.

## STATEMENT 6

Later on March 6, 2024, the Board held a special meeting via videoconference with all of the members of the Board and Mr. Mahoney in attendance. After discussion, including confirmation that the Unaffiliated Committee members could devote the time and attention to consider the Initial Proposal, and deliberation at the March 6 Board meeting, the Board delegated to the Unaffiliated Committee the full authority of the Board to examine, negotiate and evaluate the terms, conditions and advisability of a transaction involving the Company and Iberdrola or any other strategic transaction, including with a third party, to oversee negotiations of any such transaction, and to determine to elect not to pursue any such transaction. The Board also granted the Unaffiliated Committee the authority to engage, at the Company's expense, its own counsel, financial advisors and such other advisors as the Unaffiliated Committee deemed appropriate, to assist the Unaffiliated Committee in performing its functions. In delegating such authority to the Unaffiliated Committee, each of the members of the Unaffiliated Committee, Mr. Duffy, Governor John Baldacci and Ms. Patricia Jacobs, confirmed, and the Board determined, that each of them was unaffiliated with, and otherwise independent from, Iberdrola, and otherwise had no material interests or relationships that would impede his or her ability to continue to serve on the Unaffiliated Committee. The Board resolutions delegating the Unaffiliated Committee such authority also provided that the Board would not approve any strategic transaction that was not recommended by the Unaffiliated Committee.

[Type here]

## STATEMENT 7

On March 27, 2024, the Unaffiliated Committee held a meeting via videoconference with all members of the Unaffiliated Committee and representatives of Paul, Weiss in attendance. At that meeting, the Unaffiliated Committee and the Paul, Weiss representatives discussed the fiduciary duties of the members of the Unaffiliated Committee under New York law in considering any transaction with Iberdrola or a third party, including the fact that the Initial Proposal stated that any transaction between the Company and Iberdrola would be irrevocably conditioned on the approval of a majority of the issued and outstanding shares of Avangrid Common Stock not held by Iberdrola or its affiliates. Each of the members of the Unaffiliated Committee also confirmed that he or she was unaffiliated with, and otherwise independent from, Iberdrola, and otherwise disinterested with respect to a potential transaction involving Iberdrola. The

## STATEMENT 8

On May 17, 2024, the Unaffiliated Committee held a meeting via videoconference with all of the members of the Unaffiliated Committee, Paul, Weiss representatives and Moelis representatives in attendance. During the meeting, representatives of Paul, Weiss further reviewed with the Unaffiliated Committee the fiduciary duties of directors under New York law in considering any transaction with Iberdrola or a third party. The Unaffiliated Committee's advisors also reviewed with the Unaffiliated Committee the process that the Unaffiliated Committee had conducted to review and evaluate the Initial Proposal. At that meeting, each of the members of the Unaffiliated Committee reconfirmed that he or she was unaffiliated with, and otherwise independent from, Iberdrola, and otherwise disinterested with respect to a potential transaction involving Iberdrola.

## STATEMENT 9

Parent also believes that the transactions contemplated by the Merger Agreement, including the Merger, are procedurally fair to the unaffiliated security holders based on the following factors, which are not listed in any relative order of importance:

- all members of the Unaffiliated Committee during the Company's sale process were and are independent directors and were and are unaffiliated with Parent and none of such Unaffiliated Committee members is an employee of the Company or any of its subsidiaries or affiliates.

## STATEMENT 10



John Baldacci, 70, served as Senior Advisor for Economic Development & Government Relations at Pierce Atwood LLP from 2012 until May 2021. Mr. Baldacci served as the 73rd Governor of the State of Maine from 2003 until 2011. He previously served as Director of the U.S. Department of Defense's Military Health Care Reform Initiative from 2011 to 2012, and U.S. Representative for Maine's 2nd Congressional District from 1995 to 2003. Among other qualifications, Mr. Baldacci brings senior leadership experience to the Board, including his service as the Governor of the State of Maine, along with extensive experience in economic development and government relations.

Selected directorships and memberships: Board of Directors, Jobs for America's Graduates

[Type here]

## STATEMENT 11

**Robust Unaffiliated Committee Process**    

➢ The Unaffiliated Committee is comprised solely of independent and unaffiliated directors
   ○ At the outset of negotiating the proposed transaction, each member of the Unaffiliated Committee confirmed that they are
     unaffiliated with, and independent from, IBE, and disinterested with respect to a potential transaction involving IBE

SEE, *MARC GOLDSCHEIN, etc. v. Avangrid, et al., S.D.N.Y. , Case 1:25-cv-00772-JMF*

175.    The Board's Vice Chairman was Baldacci, who Avangrid claimed was independent

during the Buyout but was explicitly identified by Avangrid in its annual proxy statements as *non-*

*independent* until 2022:

## Director Nominees

| Name | Age | Independent | Director Since | Committee Memberships |
|------|-----|-------------|----------------|------------------------|
| Ignacio S. Galán (Board Chair) | 70 | | 2014 | ● Executive |
| John Baldacci (Board Vice Chair) | 66 | | 2014 | |
| Dennis V. Arriola | 60 | | 2020 | ● Executive |
| Daniel Alcaín Lopéz | 47 | | 2020 | |
| Pedro Azagra Blázquez | 52 | | 2019 | ● Executive |
| Robert Duffy | 66 | ✓ | 2019 | ● Unaffiliated |
| Teresa Herbert | 59 | ✓ | 2019 | ● Audit and Compliance |
| Patricia Jacobs | 57 | ✓ | 2019 | ● Compensation, Nominating and Corporate Governance<br>● Unaffiliated |
| John Lahey | 74 | ✓ | 2015 | ● Compensation, Nominating and Corporate Governance<br>● Executive<br>● Unaffiliated |
| José Ángel Marra Rodríguez | 54 | | 2020 | |
| Santiago Martinez Garrido | 52 | | 2015 | |
| José Sáinz Armada | 61 | | 2014 | ● Compensation, Nominating and Corporate Governance<br>● Executive |
| Alan Solomont | 72 | ✓ | 2014 | ● Audit and Compliance |
| Elizabeth Timm | 67 | ✓ | 2016 | ● Audit and Compliance |

176.    August 20, 2024 and September 6, 2024, Defendants issued the Proxy, which

contained the materially false and omissive statements identified above. By describing

[Type here]

Baldacci's prior professional experience and touting his *purported* disinterestedness, independence, and lack of affiliation with Iberdrola, but omitting any mention of his long-standing ties to Iberdrola, Avangrid's past identification of him as a non-independent director in corporate filings, the challenged statements were materially false or misleading. Indeed, the Proxy left shareholders with the *false* impression that one of the key fiduciaries charged with negotiating on their behalf and protecting their interests was "unaffiliated with, and otherwise independent from, Iberdrola, and otherwise had no material interests or relationships" with Iberdrola. Thus, the following statements contained in the proxy statement are false.

177.    This was false and misleading as Baldacci received over $1.6 million in cash compensation from Avangrid (i.e., Iberdrola) prior to the Buyout. Notably, significant portions of Baldacci's compensation included payments unique to him that meaningfully exceeded compensation paid to other directors. These additional payments were not explained in the Company's proxy for 2015, but were described in later proxies as ostensibly based upon Baldacci's specific role as Vice Chairman (2016-2023) and committee memberships (2023). He was also the highest paid director of the Company for almost all of the below years:

| Year | Annual cash payments for directorship |
|------|---------------------------------------|
| 2023 | $240,000 (including $40,000 Vice Chair retainer and $30,000 for committee memberships) |
| 2022 | $200,000 (including $60,000 Vice Chair retainer) |
| 2021 | $200,000 (including $60,000 Vice Chair retainer) |
| 2020 | $200,000 |

[Type here]

| | |
|---|---|
| | (including $60,000 Vice Chair retainer) |
| 2019 | $200,000 (including $60,000 Vice Chair retainer) |
| 2018 | $200,000 (including $60,000 Vice Chair retainer) |
| 2017 | $200,000 (including $60,000 Vice Chair retainer) |
| 2016 | $150,000 (including $40,000 Vice Chair retainer) |
| 2015 | $100,000 (including $20,000 additional unique payment) |

178.     The Avangrid Utilities permitted the remaining shareholders to be defrauded. A non-disinterested director was appointed to the committee to protect the interests of the minority shareholders. Not only was this fraud on the minority shareholders, but the filing of the proxy statements violated Rules 10(b), 13(a) and 13 (b) of the Security Exchange Act of 1934

**FURTHER BAD ACTS OF AVANGRID AND IBERDROLA**

179.     As was referenced in the plaintiff's complaint, there was prior litigation between the instant parties. That litigation arose out of Mr. Silva testifying at a New Mexico Public Utilities Commission public comment proceeding regarding Avangrid's attempt to a merge or otherwise gain managerial control over New Mexico's power utilities. Mr. Silva testified on two occasions and discussed his experiences with and knowledge of AVANGRID's business practices.

[Type here]

180.    The PUC eventually denied Avangrid's petition for approval of the merger.

Avangrid took an appeal of the PUC's decision to the New Mexico Supreme Court. Avangrid

simultaneously commenced an action against SLI and Mr. Silva. The gist of the civil

complaint was that SILVA had spoken at the public comment session in an attempt to extort

AVANGRID for additional contracts and had falsely testified that Iberdrola executives were

under indictment in Spain due to illegal business practices. SLI and SILVA were required to

appear in that action.

181.    Fortunately, the New Mexico District Court ruled in favor of SLI and SILVA's anti

SLAPP motion and dismissed the case. AVANGRID appealed that judgment to the New

Mexico Court of Appeals, which affirmed the District Court's judgment. Avangrid persisted in

the prosecution of this matter and sought review by the New Mexico Supreme Court by way of

a writ of certiorari. On March 3, 2025, the New Mexico Supreme Court denied certiorari and

remanded the matter to the Court of Appeals for further proceedings- namely, the assessment

of costs and attorney fees, which exceed $70,000. That application for fees is still pending.

182.    AVANGRID fared no better on the request to the New Mexico Supreme Court for

review of the PUC's denial of the merger. During that litigation, it was determined that there

was a criminal investigation against certain executives of Iberdrola, but the investigation was

discontinued due the expiration of the criminal statute of limitation. There was never any

judicial finding that the Iberdrola and Avangrid defendants were cleard of criminal

wrongdoing.  However, the investigation continued against one party, Jose' Manuel Villarejo, a

former member of the Spanish Secret police. In that proceeding, Dr. Corneliu Dica, a Romania

businessman who had a contract with Iberdrola (Avangrid's parent company) was listed as an

"aggrieved person". It is alleged that Iberdrola retained Villarejo and his company CENYT to

[Type here]

carry out illegal espionage activities against Dr. Dica. CENYT prepared three reports for the Board of Iberdrola, recommending a course of action to deal with Dr. Dica. One recommendation included Dr. Dica's "liquidation".

183.    In furtherance of the request for a rehearing of the denial of the merger sought by Iberdrola in New Mexico, Avangrid, in violation of New Mexico's Open Meetings Act, met five times with the PUC in executive session. Avangrid also increased its political contribution in the United States tenfold, to a sum of $589,000.

184.    On 11/18/2024, the retained corporate spy, Jose Villarejo, was convicted and sentenced by the Spanish High Court to 19 years in prison.

185.    While awaiting bids on the Phase II, Mr. Silva made it known that he was instrumental in the successful completion of Phase I of the ASD Cyber Security System and was interested in getting contract work on Phase II. In response to his inquiry regarding the Phase II RFP, Silva was directed by Avangrid to meet with Prosegur, an approved vendor in the Iberdrola, S.A. procurement system. The direction to meet with Prosegur was relayed to Silva by David Lathtop, Jose Villarejo, Henrique Victorero, and Ignacio Sanchez Gallan-Tabernero.  Ignacio Sanchez Gallan-Tabernero, is the son of the Iberdrola CEO and head of Global Procurement Department for Iberdrola S.A. and close friend of Javier Tabernero, Ex. CEO of Prosegur. He has elected to use his mother's maiden name.

**OPEX AND CAPEX**
**RETURN ON INVESTMENT**

186.    Prior to the buyout and delisting of Avangrid from the NYSE, SLI and SILVA had entered into business relationships with Avangrid and Network. AVANGRID, an energy services and delivery company with multi-billion-dollar assets in 24 States, is a subsidiary of Iberdrola, a Spanish global energy company with assets in excess of €120 billion. Networks is

[Type here]

a subsidiary of AVANGRID and owns and operates eight electric and natural gas utilities, serving 3.25 million customers in New York and New England.

187.    As was stated above, based on expenses incurred, AVANGRID and NETWORK may apply to the various PSC for rate increases to cover OPEX and CAPEX investments. CAPEX "reimbursements" in rate cases allow a utility to recover costs plus a 7% to 15% return. Therefore, the AVANGRID UTILITIES set quarterly profit targets for CAPEX to maximize shareholder value.

188.    In order to give the appearance that AVANGRID UTILITIES are securing the most cost effective and competent goods and services, AVANGRID UTILITIES are supposed to seek competitive bids in the course of their procurement process. These competitive bids are obtained in response to Requests for Proposals (RFP and/or Requests for Qualifications (RFQ). Qualified bidders then submit detailed bids, or tenders, culminating in a bidder's best and final offer (BAFO).

189.    Under the procurement system employed by AVAVGRID, NETWORKS issued the RFPs to prospective vendors. The bids and BAFOs were aggregated in Iberdrola's procurement system, which is housed in Spain. The actual procurements were made by AVANGRID, INC.

190.    Tenders generally contemplate five service categories that, from an accounting perspective, are associated with the creation and maintenance of a network. These are:

> i) Design and Engineering Services, which contemplates the design and architecture of data centers, head-end systems, and networks; it also includes the development of purchasing requirements in the form of a Bill of Materials, and the purchasing all of the requisite hardware;