[Type here]

ii) Construction, which contemplates the creation and maintenance of the network's physical structures, and includes civil engineering, procurement, materials handling, code adherence and permitting;

iii) Systems Integration, which contemplates the configuring and installation of the hardware necessary to effectuate the network's design in accordance with engineering specifications;

iv) Program Management, which contemplates management and accountability over finances and accounting in accordance with rate case regulations associated with the creation and maintenance of the network. Program Management involves the day-to-day management of scope, schedule, and cost across the rate-case program portfolio, thus unifying Project Plans for each of the five categories into a single Program Initiative; and

v) Telecom, which contemplates the purchasing of equipment and components part of the fiber optic transport network, cable deployment, and configuration of Dense Wavelength Division Multiplexing (DWDM) devices to link the network's constituent components.

191.    The five categories constitute complementary and interrelated service areas specific to the data centers and network at issue. As a result, it is inefficient (and highly unusual) for a utility to disaggregate a category of service (or a portion of work from that category) and reissue it in the form of a new tender.

## AVANGRID ENGAGES SLI
## FOR CRITICAL INFRASTRUCTURE

192.    Founded by Paulo Silva in 2007, Plaintiff SLI is a full-service technology, engineering, architecture, and consulting solutions firm. SLI is among the leaders in many service categories, including Hyper Converged Data Center design and engineering services, and Smart Grid-AMI cyber security design and engineering. Particularly notable in its portfolio is a proprietary secure integrated private cloud architecture and design that, in or about mid-2018, SLI would formally name Ironclad™.

193.    In 2017, AVANGRID sought to improve the quality and reliability of its cyber security program to provide benefits disclosed in various rate-case filings (Phase 1 program)

[Type here]

and retained a Canadian engineering firm, SNC-Lavalin (SNC)to perform those services. When it became obvious that SNC-Lavalin performance was below expectations and was untimely, in early 2018, SILVA, as SLI's principal, approached David Lathrop, then the NETWORKS Technical Security Manager, to provide services to AVANGRID. After explaining his vision for addressing the problems, Lathrop sought the services of SILVA and SLI. However, since SLI was not an approved vendor of AVANGRID, on March 1, 2018, SLI entered into an independent contractor agreement with SNC, the then prime contractor.

194.    SLI began work on the project and, based on SILVA'S intellectual property expertise, SLI significantly modified the design and used IRONCLAD$^{TM}$ with the developing design to successfully complete the creation of the Avangrid Secure Domain (ASD). Central to the ASD was the Ironclad$^{TM}$ Runbook, SLI's comprehensive, proprietary compendium of, *inter alia,* blueprints, technical specifications, and equipment necessary to build and implement the Ironclad$^{TM}$ design.

195.    The ASD, which established an overall architecture for securing the critical infrastructure of Avangrid, was implemented to conform and comply with hundreds of security controls, including those established by the Federal Energy Regulatory Commission ("FERC,"), the North American Electric Reliability Corporation ("NERC"), and the National Institute of Standards and Technology ("NIST"). The ASD was built to introduce value to rate-payers by allowing both consolidation and integration of data centers to and systems across several operating utility companies in the Northeast of the United States, and provided a secure and orderly path for migrating critical systems, applications, and services from a legacy infrastructure onto a 21st century secure private cloud architecture, ultimately savings rate-payers hundreds of millions of dollars.

196.    Consistent with the achievement the ASD represented, and recognizing the

37

[Type here]

centrality of the Ironclad$^{TM}$ Runbook and its benefit to grid security, Avangrid licensed the technology by entering into an end-user license agreement with SLI on or about February 11, 2019 (the "EULA").

197.    Notwithstanding the centrality of Silva and SLI to the ASD, SLI was not an "approved vendor" of Avangrid as to the Phase I work, and thus had to perform its pivotal work in the capacity of a subcontractor. SNC-Lavalin was briefly displaced as the prime contractor by B&V, which itself was displaced by UTI. Considering Silva's expertise, Avangrid encouraged SLI – a design and engineering firm – to oversee implementation of the ASD in the capacity of a sub-contractor to UTI, a systems integrator.

198.    Thus, on March 28, 2019, SLI entered into a subcontractor agreement with UTI (the "UTI Subcontractor Agreement"). Throughout the tenures of SNC-Lavalin, B&V and UTI as prime contractor, Mr. Silva, through SLI, assumed the role of Chief Security Architect of the Avangrid Security Program.

## THE BID RIGGING SCHEME
## AND PHASE II

199.    . As was explained above, Avangrid was obligated to procure services and equipment by issuing requests for proposals, and reviewing responsive bids in an unbiased and transparent manner in accordance with statutory procurement guidelines and the United Nations Sustainability Goals in which AVANGRID participates. Yet when conducting bidding for Phase II of the project, Avangrid did the precise opposite.

200.    Entirely apart from the enthusiasm Avangrid had expressed over SLI's earlier performance, and the respect that SLI's hand-picked engineers had garnered, the ASD relied on SLI's own intricate knowledge of the Ironclad$^{TM}$ design, making SLI an obvious choice for assuming broad responsibilities in connection with the Phase II design and implementation.

[Type here]

SLI had already been asked to bid on a September 11, 2018 tender, in the form of a Statement of Work, for the Optical Transfer Network -Automated Metering Infrastructure project (the OTN-AMISOW). RFP," and it was first proffered for bidding on February 18, 2019, in the form of RFP Tender No. 776388 (the "Original ICT Engineering RFP"). The Original ICT Engineering RFP included professional services, hardware, software, and labor, and was originally valued at $134 million.

201.    SLI, along with three competing firms – WiPro, Insight, and Accenture – made bids responsive to the Original ICT Engineering RFP between March and June 2019. SLI made its first bid on the lucrative Original ICT Engineering RFP on or around March 18, 2019, and made its BAFO as to the Original ICT Engineering RFP on or around April 30, 2019. SLI would make further bids and BAFOs to progressively diminishing portions of the Original ICT Engineering RFP in the months to come, not realizing the RFPs were being refined and reissued on the basis of SLI's own bidding information, as a means of facilitating the bids of SLI's competitors.

202.    As would soon become evident, Avangrid, through its subsidiary Networks, wholly subverted the bidding process. First, it tolerated (if not encouraged) the misappropriation and sharing of SLI's confidential bidding information between Defendants PSM and Cipher, vendors that were subsidiaries of Prosegur, a Spanish company with close ties to Avangrid's parent company, Iberdrola. Second, it manipulated the bidding process to facilitate the improper bids of Prosegur subsidiaries and UTI, foreordaining the award to SLI's competitors of valuable contracts that SLI would have otherwise been awarded under a transparent and fair bidding process. Third, forgoing any pretext of competitive bidding, Avangrid and Iberdrola sole sourced to SLI's competitors dubious equipment purchases prices far in excess of those

[Type here]

which SLI (the owner of the design) would have charged, in order to contrive, and benefit from, capital expenditures.

203.    SILVA began to suspect illegal bid rigging when two Avangrid executives, David Lathrop and John Allen, introduced Silva to Defendant PSM, a security monitoring company then known as Viewpoint. Viewpoint had been recently acquired by Prosegur. Bill Reilly, a Viewpoint executive, introduced Silva to Prosegur, and, In turn, to Cipher, another security firm acquired by in Prosegur. Unbeknownst to Silva, Prosegur – with Avangrid's knowledge and cooperation – intended to poach from SLI lucrative Avangrid contracts through its American subsidiaries SLM and Cipher. At the encouragement of David Lathrop, Enrique Victorero, and Ignacio Sanchez Gallan-Tabernero (the son of Iberdriola's CEO) and three senior Prosegur executives with strong ties to Iberdrola, including but not limited to Javier Tabernero, Ex. CEO Prosegur. SLI was coerced into agreeing to explore a potential working relationship with Cipher. Thus, on or about or about August 5., 2019, Cipher and SLI executed a Mutual Confidentiality Agreement (the "NDA") in anticipation of a possible collaborative bid for Avangrid's Original ICT Engineering RFP. Relying on the NDA, SLI provided confidential information to, *inter alia*, Cipher's Chief Financial Officer, Andre Viera Rolim, and Vice President, Troy Wachter. The information included business secrets regarding bid proposal requirements, including pricing and corporate capabilities to be offered in in support of a bid for the Original ICT Engineering RFP.

204.    SLI provided this highly confidential information to Cipher based on the NDA and Boucas's representation that the parties would work together in good faith, that Engineering RFP, and that the parties would explore a joint bid or some other mutual business transaction. The subsequent misuse of SLI's business secrets belie any notion that any meaningful

[Type here]

collaboration or joint venture was ever intended.

205.    Instead of considering an joint action, Prosegur and Cipher utilized SLI proprietary business information and created a "dashboard" that was to be used with the Phase 1 ADS. Not seeking to even conceal its subterfuge, the Prosegur Dashboard was submitted to Avangrid as a bid. Remarkably, CIPHER placed its own header on SLI's 15 page bid, and submitted the same paperwork. The SLI original bid, with Cipher's header is included below.

206.    Remarkably, the "neck step" page of the CIPHER submission bears close examination. The document states:



Menu

**Next Steps:**

1. Out of the 3 scenarios, we focus (initially) in **"Plan A" (Subcontract Scenario)**. Leaving "Plan B" (Joint Venture "LLC" Scenario) and "Plan C" (M&A Scenario) as potential future alternatives. "Plan A" give us the ability to comply w/ current tender.
   a. Action: Need to build an **argument document and Q&A** that supports the rationale behind "Plan A" (Subcontract Scenario) and that we all can use in a coordinated way internally and more important w/ Avangrid and Iberdrola. Focus in the positive reasons behind it. **Owner: Andre (w/ Legal and Troy)**

2. MoU  - APPENDIX A - SCOPE OF SERVICES ALLOCATION: Not sure if best approach is an allocation based in % of services and instead based in the type of service. We should be able to **show a ramp-up and ramp-down of Paulo in the project.** That way we "lock" Paulo to the project (till the end) while we show Avangrid/Iberdrola that we are progressively reducing Paulo dependency and taking control.
   a. Action: **Analyze type of services (Presales analysis) and optimal allocation** based in Cipher services current capabilities (day 1) and "SL". Progressive transition till a % that we feel comfortable. **Owner: Troy**

3. APPENDIX B – SUPPLIES AND EQUIPMENT: Map infrastructures needs and **best buying/pricing negotiation capacity** (Prosegur/Cipher/Paulo) as well as **identify which technologies are need it to provide the service** versus which technologies are pure resale.
   a. Action: **List of procurement list w/ pricing quotes**, margin, "negotiation owner" (Prosegur/Cipher/Paulo). **Owner: Andre** (w/ Prosegur Corporate Procurement and Paulo)
   b. Action: **List of technologies need it to provide the service. Owner: Troy**

4. Risk & Liabilities: Understand all **risks and liabilities stated in the MSA and also from the technical/commercial perspective** (e.g. specific energy technology platforms)
   a. **List of risks and liabilities** assess identifying proposal to mitage/eliminate risk/liabilities. **Owner: Andre** (w/ Legal and

5. **Security Limits Financials:** Analyze the numbers and prepare the report w/ assessment. **Owner: Andre**

6. **Business Case:** Finalize cash flow, project P&L. **Owner: Andre**

(emphasis added)

[Type here]

207.     First, and notably, the "Next Steps" page speaks of the strategic importance of developing an "argument document and Q&A" supporting a rationale for confining SLI to subcontractor status, which it refers to as "Plan A." While wanting to obtain the lucrative ICT Engineering Contract for itself and limit SLI's role, Prosegur still needed to ensure SLI's involvement, not only because it was dependent on SLI's know-how, but because, unlike SLI, neither Prosegur entity had formally entered a bid in response to the Original ICT Engineering RFP Tender 776388.

208.     More astonishing still, the "Next Steps" page openly acknowledges Prosegur's coordination with Avangrid – issuer of the RFP – and its parent, Iberdrola, wholly belying any notion that the Utility Networks conducted an unrigged bidding process; the "argument document and Q&A" were intended to be tools "we all can use in a coordinated way internally **and more important w/ Avangrid and Iberdrola"** (emphasis supplied).

209.     Paragraph 2 of the "Next Steps" page openly muses over the best strategy for developing Prosegur's own bona fides while simultaneously ensuring a diminishing role for SLI and Silva (here referred to by his first name, "Paulo") in the contemplated work. "We should be able to **show a ramp-up and a ramp-down of Paulo in the project"** (emphasis in the original).

210.     The very fact of the Prosegur Dashboard's creation (and its unblushing, wholesale integration of SLI's bid) evidences Prosegur's willingness to employ improper means to secure business from the Utilities Defendants. But the continuation of paragraph 2 of the "Next Steps" page vividly demonstrates (i) Prosegur's acknowledged inability to secure or perform the ICT Engineering contract without the support of Silva and SLI, (ii) the Utilities Defendants' awareness of Prosegur's dependency on Silva and SLI, and (iii) Prosegur's desire to take control of the lucrative ICT engineering work, to the exclusion of SLI: **"That way we**

[Type here]

**'lock Paulo' to the project (till the end) while we show Avangrid/Iberdrola that we are progressively reducing Paulo dependency and taking control"** (emphasis supplied).

211.    The Prosegur Dashboard is an extraordinary document that memorializes the misfeasance central to the Bid-Rigging Scheme and exposes its participants for the racketeers that they are. The subsequent actions of the Utilities Defendants and the Vendor Defendants, all taken in furtherance of the Bid-Rigging Scheme, would simply confirm the pattern of misfeasance.

**Bid-Rigging Scheme Emerges**

212.    In or around mid-2018, irregularities in Avangrid's bidding process became apparent. For example, on one critical Avangrid project (a multi-million-dollar data center "Advanced Metering Infrastructure [AMI]), SLI was initially encouraged by Avangrid's Director of Telecom Engineering, Tom Fitzgerald and Senior Director, David Lathrop to develop a proposal and bid on a sole source $45M opportunity. SLI's proposal was technically superior; however,  David Lathrop, along with Senior Telecom Director Tom Fitzgerald, abruptly directed SLI to **"step aside"** as a prime bidder and demanded that SLI turn over its entire bid package—including proprietary methodologies, designs, and pricing—to Black & Veatch ("B&V"), a large engineering firm that lacked SLI's specialized expertise so that SLI and B&V could team up on the contract opportunity. SLI shared its bid information in good-faith; nevertheless, the contract was sole sourced to B&V. On or about April 3, 2019, Lathrop and Tom Fitsgerald, acting on Avangrid's behalf, explicitly threatened that if SLI did not immediately surrender its detailed proposal to B&V and support B&V's bid, SLI would be **excluded from any role in the project going forward, including the Phase-2 of the program.** Under this coercion and fearing the loss of not only the current contract but also future business with Avangrid, SLI capitulated and provided B&V with its confidential work product and CCed Fitzgerald and Lathrop on the email. B&V went on to win a sole-source

[Type here]

contract from Avangrid using SLI's information—despite B&V's demonstrably inferior bid. SILVA and SLI received no compensation or credit for the significant intellectual property and labor that B&V and Avangrid misappropriated.

213.     Unbeknownst to SLI at the time, this was not an isolated incident but part of a **pattern of collusion** orchestrated by Avangrid personnel. Internal communications later revealed that Avangrid's executives had pre-selected vendors like B&V, UTI, Viewpoint, and Prosegur for contract awards and viewed SLI as an outsider threat because SLI refused to engage in kickbacks or tolerate wasteful spending through its "openbook contract offering" Furthermore, Viewpoint's acquisition by Prosegur in the U.S. happened in anticipation of the tender #776388 valued at $134M in 2019 and the acquisition was orchestrated by members of Avangrid's officials (including Lathrop and Allen in New York, and Enrique Victorero, Iberdrola's International Security Director in Spain) because Viewpoint was already an Avangrid approved vendor well-known to David Lathrop and John Allen. Later, both conspired to obtain SLI's trade secrets and give them to Avangrid's favored vendors, thereby enriching those vendors and Avangrid insiders at SLI's expense. Another participant, Unlimited Technology, Inc. ("Unlimited"), aided this scheme by removing SLI from ongoing Avangrid sub-projects and reallocating SLI's work to co-conspirators after SLI had shared valuable technical know-how. Likewise, Prosegur and its affiliate Cipher Security (which had entered a Non-Disclosure Agreement with SLI) obtained SLI's sensitive data under false pretenses and then disseminated that data within Prosegur's network to replicate SLI's solutions and edge SLI out of Avangrid projects. The document displayed below is brazen evidence of collusion below between Prosegur and Cipher.

44

[Type here]



214.    Eventually, SILVA and SLI were compelled to report the bid-rigging The Avangrid Board was made aware of the conduct. Rather than address these concerns, Avangrid's leadership, Deputy CEO Mr. Bob Kump—treated Silva as a troublemaker. Communications show that Avangrid internally discussed that Silva was "making too much noise" about possible fraud. In 2020, Silva escalated his whistleblower reports to Avangrid's and Iberdrola's compliance department to no avail. Avangrid immediately began a major corporate security program reorg and then months later issued a cease-and-desist letter to SLI claiming "harassment" without ever conducting an interview with Mr. Silva to capture the whistleblower complaint, a major U.S. Department of Justice (DOJ) corporate compliance program guideline violation.

**AVANGRID Retaliates**

215.    In December 2021, Avangrid Inc. filed a lawsuit in New Mexico (a state wherein SLI had never conducted business) accusing Silva and SLI of "extortion" and "defamation." The claims were entirely fabricated — Avangrid was essentially suing Silva for having blown the whistle, labeling his truthful allegations as "extortionate" threats. The New Mexico court dismissed Avangrid's lawsuit **with prejudice**, finding that SLI's procurement complaints were "not baseless" and that Avangrid's case was a **"sham"** designed to retaliate against a vendor

[Type here]

turned whistleblower. The court even awarded SLI its attorneys' fees, underscoring the frivolous and malicious nature of Avangrid's suit in violation of the Anti-SLAPP (Strategic Lawsuits Against Public Participation) and The Noerr-Pennington doctrine.

216.    After the New Mexico District Court dismissed the anti-SLAPP suit on a pre-answer motion, AVANGRID filed an appeal with the New Mexico Court of Appeals. That appeal was denied. Next, AVANGRID filed a writ of certiorari for review by the New Mexico Supreme Court. The Supreme Court denied the writ of certiorari.

217.    As was explained in ¶ 186, *supra.* AVANGRID was not limiting its efforts to get approval to merge with the New Mexico Utility. In violation of the open meetings law, the PSC met with AVANGRID five times to determine if a denial of merger, affirmed by the State Supreme Court could be reopened and reset for another hearing. It could not and eventually, AVANGRID relented in its pursuit of the NM utility. (The respective decisions are annexed hereto)

218.    While AVANGRID relented in its pursuit of the NM utility, it intensified its patterns of racketeering by further obstructing the course of justice. In November 2022, Avangrid, supported by co-conspirator Steptoe and Johnson LLP through partner Tom Watson, initiated a nearly identical lawsuit in the Southern District of New York (the current action). This lawsuit revived previously rejected, baseless allegations of extortion, false claims of data theft designed specifically to damage the professional reputation of Mr. Silva, respected cybersecurity expert, and claims of interference already dismissed by the New Mexico courts. This blatant forum-shopping and relitigating of dismissed claims is part of Avangrid's strategy to **bury SLI in legal expenses** and tarnish SLI's reputation, rather than to obtain any legitimate relief. Avangrid's misuse of the judicial system – filing baseless claims in multiple jurisdictions – is a key component of its ongoing effort to **"bleed dry"** a small company that dared to expose Avangrid's corruption.

[Type here]

**Continuing Harm to SLI**

219.     As a result of Avangrid's defamatory statements and blackballing of SLI in the industry, SLI's business has been decimated. For instance, in 2021, SLI was in advanced discussions to be acquired by Clean Water Ventures ("CWV"), a strategic partner, for an estimated $11.2 million valuation (with an anticipated EBITDA multiplier that could make the deal worth over $32 million to SLI's principals). However, once Avangrid's litigation and public accusations against SLI/Silva became known, CWV's general counsel expressed grave concerns and ultimately **refused to proceed with the acquisition**, scuttling the deal.



Ironclad Security Holdings Corp. & Clean Water Ventures (CWV)

**Full Acquisition Deal**

The acquisition entails the discontinuation of Ironclad Security Holdings Corp.'s operations and the transfer of its tangible and intangible assets to Clean Water Ventures (CWV). CWV will gain exclusive ownership and utilization rights of "Ironclad Private Cloud."

Under a 5-year employment contract, Paulo Silva, Ironclad's founder and CEO, will provide his expertise to develop a SCADA Application and expand the Ironclad solution for CWV. Ironclad's intellectual property will be leveraged to establish a secure operations technology system and ICT infrastructure for CWV.

**Executive Summary:**

The proposed Acquisition deal structure is based on a preliminary discussion between Paulo Silva, founder and CEO of Ironclad, and Roy DiBenedini, Founder, Chairman, and CEO of CWV.

Based on Ironclad's Valuation of $11.2 million, the proposed acquisition deal will be funded through:

○ A 0.2% (TBC) equity stake of CWV in preferred stocks to Paulo Silva, valued at $1 million.

○ A cash payment of $1.3 million, equivalent to 25% of Ironclad's Assets (Tangible and intangible), valued at $5.2 million and deeply discounted. The rest of the asset's value will be paid in annual installments of $996K.

○ A 5-year average of $65K annually, settling Ironclad's outstanding loan balance.

○ A 5-year employment contractual agreement for Paulo Silva as the Chief Information Security Officer of CWV with an annual salary package of $425,000 and increases by 20% per annum.

○ An annual bulk payment to Silva based on achieving pre-determined KPIs of the Ironclad's installation and performance starting in 2025. The bulk payment starts at $1.17 million and grows by 20% annually with the projected CWV growth (AGI % to be countered by CWV).

The complete Acquisition of Ironclad stands at a net present value of $11.2 million and a total 5-year future value of $15.8 million; extremely conservative figures to facilitate discussions.

[Type here]

| From: | Roy DiBenerdini |
|---|---|
| To: | Paulo Silva |
| Cc: | Anthony Sarcone; Mike Steinmetz; Randy Berholtz; Bruce Greenhaus; Nancy Parrilo |
| Subject: | Re: CWV & IronClad Security/Cloud Fortress |
| Date: | Monday, August 21, 2023 1:10:41 PM |

Dear Paulo,

Thank you for your time earlier today.

After speaking with our General Counsel (Randy, cc'd), we can only revisit this potential
acquisition after your settlement, and all open litigations, legal matters have come to an end.

Best,
Roy

**Roy DiBenerdini**
Founder & CEO
Clean Water Ventures, Inc. (CWV)
81 Ocean State Drive
North Kingstown, RI 02852
858-437-3294
cleanwaterventures.com

On Sun, Aug 20, 2023 at 8:51 PM Paulo Silva <paulo.silva@cloudfortress.ai> wrote:

> Hello Roy, please see the responses below.

220.     Similarly, other prospective clients and partners were warned by Avangrid
representatives to "stay away" from SLI and Silva. Avangrid personnel falsely told third
parties that Mr. Silva "lacks a good reputation" and insinuated that SLI was involved in
wrongdoing. These falsehoods spread fear, uncertainty, and doubt, causing SLI to lose multiple
contract opportunities (collectively worth over $35 million in revenue) and severely damaging
SLI's tanding in the market. . *Email from Retired Admiral Michael Brown, Ex. Assistant
Deputy Secretary of the Department of Homeland Security.*

48

[Type here]

| From: | Michael Brown |
|---|---|
| To: | Paulo Silva |
| Subject: | Resilent Advisors |
| Date: | Thursday, October 1, 2020 11:45:07 AM |

Paulo,

The team has decided to pass on the Security Limits opportunity. We just can't figure out the right path forward. I also want to let you know that Avangrid (I don't know who) is making comments about you to people who enquire. One of my friends asked Avangrid about Security Limits and you, and he was told to stay away from you and that you don't have a very good reputation. As I stated, I don't know who made the comment inside Avangrid, but that could have an impact on the company.

Let me know if you want to talk. I've got a lot of meetings today – but might be able to talk around 4pm.

Cheers,
Mike

Michael Brown
RADM, USN (Ret)
Spinnaker Security LLC
PO Box 1078
Seabrook, NH 03874
(443) 615-3568

221.     In sum, Avangrid and its co-conspirators orchestrated a multi-faceted scheme to enrich themselves and punish SLI: first, by **rigging bids** and expropriating SLI's trade secrets to award contracts to insiders' favored vendors; second, by **defaming SLI** to other industry participants to ensure SLI would not find alternative business; and third, by abusing legal process (sham lawsuits and regulatory misrepresentations) to intimidate SLI into silence and bankruptcy. The following Causes of Action seek to hold Avangrid liable for this unlawful course of conduct.

[Type here]

## COUNT I

## VIOLATION OF RICO, 18 U.S.C. §1962(c)

222.    **RICO "Person."** Counterclaim Defendants Avangrid, Inc. Avangrid Networks, Inc. Avangrid Service Company and Iberdrola S.A. are each a "person" within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c), capable of holding legal or beneficial interest in property.

223.    **RICO Enterprise.** Counterclaim Defendants, together with their co-conspirators, formed an association-in-fact enterprise – hereafter the "Avangrid Enterprise" – for the common purpose of carrying out the fraudulent bid-rigging and extortion scheme described above and concealing its existence. The Avangrid Enterprise is an ongoing organization with a structure and continuity of personnel. It consists of at least: (a) the Avangrid corporate entities (including Avangird, Inc. Avangrid Networks, Avangrid Service Company, and Avangrid's parent Iberdrola, S.A.); (b) the favored vendor companies  (including Prosegur, Cipher, Unlimited, and Black & Veatch, among others) that colluded with Avangrid; and (c) individuals who were officers, employees, or agents of those entities (including Lathrop, Allen, Fitzgerald, Victorero, and others identified herein). These diverse members functioned as a unit in furtherance of the scheme. The Avangrid Enterprise had an ongoing decision-making structure – for example, Avangrid and Iberdrola executives like Enrique Victorero and others set overall objectives (such as which contracts to steer to which vendors), while Avangrid Networks and Avangrid Inc. managers like Lathrop, Allen, and Fitzgerald executed the day-to-day fraudulent acts (issuing sham Requests for Proposals, pressuring SLI to give up information, misrepresenting the bidding process, etc.), and the vendor conspirators played their role by submitting pretextual bids, misusing SLI's data, and overcharging under the rigged contracts. The enterprise engaged in, and its activities affected, interstate commerce. For example, the enterprise's members coordinated multi-state utility projects and procured equipment at high prices to inflate CAPEX and services across state lines (New York, Maine,

[Type here]

and Connecticut), all in service of the fraudulent scheme. Avangrid violated applicable antitrust and procurement laws by utilizing procurement systems managed by its parent company, Iberdrola S.A., in Spain, rather than in the United States. Multiple RFPs, including but not limited to RFP 776388, RFP 789546, RFP 792241, RFP 795776, and RFP 798582, were repeatedly issued for substantially similar or identical services. Responses to these requests were improperly directed through procurement platforms located in Spain, circumventing regulatory oversight in the United States. Such conduct reflects deliberate bid-rigging practices designed to manipulate competitive bidding processes, undermine legitimate competition, and evade regulatory scrutiny, thus constituting clear violations of applicable procurement standards and raising serious concerns under relevant federal and state laws.

### Distinctness of the Enterprise

224.      The Avangrid Enterprise is **distinct** from the Avangrid corporate "persons" themselves. The enterprise is comprised of a network of separate legal entities and individuals with divergent economic interests (Avangrid's outside vendors and their principals, as well as Avangrid's own employees acting beyond mere internal roles). Avangrid participated in the enterprise, but the enterprise's identity and structure extend beyond the Avangrid entities alone. Accordingly, the person-enterprise distinctness requirement of 18 U.S.C. § 1962(c) is satisfied. See, e.g., *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 163 (2001) (enterprise comprised of corporation and individual was distinct from the individual RICO defendant); *Gottstein v. Nat'l Ass'n for Self-Employed*, 53 F. Supp. 2d 1212, 1219–20 (D. Kan. 1999) (enterprise consisting of "separate corporations with presumably divergent economic interests" met distinctness requirement apart from the corporate RICO person). In this case, Avangrid associated with outside vendors and agents in a collusive venture; logically, a company can associate with a group of which it is a member, and yet the group and the company remain distinct for RICO purposes.

[Type here]

### Participation in Enterprise Affairs

225.    Each Counterclaim Defendant conducted or participated, directly or indirectly, in the conduct of the Avangrid Enterprise's affairs through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(c). Specifically, Avangrid (acting through its officers and agents) orchestrated, directed, and carried out the unlawful scheme via multiple predicate acts as enumerated below. The actions of Avangrid's personnel are attributable to Avangrid. Moreover, Avangrid is liable for the predicate acts committed by its co-conspirators in furtherance of the enterprise under basic agency and conspiracy principles. At all relevant times, Avangrid and each member of the enterprise understood the overall fraudulent goals and knowingly took actions to promote those goals, rather than acting within lawful bounds of independent decision-making. Avangrid and its co-conspirators each performed roles that were necessary and complementary to achieve the enterprise's illicit objectives. By engaging in the racketeering acts detailed herein, Avangrid conducted the affairs of the enterprise (as opposed to merely its own isolated affairs).

### Pattern of Racketeering Activity

226.    The Avangrid Enterprise engaged in a **pattern of racketeering activity** within the meaning of 18 U.S.C. §§ 1961(1) and 1961(5). The racketeering acts ("predicates") included but were not limited to extortion, theft of trade secrets, mail fraud, wire fraud, and related acts indictable under state and federal law. These acts were related to each other (having the common purpose of cheating SLI and suppressing competition) and occurred continuously over multiple years, from at least 2018 through 2022. For example, David Lathrop, after having signed the EULA which was filed and transmitted to the Legal Database in Spain, colluded with B&V to obscure the EULA transaction and steal SLI's intellectual property rights by orchestrating a last-minute modification to the "subcontractor agreement" between SLI and B&V as SLI worked directly for Avangrid Inc. without a contract after the termination of SNC Lavalin's contract for poor performance. Another instance, Prosegur'S CEO sends text

[Type here]

message instructing SLI to contact them after SLI decided to walk away from executing an MOU because it caught Prosegur working in collusion with Iberdrola S.A. and Avangrid on the issuance of several RFPs as part of a bid-rigging scheme.

227.    They were not isolated events, but part of Avangrid's ongoing business practice of "fixing" its procurement process to its advantage. The predicates had similar participants (often the same Avangrid officials and favored vendors), similar targets (SLI and any other outsider posing a threat to the scheme), and similar methods (threats, misappropriation of data, sham communications). The racketeering acts thus exhibit both **"relatedness"** and **"continuity"** sufficient to constitute a pattern. Indeed, Avangrid's conduct satisfies **closed-ended continuity** in that it spanned several years with repeated instances of wrongdoing and also indicates **open-ended continuity** in that Avangrid's persistent abuse of legal process and its parent Iberdrola's historical pattern of corruption suggest a continued threat of similar criminal behavior in the future if not stopped. See *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 241–42 (1989).

228.    **Predicate Acts.** Without limitation, the racketeering acts that Avangrid and its co-conspirators committed as part of the pattern include:

a. **Extortion (N.Y. Penal Law § 155.05 and Related Provisions):** Avangrid, through its agents, committed acts **chargeable under New York law** constituting larceny by extortion (a felony punishable by over one year in prison). New York Penal Law § 155.05(2)(e) defines extortion as obtaining property from another, with consent, induced by a wrongful threat to cause economic injury or other harm. Here, Avangrid's officials, with intent to appropriate SLI's property for Avangrid's benefit and for the benefit of Avangrid's chosen vendors Prosegur, UTI, and B&V, wrongfully compelled SLI to surrender its valuable property (its bid proposal, confidential technical data, and the opportunity to win the contract) by instilling in SLI the fear of severe economic harm—namely, being completely excluded from current and future business with Avangrid—if SLI did not comply. On April 3, 2019, in New York, Lathrop and Fitzgerald explicitly threatened SLI that refusal to hand over its bid information would result in SLI's elimination from the project. SLI reasonably feared this outcome and, under duress, gave up its proprietary data to B&V. This **extortionate taking** of SLI's property through economic threats is a predicate racketeering act. Additionally, Avangrid's initiation of the sham defamation/extortion lawsuit in December 2021 was itself used as a means of extortion: by suing SLI for exorbitant damages with no basis, Avangrid intended to instill fear that if SLI did not abandon its whistleblowing and "deliver" silence, Avangrid would litigate SLI into ruin. Using the threat of

[Type here]

crushing legal liability and expenses to coerce SLI's capitulation is another instance of obtaining (or attempting to obtain) SLI's property (money, or the intangible right to speak out) through wrongful threat. Each such act of extortion is **related** (all aimed at depriving SLI of its property or rights to benefit Avangrid's scheme) and **continuous** (occurred on multiple occasions over time).

b. **Extortion (Hobbs Act, 18 U.S.C. § 1951):** Avangrid also committed **federal extortion** affecting interstate commerce, indictable under the Hobbs Act. The Hobbs Act makes it a crime to obtain another's property with consent induced by wrongful use of actual or threatened force, violence, or **fear** (including fear of economic harm). See *18 U.S.C. § 1951(b)(2)*. As detailed above, Avangrid's agents used wrongful economic fear to obtain SLI's property. The April 2019 coercion of SLI into transferring its bid intellectual property to B&V under threat of losing all future work fits squarely within Hobbs Act extortion (property was obtained from SLI with SLI's begrudging "consent" induced by fear of economic loss). Such conduct is inherently wrongful, as Avangrid had no legitimate claim of right to SLI's proprietary information or to exclude SLI from bidding. Each instance in which Avangrid leveraged economic threats to extract property or advantage from SLI (including the threats implicit in Avangrid's baseless multi-million-dollar lawsuit) constitutes a violation of 18 U.S.C. § 1951. These acts had an obvious effect on interstate commerce: SLI's business activities across state lines were curtailed, and the flow of services and funds in interstate utility projects was impacted by Avangrid's interference. Each Hobbs Act predicate is part of the pattern of racketeering.

c. **Theft of Trade Secrets (18 U.S.C. § 1832):** Avangrid and co-conspirators committed multiple acts **indictable under 18 U.S.C. § 1832**, the federal criminal provision prohibiting theft of trade secrets. SLI's bid proposals, network designs, pricing models, and other confidential technical information qualify as **trade secrets** under 18 U.S.C. § 1839(3) – they derived independent economic value from not being generally known, and SLI took reasonable measures to keep them secret (including using Non-Disclosure Agreements and restricted access). Avangrid, through its agents, **misappropriated SLI's trade secrets** with intent to convert them for the use of others (B&V, Prosegur, etc.), knowing that this would harm SLI. For example, by forcibly sharing SLI's detailed AMI project design with B&V without SLI's consent, Lathrop and Allen enabled B&V to usurp SLI's competitive advantage – a classic trade secret theft for the benefit of B&V and Avangrid. Likewise, Prosegur, acting in concert with Avangrid, induced SLI to share sensitive security architecture information under the guise of partnership and NDA protection, only to funnel that information to Prosegur affiliates and re-create SLI's solutions for Avangrid's use. Each such act – each improper acquisition, disclosure, or use of SLI's trade secret information – constitutes a separate violation of § 1832. Notably, the trade secrets in question were related to products and services used in interstate commerce (modernizing a multi-state utility's infrastructure), satisfying the jurisdictional element of § 1832. Theft of trade secrets is expressly included as a predicate "racketeering activity" by 18 U.S.C. § 1961(1)(B) (as amended by the Defend Trade Secrets Act of 2016). Thus, Avangrid's misappropriation of SLI's trade secrets on multiple occasions is a further predicate pattern act. Please see EXHIBIT-G.

[Type here]

Susan,

As a result of your ambiguous statements in prior communications, I need an email or document from B&V Legal Counsel clearly stating your understanding and acceptance of the following disclosure(s):

1. B&V understands that as of "THIS DATE" there is NO subcontract agreement or contract between SLI and B&V. Contract negotiations failed; therefore, contract was never executed.
2. B&V understands that it has NO Intellectual Property Rights to SLI's intellectual property and/or work product(s) introduced and in current development of the "Avangrid Secure Domain" – Avangrid's Physical and Cyber Security Program".
3. B&V understands and has been notified numerous times by various parties within Avangrid that the intellectual property and all ASD design and engineering materials, including, but not limited to all drawings, plans, specifications, reports, designs, design data, technical and scientific data, findings, recommendations and memoranda whether furnished to or prepared by SLI under the Direct Avangrid License Agreement (the "Security Limits Inc. Work Product"), all belongs to Security Limits Inc. [SLI; acquired legally and affirmed by client's legal department (Avangrid) officially filed with Avangrid Legal under "PUSNY0EASA0101" (MP C4503).
4. B&V will not be using its knowledge of the SLI's design methods and drawings acquired either indirectly or directly during the course of its engagement at Avangrid to solicit third-party businesses.
5. B&V shall not be making any claims that it has either "designed and/or Engineered" the ASD-ICT infrastructure at Avangrid.
6. Any attempt to acquire such material indirectly and without express written permission from either Security Limits Inc. or Avangrid Physical and Cyber Security Department will be treated as a Intellectual Property Infringement, potential NERC-CIP Violation, and a matter of National Security as I am in discussions with Government dignitaries on best ways to apply such IP for the benefit of the country and many other Utilities hosting Critical Infrastructure.

Susan,

The statement below was added by Black & Veatch into the final contract version without my consent and without proper due care process for contract modification disclosure; therefore, it is now deemed a malicious attempt against SLI's Intellectual Property Rights. Susan, were you aware of this statement being added after "my original draft"? How come it was never highlighted for comment/review? And how come you were not in direct communications with my attorney Jack during these negotiations? Geoffrey represented himself to me as an attorney. I am so confused.

Subcontractor agrees to license to B&V on a world wide basis, without restriction on use in connection with the Project, all of Subcontractor's right, title and interest in and to any and all Subcontractor's intellectual property which may be created (either individually or with others) pursuant to this Agreement, including, but not limited to all drawings, plans, specifications, reports, designs, design data, technical and scientific data, findings, recommendations and memoranda whether furnished to or prepared by Subcontractor under this Agreement (the "Subcontractor Work Product")."

As you can see, comparing to the enclosed "email evidence", this entry significantly deviates from the "original enclosed draft" provided by me; hence why I decided to discontinue contract negotiations with B&V.

Lathrop shares IP with Viewpoint, Prosegur.

**Paulo Silva**

| | |
|---|---|
| From: | Lathrop, Dave <Dave.Lathrop@Avangrid.com> |
| Sent: | Tuesday, March 26, 2019 9:27 AM |
| To: | 'Bill Reilly' |
| Cc: | Paulo Silva |
| Subject: | FW: New Map of the AREN Regions with changes. |
| Attachments: | 5RegionOpsMap_2019-3-25.pptx |

Bill

Thanks for meeting yesterday, I found the meeting to be helpful in understanding your goals.
Please tell your team I said I was impressed with Prosegur.

Two things

1, see attached map of Renewables. This is just to give you an idea of overall Ren.

2, Paulo Silva is attached to this Email and I have included his contact information below. As requested.
If you would like to set up a meeting in Rochester , at my office I would be happy to attend and make introductions. Security Limits holds the IP on the Ironclad product we reviewed last night.

**Chief Enterprise Security Archi...**
EXTERNAL
SEC SECURITY TECHNICAL SERV
AGR AP > AMC 22 > SEC PHYSICAL SE...
(860) 665-6175 Work
(917) 270-8209 Mobile
Psilva@securitylimits.com
paulo.silva@avangrid.com
89 EAST AVENUE
ROCHESTER, NEW YORK 14649

Dave Lathrop

d. **Mail and Wire Fraud (18 U.S.C. §§ 1341, 1343):** The Avangrid Enterprise also engaged in numerous acts of **fraud** using U.S. mail, interstate, and international wire communications in furtherance of its scheme to defraud SLI and others. Specifically, Avangrid (including its parent Iberdrola) devised or intended to devise a scheme to defraud SLI (and to obtain SLI's money and property by means of false pretenses and misleading statements), and for the purpose of executing

[Type here]

or concealing that scheme, caused materials to be sent or transmitted via mail and interstate wires. For example, in 2018 through 2021, Avangrid (through Avangrid Networks, Iberdrola S.A. and Avangrid Inc. personnel) sent **email communications** to SLI in Pennsylvania falsely representing that SLI was a bona fide contender for certain contracts and inviting SLI to submit bids, even though internally Avangrid had predetermined that those contracts would never be awarded to SLI regardless of merit. These communications were fraudulent in that they omitted and misrepresented material facts: Avangrid pretended to conduct a legitimate competitive bidding process while secretly ensuring the outcome in favor of other vendors. SLI, relying on these misrepresentations, expended time and resources in preparing bids and divulging proprietary data, which Avangrid then exploited. Each such email or phone call placed in furtherance of the bid-rigging conspiracy (including coordination calls with co-conspirator vendors) was an instance of wire fraud under 18 U.S.C. § 1343. The procurement response below was false. RFP 776388 was improperly sole-sourced to UTI around January 2020, and notably, David Lathrop joined UTI just weeks after approving the purchase order to UTI. Lastly, on Monday, June 13, 2022, 10:16 AM SLI received an email from Brendan Sereson, an employee of Avangrid Service Company, soliciting information from SLI under false pretense as our companies were embroiled in legal disputes, a lame attempt to collect data from SLI without having the slightest interest in conducting commerce with the company.

---

**From:** Paulo Silva [mailto:psilva@securitylimits.com]
**Sent:** Monday, July 12, 2021 8:59 AM
**To:** BRIAN EWING; Jones-Smith, Tamara M.
**Cc:** Michael Brown; Peter Sherlock
**Subject:** EXTERNAL:Re: Letter of Credit Sample and Insurance Information - Security Limits Inc.

Brian,

Thank you for your response.

Is there a date for releasing this award? Is it still procurement's intention to release the award for these services? Security Limits originally bid on this award over two years ago. Please advise.

Paulo

---

**From:** BRIAN EWING <brian.ewing@uinet.com>
**Sent:** Monday, July 12, 2021 8:43:17 AM
**To:** Paulo Silva <psilva@securitylimits.com>; Jones-Smith, Tamara M. <Tamara.Jones-Smith@avangrid.com>
**Cc:** Michael Brown <michael.brown@ironcladsecurity.com>; Peter Sherlock <peter.sherlock@ironcladsecurity.com>
**Subject:** RE: Letter of Credit Sample and Insurance Information - Security Limits Inc.

Paulo,

To date nothing has been awarded.

Best Regards,

Brian Ewing

Director of
Procurement
180 Marsh Hill Road, Orange, CT 06477    O 203 499-2937  M 203-223-2930

AVANGRID

56

[Type here]

229.      In addition, on or about January 18, 2022, Avangrid electronically submitted (via interstate wire) to the Maine Public Utilities Commission an **altered and misleading copy** of its New Mexico complaint against SLI. In that submission, Avangrid **omitted** crucial information – such as the names of public officials (Rep. Seth Berry and advocate Mariel Nanasi) whom Avangrid had targeted through abusive discovery in the New Mexico case, and details about Avangrid's own procedural misconduct. By providing a sanitized version of the lawsuit to Maine regulators, Avangrid attempted to deceive a government agency into believing that SLI's whistleblower allegations were already thoroughly and fairly litigated (when in truth the case had been dismissed as a sham). This constitutes wire fraud: a knowing transmission of a material misrepresentation (a half-truth document omitting material facts) by wire for the purpose of defrauding regulators and deflecting the ongoing MPUC investigation into Avangrid's practices. Furthermore, Avangrid disseminated via interstate wires (email and internet) press releases and statements that it knew to be false – for instance, public statements by Avangrid in December 2021 labeling Silva as a "disgruntled contractor" and portraying SLI's allegations as "baseless." These statements were intended to fraudulently preserve Avangrid's ill-gotten gains (by discrediting SLI and preventing regulators or other partners from taking SLI's claims seriously). Each of these uses of the wires in service of the fraudulent cover-up and disinformation campaign is a predicate act of wire fraud. Likewise, any use of the U.S. mail (such as sending hard-copy correspondence or payments connected to the rigged bids or sham legal claims) would constitute mail fraud under 18 U.S.C. § 1341. All such communications were made as part of executing or concealing the scheme to defraud SLI and ratepayers in the State of Maine, New York, and Conneticut, satisfying the elements of mail/wire fraud. These predicates are related and continuous, further cementing the pattern of racketeering.

*(Each predicate act described above is alleged as to Avangrid and its co-conspirators. To the extent certain acts [such as those by Prosegur, UTI, or B&V] were directly committed by non-parties, Avangrid is nevertheless responsible because those parties were acting in concert with and at the direction of Avangrid's agents in furtherance of the common scheme. Avangrid knowingly **aided and abetted** these acts and benefitted from them through CAPEX inflation and offcers' personal gain, making Avangrid liable under 18 U.S.C. § 2 as well as under conspiracy principles addressed in Count II below.)*

[Type here]

e. **Injury to Business or Property.** As a **direct and proximate result** of the racketeering violations by Avangrid, Counterclaim Plaintiffs have been injured in their business and property, within the meaning of 18 U.S.C. § 1964(c). SLI suffered substantial, tangible financial losses because of the illegal scheme. These losses include, inter alia: **(a)** the loss of multiple specific contract awards that SLI would have won and profitably performed absent Avangrid's interference (including the data center project in 2019 and other Avangrid security projects, which together represent at least approximately **$36.6 million** in lost profits and business value, as will be shown through bid records and SLI's financial data); **(b)** the loss of the CWV acquisition deal (an $12.1 million transaction that would have greatly expanded SLI's operations—value that was destroyed when the deal fell through due to Avangrid's actions); **(c)** the loss of numerous prospective business relationships and customers who shunned SLI after Avangrid's defamatory warnings, amounting to at least **$12 million** in identifiable lost opportunities (and likely more in future lost revenue); **(d)** damage to SLI's goodwill and business reputation, which has effectively crippled SLI's ability to operate and generated a loss of enterprise value (SLI went from a growing, sought-after specialist contractor to a pariah in its industry as a result of Avangrid's smear campaign, a loss valued in the millions of dollars); and **(e)** significant out-of-pocket costs, including **attorneys' fees and litigation expenses** that SLI and Silva have been forced to incur to defend against Avangrid's baseless lawsuits and to address the fallout of the racketeering (these costs exceed $200,000 and continue to mount). These injuries are concrete and were **proximately caused** by Avangrid's racketeering acts. The rigged bidding and extortionate acts directly resulted in SLI not obtaining contracts it otherwise would have (a foreseeable and intended consequence of the scheme). The defamatory and fraudulent communications to third parties directly caused those parties to withdraw from deals or avoid SLI (which was exactly Avangrid's intent). The abuse of litigation process directly inflicted financial injury in the form of legal fees (again, an intended result to punish SLI). There are no intervening causes – SLI and Silva were the primary and intended victims of the enterprise's scheme. Accordingly, Counterclaim Plaintiffs have RICO standing to recover for these business and property injuries.

f. **Damages.** Pursuant to 18 U.S.C. § 1964(c), Counterclaim Plaintiffs are entitled to recover **threefold the damages** they have sustained, plus the costs of this suit and reasonable attorneys' fees. Based on current information, SLI's damages from Avangrid's racketeering scheme are estimated at no less than **$171 million** (after trebling). This includes approximately $57 million in actual damages (lost contract profits, lost business value, and expenses) multiplied by three as provided by statute. The exact amount of damages will be proven at trial. In addition, the pattern of racketeering described above justifies injunctive relief to prevent further harm: absent court intervention, Avangrid is likely to continue its campaign of retaliation and fraud (as evidenced by its ongoing actions into 2022), so SLI seeks appropriate equitable relief to dismantle the enterprise and prohibit Avangrid from engaging in similar misconduct in the future.

[Type here]

g. **Prayer for Relief (RICO).** WHEREFORE, Counterclaimants request judgment against Avangrid on Count I for compensatory damages in an amount to be determined at trial, treble damages (i.e., three times the compensatory amount) as provided by law, recovery of costs and attorneys' fees, and injunctive and declaratory relief as the Court deems just and proper to prevent and restrain further violations of RICO by Avangrid.

## COUNT II

### Conspiracy to Violate RICO, 18 U.S.C. § 1962(d)

230.    Counterclaim Plaintiffs repeat and reallege each and every preceding paragraph as if fully set forth herein.

231.    In addition to directly violating RICO, Avangrid violated 18 U.S.C. § 1962(d) by **conspiring** to violate § 1962(c). Avangrid knowingly agreed and combined with the co-conspirators identified above to conduct and participate in the affairs of the Avangrid Enterprise through a pattern of racketeering activity. Avangrid and each member of the conspiracy shared a common purpose and plan: to divert contracts and opportunities from SLI and other honest vendors to themselves through illegal means, and to cover up that wrongdoing by silencing or discrediting anyone (like SLI) who might expose it.

232.    Avangrid **knew** of the nature and scope of the enterprise's unlawful activities and agreed to facilitate the commission of those unlawful acts. For example, Avangrid (through its officers) entered into an understanding with B&V and Unlimited that SLI would be cut out of the data center project and that B&V would use SLI's data to prepare a faux "winning" bid; Avangrid likewise agreed with Prosegur/Cipher that SLI's expertise would be mined and then SLI removed from subsequent projects (as evidenced by their coordinated actions after Cipher acquired SLI's information). Avangrid executives also conspired with each other and with Iberdrola officials – such as Enrique Victorero – to obtain SLI's proprietary runbook for NERC-CIP compliance and to share it with Iberdrola in Spain, which was outside the scope of any legitimate Avangrid business and done covertly. When SLI began raising concerns, Avangrid furthered the conspiracy by roping in its in-house and outside counsel and others to initiate sham litigation, an act that required

[Type here]

coordination and agreement among multiple actors (corporate officers, lawyers, etc.) to pursue a baseless case purely to harm SLI. The totality of circumstances demonstrates an **ongoing agreement** among Avangrid and various co-conspirators to carry out the racketeering scheme.

233.    It was part of the conspiracy that each member would commit at least two acts of racketeering in furtherance of the enterprise's affairs. While not every conspirator may have executed each type of predicate, all conspirators agreed that the enterprise's objectives would be achieved through a **pattern** of such illegal acts (including extortionate threats, information theft, and fraudulent misrepresentations). Avangrid is liable for **all** acts of racketeering committed by any of its co-conspirators in furtherance of the conspiracy, even acts Avangrid did not personally carry out, because Avangrid agreed to the commission of those acts. *See Salinas v. United States*, 522 U.S. 52, 64 (1997) (a RICO conspirator need only agree that some member of the conspiracy will commit the predicate acts; the conspirator "need not himself commit or even agree to commit" the acts to be liable).

234.    As a direct and proximate result of Avangrid's § 1962(d) conspiracy violation, Counterclaim Plaintiffs have suffered injury to their business and property as described in Count I, in an amount to be proven at trial and believed to be in the millions of dollars (subject to trebling under RICO). The conspiracy itself and the acts taken in furtherance of it caused SLI's losses, and SLI's injuries were the **foreseeable and intended result** of the conspiracy (the scheme was designed to impoverish SLI and benefit the conspirators).

235.    Pursuant to 18 U.S.C. § 1964(c), Counterclaim Plaintiffs are entitled to recover treble damages, costs, and attorneys' fees for the § 1962(d) violation as well. SLI also seeks appropriate equitable relief to dismantle the conspiracy and prevent future harm.

236.    **Prayer for Relief (RICO Conspiracy).** WHEREFORE, Counterclaimants pray for judgment against Avangrid on Count II, awarding all relief requested under Count I (as applicable to the conspiracy claim) including damages (trebled), costs and fees, and injunctive relief, and granting such further relief as the Court deems just and proper.

[Type here]

## COUNT III:

### Defamation (Libel and Slander) – *Per Se*

237.     Counterclaim Plaintiffs repeat and reallege each preceding paragraph as if fully set forth herein, to the extent not inconsistent with the allegations of this Count. This Count is pleaded in the alternative to the RICO claims to the extent any factual allegations overlap.

238.     Avangrid, by and through its officers, employees, and agents, made numerous **false and defamatory statements** of fact concerning Silva and SLI to third parties, including industry participants, regulatory officials, and the general public. These statements were published orally (slander) and in writing (libel).

239.     In or around 2020 and continuing into 2021 and 2022, Avangrid executives and representatives (including Mr. Bob Kump, Avangrid's Deputy CEO, and others at Avangrid Networks) **advised business associates and potential partners to "stay away" from SLI and Mr. Silva,** falsely asserting that SLI and Silva "lack a good reputation" and had engaged in misconduct. For example, on December 3, 2021, in an Avangrid press release and related media statements, Mr. Kump publicly referred to Silva as a "**disgruntled contractor**" and implied that Silva's claims about Avangrid's bid-rigging were baseless. Around that same time, Avangrid personnel privately communicated to at least one prospective SLI investor (CWV's principals) that SLI was entangled in "legal trouble of its own making," suggesting that SLI was the wrongdoer and cautioning them against doing business with Silva. These statements were false and disparaging.

240.     **Defamation Per Se.** The defamatory statements made by Avangrid are **defamatory per se** under New York law (and the law of other applicable jurisdictions) because they impugned SLI and Silva in their business, trade, and profession. Avangrid's comments effectively accused Silva and SLI of dishonest or unethical conduct (extortion, data theft, etc.) and professional unreliability, which are the type of accusations that are presumed to cause reputational harm. By telling others in the industry that SLI was not reputable and that Silva was merely a "disgruntled" actor making false claims, Avangrid was charging SLI with

[Type here]

professional fraud or misconduct. Such statements, which tend to injure a person in his or her
trade or business, are considered defamatory per se, meaning damage to reputation is
presumed.

241.    **Falsity.** Avangrid's statements were false. SLI and Silva were not engaged in any
wrongful conduct; to the contrary, they were raising genuine concerns about Avangrid's
misconduct. Avangrid had **no factual basis** to claim SLI "lacked a good reputation" or that
Silva was acting out of mere disgruntlement. In fact, prior to SLI's whistleblowing, Silva and
SLI had an excellent reputation with Avangrid's own staff (evidenced by internal emails
praising SLI's work). The only reason anyone began questioning SLI's reputation was because
Avangrid seeded those false narratives in retaliation. The allegations Avangrid made in its
lawsuits (which it repeated to others) accusing Silva/SLI of extortion and theft were
adjudicated to be unfounded – the New Mexico court explicitly found SLI's actions were not
extortionate and that Avangrid's claims were without merit. Thus, any repetition of those
allegations outside the courtroom lacks any privilege and is demonstrably false. Moreover,
Avangrid's suggestion that SLI's whistleblowing was baseless is proven false by the fact that
Avangrid quietly changed its internal practices and even misled regulators rather than
confronting SLI's evidence in open forum.

242.    **Fault (Actual Malice).** Avangrid made the defamatory statements **knowingly or
with reckless disregard for the truth**. In other words, Avangrid acted with actual malice,
especially with respect to statements about Silva's motives and SLI's integrity. Avangrid's top
executives knew full well that SLI's allegations had merit – internal documents show Avangrid
launched an internal damage-control effort because SLI's complaints of waste and fraud were
substantiated. Yet Avangrid chose to publicly brand SLI as a liar and troublemaker. The timing
and context of Avangrid's statements (coming right after SLI's complaints and in the midst of
Avangrid attempting to quash investigations) show the statements were calculated to retaliate
and discredit, without regard for truth. Even if considered private figure defamation, Avangrid
at least was negligent in making false statements, but the evidence will show a higher level of

62

[Type here]

intent to harm.

243.    **Publication.** The defamatory statements were **published to third parties** without privilege. For instance, the "disgruntled contractor" remark was published to members of the press and thus to the public at large via news media. The warnings to "stay away" from SLI were communicated to potential SLI customers or partners in informal settings and through phone calls/emails, none of which were part of any judicial proceeding or otherwise privileged context. Avangrid cannot cloak these deliberate smear tactics in any privilege. (Notably, any statements made in the context of the New Mexico litigation were absolutely privileged in court filings, but Avangrid's repetition of accusations outside the litigation – such as in Maine regulatory filings and press releases – is not protected to the same extent, especially when the content was edited or presented misleadingly.)

244.    **Injury.** As a direct and proximate result of Avangrid's defamatory statements, Counterclaim Plaintiffs have suffered significant injury, including but not limited to: loss of business opportunities and contracts (as detailed, e.g., the collapse of the CWV acquisition and multiple lost client engagements can be traced to the reputational taint caused by Avangrid's defamation), loss of goodwill in the industry, and personal distress and reputational harm to Mr. Silva (who has seen his professional standing severely damaged). Because the statements were defamatory per se, general damages are presumed. SLI's business was essentially destroyed by the twin impact of Avangrid's defamation and blackballing campaign. Quantifiable losses attributable to the defamation include at least **$12 million** in specific lost deals and the $32 million lost company value from the failed acquisition, among other damages. Silva has suffered irreparable reputational harm that has made it difficult for him to find new business or employment in his field.

245.    In addition, Avangrid's conduct was willful, malicious, and in wanton disregard of Counterclaimants' rights, justifying an award of **punitive damages** to punish Avangrid and deter such egregious misconduct in the future.

246.    **Prayer for Relief (Defamation).** WHEREFORE, Counterclaim Plaintiffs demand

[Type here]

judgment against Avangrid on Count III for compensatory damages in an amount to be
determined at trial (including damage to reputation, lost income, and consequential losses),
presumed general damages for harm to reputation, punitive damages, costs of suit, and
such other and further relief as the Court deems just and proper.

## COUNT IV

### Tortious Interference with Business Relations

247.    Counterclaimants incorporate by reference the allegations set forth above. This
Count addresses Avangrid's interference with both existing and prospective business
relationships of SLI and Silva.

248.    **Existing Contracts/Business Relations:** SLI had valid business relationships and
expectancy in certain contracts and arrangements that were **known to Avangrid**. For example,
SLI had been working as a subcontractor or partner on ongoing projects (including with
Unlimited Technology, Inc. and PSM (Viewpoint) on Avangrid-related work) and had
reasonable expectations of continuing and expanding those engagements. Avangrid was aware
that SLI was part of these projects. However, Avangrid intentionally induced the termination of
SLI's involvement by pressuring those partners to drop SLI. In one instance, Unlimited (acting
at Avangrid's behest) removed SLI from a project mid-stream in late 2019 and redistributed
SLI's remaining work to other Avangrid-aligned vendors, thus cutting off SLI from the
expected revenue. This was done without justification, other than Avangrid's desire to punish
SLI and favor its co-conspirators.

249.    **Prospective Business and Investment**: SLI also had a **prospective economic
relationship** with Clean Water Ventures (CWV) regarding a potential acquisition/investment,
as described earlier. Additionally, SLI's multi-million dollar transaction with Resilient
Advisors LLC failed due to Avangrid's efforts to undermine SLI's business. Avangrid was
generally aware that SLI, like many startups, was seeking investors/partners and that its
actions toward SLI could influence such third parties. By launching a second high-profile

[Type here]

lawsuit in New York City, SLI's backyard, and making defamatory claims, Avangrid effectively broadcast to the business community that SLI was embroiled in serious "legal troubles." Upon information and belief, and in any event Avangrid certainly **foresaw** that its public accusations against SLI would scare off any potential investors or partners. Indeed, CWV's general counsel explicitly cited Avangrid's litigation and allegations as the reason for pulling out of the deal in mid-2023: he communicated to Silva that CWV could not proceed while SLI was being sued by a large utility for alleged misconduct. Thus, Avangrid's actions resulted in the termination of that prospective deal.

**Wrongful Means and Intent**

250.    Avangrid's interference was accomplished through **wrongful means** – namely, defamation and the filing of a sham lawsuit (abuse of process). These actions are independently tortious and cannot be justified as normal business competition. Avangrid's motive was purely malicious: to retaliate against and economically destroy a smaller competitor (SLI) for whistleblowing, and to ensure SLI would not have the resources or relationships to challenge Avangrid's conduct. Avangrid intended to interfere with SLI's relationships (or, at minimum, knew that interference was substantially certain to result). This satisfies the intent requirement for tortious interference. Given Avangrid's knowledge of SLI's situation, it is reasonable to infer Avangrid intended the consequences – that SLI would lose business opportunities – as part of its campaign.

251.    **Damage to SLI/Silva:** As a direct result of Avangrid's intentional interference, SLI's business relationships were disrupted or destroyed, causing significant financial harm. SLI lost the aforementioned CWV acquisition opportunity (projected value of at least $8–$10 million upfront and much more in long-term growth) and lost other prospective clients who were on the verge of signing contracts but backed away after hearing Avangrid's derogatory statements or learning of the lawsuit. Additionally, Avangrid's influence in the industry meant SLI was effectively blacklisted from new work – a form of interference with all of SLI's prospective business. Silva, as the owner of SLI, suffered damage in the form of lost company value and lost personal income tied to SLI's success. These damages coincide with those

[Type here]

described in the defamation count, and Counterclaim Plaintiffs seek recovery for the full measure of losses proximately caused by Avangrid's interference.

252.    Alternatively, even if some of SLI's lost opportunities were not known to Avangrid in detail, Avangrid's actions were so egregious and targeted that Avangrid is liable for **interference with prospective economic advantage** under a general theory that one who, without justification, intentionally harms another's business relationships through wrongful conduct is liable for resulting damages. No legitimate business purpose justified Avangrid's conduct – it was purely punitive and anticompetitive.

253.    **Prayer for Relief (Interference).** WHEREFORE, Counterclaim Plaintiffs demand judgment against Avangrid on Count IV, for an award of compensatory damages in an amount to be proven at trial (including but not limited to the lost $32 million CWV deal value and other lost profits), and an award of punitive damages in light of Avangrid's willful and wanton interference, plus such other relief as the Court deems just and proper.

## COUNT VI

## BREACH OF CONTRACT

**NATURE OF THE CLAIM**

254.    Counterclaim Plaintiffs Security Limits Inc. ("SLI") and Paulo Silva ("Silva") bring this counterclaim against Avangrid Inc. for Breach of Contract, Fraudulent Inducement, Unjust Enrichment, and Promissory Estoppel based on Avangrid's unlawful procurement practices and fraudulent promises regarding the Ironclad® Runbook license and Phase-2 engagement of the $400M Corporate Security Program.

255.    Avangrid, a $40 billion company, led SLI to operate on-premises in Rochester, NY without a written contract, made verbal assurances of licensing fees and future compensation, then abruptly terminated SLI when it refused to participate in corruption. This reckless and unethical business practice raises serious concerns about how Avangrid could have engaged in such grossly negligent behavior while handling public infrastructure projects.

[Type here]

## II. FACTUAL ALLEGATIONS

### Avangrid's Executives Fraudulently Induced SLI to Transfer Its Intellectual Property

256.　　In February 2019, Avangrid's David Lathrop and Tom Fitzgerald personally approached Paulo Silva regarding a license for the Ironclad® Runbook, a proprietary security framework developed by SLI.

257.　　Lathrop, a senior Avangrid official, was aware of procurement fraud related to the OTN-AMI contract manipulation and sought to secure licensing rights to the Ironclad® Runbook without immediate payment.

258.　　Lathrop explicitly told Silva that the Corporate Security Program had no budget available within its "financial framework" but that Avangrid needed an enterprise license to continue security operations under the Avangrid Secure Domain (ASD) Project.

259.　　Lathrop personally assured Silva that if he turned over the End User License Agreement (EULA) at no cost, SLI would recover its full $5 million estimated license fee—ten times over—through its participation in Phase-2 of the Corporate Security Program.

260 .　　Believing that a $40 billion company would honor its word, Silva agreed to execute the EULA without upfront payment, trusting that Avangrid would fulfill its obligations in Phase-2. SLI successfully delivered on all obligations for Avangrid's $400 million Corporate Security Program between 2018 and 2019, reinforcing its expectation of continued collaboration.

[Type here]

## IV.    SECURITY LIMITS' INTERACTIONS WITH AVANGRID

To implement the ASD project, Avangrid has retained qualified service providers. In turn, those companies have retained multiple subcontractors. Here, Security Limits served as a subcontractor on Phase 1 of the ASD Project. Neither Avangrid, nor any other Avangrid entity, has ever had a direct contract with Security Limits or its principal Paolo Silva, other than a License Agreement for software used in the ASD project.

Security Limits provided certain information technology services from approximately February 2018 to December 2018, as a subcontractor of third-party SNC, Ltd., and from January 2019 to September 2019, as a subcontractor of third-party Unlimited Technology, Inc. ("Unlimited Technology"), to Avangrid Service Company ("Avangrid Service Co."), a subsidiary of Avangrid Networks. Unlimited Technology ceased using Security Limits'

6

services when the scope of the work for Security Limits concluded; Unlimited Technology then awarded other parts of the ASD project to other vendors.

261. This official admission proves that Avangrid knowingly acquired the Ironclad® Runbook under the terms of its agreement with SLI and yet never compensated SLI for its intellectual property, in direct violation of the agreement.

262. This official admission proves that Avangrid knowingly acquired the Ironclad® Runbook under the terms of its agreement with SLI and yet never compensated SLI for its intellectual property, in direct violation of the agreement.

[Type here]

**Avangrid's Scheme Was Based on Procurement Corruption and Retaliation**

263. Avngrid never intended to honor its promises to compensate SLI and instead leveraged fraudulent procurement schemes to extract SLI's intellectual property for free while planning to eliminate it from future contracts.

264. Avangrid executives, including David Lathrop and John Allen—internally acknowledged That SLI was never included in SNC Lavalin and La Bella's original Design & Engineering contract despite SLI performing the work of the Design & Engineering Firm under Avangrid's Corporate Security Program.

265. SLI was operating on-premises at Avangrid's Rochester, NY facility under a verbal contract because the Corporate Security Department was unwilling to process payroll for SLI due to the absence of a Design and Engineering Contract or a Master Service Agreement.

266. The fact that Avangrid, a publicly traded company handling critical infrastructure allowed a small business to operate without a signed contract raises serious concerns about its internal compliance program, governance, ethics, and procurement integrity.

267. The breach of contract became evident when Avangrid abruptly terminated SLI for:

- Refusing to hire David Lathrop after his retirement.
- Refusing to invest in Lathrop's personal Coil Invention.
- Refusing to lower its bid by $1 million at Prosegur's request.

267. On February 3, 2020, Avangrid released a fraudulent Request for Proposal (RFP 795776) at 4:56 AM, which brazenly invited three Prosegur Business Units and affiliates to bid against each oth er, while pressuring SLI to undercut its own pricing.

268.. Prosegur's CFO Andre Viera Rolim even acknowledged the fraudulent nature of this scheme, stating: "Putz! I will tell Viewpoint not to bid because there will be problems…"

269. SLI refused to participate in Avangrid's corrupt bidding practices and refused to subcontract under Prosegur. In retaliation, Avangrid terminated its relationship with SLI, effectively stealing its license without paying for it.

270. As a result, SLI has suffered severe financial damages, loss of business opportunities, and

[Type here]

reputational harm, all while Avangrid continues to benefit from SLI's proprietary security framework without paying for it.

## BREACH OF CONTRACT (Verbal and Implied Agreement)

271.Avangrid and SLI entered into an enforceable verbal and implied contract under which:

- SLI provided security engineering services and licensed the Ironclad® Runbook to Avangrid.
- Avangrid agreed to compensate SLI in Phase-2 of the Corporate Security Program

272.SLI fully performed its obligations under the agreement.

273.Avangrid materially breached the contract by:

- Failing to compensate SLI for the Ironclad® Runbook license.
- Terminating SLI's participation in retaliation for exposing procurement fraud.
- Misrepresenting its agreement with SLI to regulators and third parties.

274.As a result of Avangrid's breach, SLI has suffered millions in lost revenues and reputational harm.

## LEGAL BASIS

275. Verbal agreements, though lacking formal documentation, are fully enforceable under New York law when the essential terms are clear and parties have demonstrated mutual assent and performance. Courts have upheld verbal agreements, particularly when one party substantially relies upon verbal assurances to their detriment:

- In Adjustrite Systems, Inc. v. GAB Business Services, Inc., 145 F.3d 543 (2d Cir. 1998), it was established that where parties rely upon verbal assurances and actions, a binding agreement can be recognized by the court in absence of a formalized written document.
- In Brown Bros. Electrical Contractors, Inc. v. Beam Construction Corp., 41 N.Y.2d 397, 393 N.Y.S.2d 350, 361 N.E.2d 999 (1977), the New York Court of Appeals reinforced that verbal agreements demonstrated by performance and reliance are fully enforceable when parties acted consistently with the terms discussed.

[Type here]

**FRAUDULENT INDUCEMENT**

275. Avangrid knowingly made false promises to induce SLI into transferring its proprietary EULA without payment.

276. SLI reasonably relied on Avangrid's statements, trusting that a $40 billion company would not deceive a small business.

277. Avangrid never intended to honor its commitments, and instead engaged in a deliberate fraud scheme to misappropriate SLI's intellectual property.

278.. SLI demands compensatory and punitive damages for Avangrid's deliberate deception.

**UNJUST ENRICHMENT**

279. Avangrid received and continues to use SLI's proprietary Ironclad® Runbook without payment.

280. Retaining these benefits without compensating SLI is unjust and unlawful.

281. SLI demands full restitution for its intellectual property and services.

**PROMISSORY ESTOPPEL**

282. Avangrid made clear and enforceable verbal promises that SLI relied upon.

283. SLI's reliance was reasonable given Avangrid's size and industry reputation.

284. Avangrid's failure to honor its commitments has caused SLI substantial harm.

285. To prevent unjust harm, Avangrid must be held accountable for its false promises.

**PRAYER FOR RELIEF**

WHEREFORE, SLI demands:

1. Compensatory damages for breach of contract.

2. Restitution for unpaid licensing fees.

3. Punitive damages for fraudulent inducement.

4. Attorneys' fees and litigation costs.

5. Injunctive relief prohibiting Avangrid from further using SLI's intellectual property.

[Type here]

**JURY TRIAL DEMAND**
**Counterclaim Plaintiffs demand a jury trial on all claims.**

WHEREFORE, the defendants/counterclaimants demand judgment dismissing the plaintiffs' complaint in its entirety and further demands judgment granting the counterclaims contained herein, in an amount that is satisfactory to the jury, the Court or both.

Dated: Greenlawn, NY 11740

March 17, 2025

Respectfully submitted,
The Law Offices of Edward J. Troy

By: _____
            EDWARD J. TROY
44 BROADWAY
Greenlawn, NY 11740
631-239-6817

72