# EXHIBIT 6

## MASTER SERVICES PROCUREMENT AGREEMENT

**THIS MASTER SERVICES PROCUREMENT AGREEMENT** (this "Agreement") is made this 12th of September, 2016 by and between **Avangrid Service Company ("Customer" or "ASC")** with its principal office located at 89 East Avenue, Rochester NY 14649, and **Unlimited Technology, Inc.** ("Supplier") with its principal office located at 20 Senn Drive, Chester Springs, PA 19425.

**WHEREAS**, Customer desires to procure certain services from Supplier, including the services described in Schedule A, attached hereto and made part hereof (the "Services"); and

**WHEREAS**, Supplier states that it is an established and well-known provider of the Services possessing the skills, qualifications, and experience necessary to perform and manage such Services in an efficient, cost-effective, and controlled manner, with a high degree of quality and responsiveness, and that it has successfully performed similar services for other customers and is willing to provide the Services to Customer in accordance with the terms and conditions of this Agreement; and

**WHEREAS**, in reliance upon such statements, Customer has selected the Supplier to provide the Services, which shall be procured and performed in accordance with this Agreement.

**NOW THEREFORE**, in consideration of the mutual covenants contained herein, and other good and valuable consideration, Customer and Supplier agree as follows:

### 1.    Definitions.

1.1    "Affiliate" means, with respect to a person or entity, any individual, corporation, partnership, firm, joint venture, association, joint stock company, trust or other unincorporated organization, directly or indirectly controlling, controlled by, or under common control with, such person or entity. The term "control" shall mean the possession, directly or indirectly, of the power to direct the management or policies of a person or an entity. A voting interest of ten percent (10%) or more shall create a rebuttable presumption of control.

1.2    "Contract Documents" means this Agreement (including all Schedules, if any, attached or incorporated by reference), the Purchase Order (as defined below), the plans and specifications, and all addenda and change orders issued by Customer. Any reference to this Agreement shall be deemed a reference to all the Contract Documents.

1.3    "Effective Date" means the date this Agreement is executed by Customer and Supplier.

1.4    "Materials" means materials, supplies, equipment, machinery, tools, and all other items and facilities to be used, furnished, or delivered in connection with the Services.

1.5    "Services" means the services described in Schedule B, attached hereto and part hereof, including any design, engineering, installation, construction, modification, and or testing to be performed as part of the Services and includes the Materials necessary for the provision of the Services.

1.6    "Purchase Order" means a purchase order issued by the Customer for the Services to be provided in accordance with this Agreement.

### 2.    Scope

2.1    Scope of Services. Supplier shall perform the Services described herein and in Schedule B hereto. Supplier shall assign sufficient qualified employees or agents ("Personnel") to

complete the Services in a timely manner, and complete the Services promptly and as specified herein. Supplier shall immediately upon discovery bring to Customer's attention any errors, omissions, discrepancies or conflicts with respect to the Contract Documents or the Scope of Services.

2.2     Time. Supplier shall begin performance of the Services as soon as reasonably practical after the Effective Date. Time is of the essence in this Agreement. At Customer's request, Supplier shall promptly furnish a detailed schedule acceptable to Customer. If the Services falls behind schedule in whole or in part as the result of acts or omissions of Supplier, at its expense, Supplier shall take all steps necessary to return performance of the Services to the schedule, including (without limitation) the use of subcontractors, overtime, and shift work.

2.3     Subcontractors. Customer must give its written approval before Supplier uses any subcontractors in the performance of any Services. Unless otherwise agreed to by the parties, if Supplier shall cause any part of the Services to be performed by a sub-contractor, the provisions of this Agreement shall apply to such sub-contractor and its officers, agents or employees in all aspects as if they were employees of Supplier, and Supplier shall not thereby be discharged from any of its obligations and liability hereunder, but shall be liable hereunder for all acts and omissions of the sub-contractors. Nothing shall create any contractual relationship between Customer and any sub-subcontractor.

### 3.     Term and Compensation.

3.1     Term. This Agreement shall be effective as of the Effective Date and shall last for a term of three (3) year(s). Thereafter this Agreement shall renew for successive one (1) year terms unless terminated by the Customer in accordance with this Agreement.

3.2     Compensation. In full consideration for the complete and satisfactory performance of the Services, Customer shall pay the amount set forth on the Purchase Order and as set forth on Schedule B attached hereto and incorporated herein. The price(s) charged by Supplier for all time and material Services shall be no more than Supplier's standard prices in effect for similar work.

3.3     Invoices. In accordance with the Purchase Order, Supplier shall submit invoices prepared in such form and supported by such documentation as Customer may reasonably request. The submission of invoices by Supplier to Customer shall be consistent with mutually agreed to progress billing as set forth more fully in the attached schedules. Customer shall pay undisputed amounts due within 30 days after invoice receipt. If agreed to by the parties, additional payment terms may be set forth on the Purchase Order. The final invoice may be submitted after Customer accepts the Services.

3.4     Waiver. No inspection, approval, payment, or acceptance of the Services shall be construed as evidence of satisfactory performance of any Services not performed in accordance with this Agreement, as a waiver of any of Customer's rights, or as relieving Supplier from its responsibility under this Agreement. Acceptance by Supplier of final payment shall constitute a waiver of all claims which Supplier may have against Customer; provided, however that any such final payment will be conspicuously designated as final payment.

3.5     Withholding. Customer may withhold payment to the extent reasonably necessary to protect Customer from (without limitation) defective Services, damage to Customer or a third party, failure to carry out the Services in accordance with this Agreement, potential claims of a third party(ies), and reasonable doubt that the Services can be completed for the balance due or on time. Should any payment be withheld per this Section 3.5, Customer shall promptly provide Supplier with a written explanation detailing the reason behind the withheld payment and provide supporting materials rationalizing the dollar amount withheld.

2



**4.    Certain Obligations of Supplier.**

4.1    Intentionally omitted.

4.2    Warranty. Supplier represents and warrants that all services shall be performed and completed using its best efforts and skills. The Services shall be of high quality; performed in accordance with sound, generally accepted professional practices and by fully experienced, equipped, organized, and properly qualified individuals; free from defaults and defects in workmanship, title and Materials; and in compliance with applicable specifications and fit for its intended purpose. All Materials shall be new, free from defects and workmanship, material, and title, and approved by or acceptable to Customer. Supplier shall be solely responsible for all means, methods, techniques, sequences, and for coordinating all portions of the Services. The Services shall not be deemed completed until all applicable drawings and other documents, if any, have been completed, delivered, and accepted by Customer whose acceptance shall not be unreasonably delayed. Customer will rely upon the accuracy, competence, and completeness of the Services. Supplier shall comply with all applicable laws, rules and regulations, including (without limitation) corporate policies of Customer. Except as otherwise agreed to by the parties, Supplier, its subcontractors or agents shall procure at Customer's sole cost and expense, all applicable permits, licenses and inspections and comply with all of the terms and conditions of the applicable permits, licenses and inspections.

4.3    Remedy. If the Services do not comply with the foregoing warranties for up to one year after final acceptance of the Services, Supplier shall reperform, repair or replace the Services, including modifications or additions as may be reasonably necessary to correct any defect or failure. The choice of repair or replacement will be made by Customer and shall be commercially reasonable. Reperformed, repaired or replaced Services shall be subject to the same terms and warranties as provided for the original Services. If Supplier cannot reperform the defective Services within a reasonable period of time, Customer may elect to remedy the defect and bill Supplier therefore. If Customer reasonably determines that reperformance is no longer feasible, Supplier shall refund any compensation paid to it for such Services and reimburse Customer for actual damages incurred and damages which may be foreseeably incurred to the extent they are attributable to acts or omissions of Supplier.

4.4    Protection. Supplier shall use industry best practices to protect and prevent damage or injury to the Services, persons, or property of Customer and others, including (without limitation) if applicable the responsibility for the security of the Services and site. Supplier shall perform the Services, including storage of Materials, so as not to interfere with the progress of the Services, Customer's normal operations, or the activities of others.

4.5    Inspection. Supplier shall permit and facilitate inspection of the Services by Customer and its agent's at all reasonable times.

5.    **Insurance.** Supplier shall maintain insurance in accordance with the requirements as set forth in Schedule C. Supplier must maintain applicable insurance. An insurance certificate must be mailed to Customer prior to starting Services.

6.    **Audit.** For all Services not performed on a fixed-price basis, Supplier shall keep accurate records and accounts showing all direct and indirect charges, disbursements, costs or expenses incurred by Supplier in the performance of the Services. Upon five days written notice, Customer shall have the right to audit Supplier's records and accounts related to the Services up to two years after payment of the final invoice for the Services. Upon five days written notice, Supplier shall also allow Customer to audit or inspect Supplier's facilities and books and records related to the Services to determine Supplier's compliance with this Agreement, including (without limitation) quality assurance, project management, and other standards.

7.    **Changes.** At any time, Customer may make changes ("Changes") in the Services, as it deems necessary or appropriate. Changes include (without limitation) additions to or omissions from the Services, schedule changes, or a temporary suspension of all or part of the Services. Within eight days

3

after any Change proposal from Customer, Supplier shall notify Customer of any additional time or compensation which will be necessitated by the Change. The resulting time to complete the Services and/or the cost or credit to Customer shall be equitably and mutually determined by Customer and Supplier. No additional time or compensation shall be due to the extent a Change results from the fault or negligence of Supplier. No Change shall be binding unless made in a subsequent Customer Purchase Order and agreed to by the Parties.

**8.** **Proprietary Information.** Data or information generated or acquired during this Agreement relating to Customer which is not otherwise publicly available, shall belong to and be proprietary to Customer and shall be kept secret by Supplier, although Supplier may use it to the extent necessary to perform the Services. Drawings, specifications, calculations, reports, Services in process, models, or other work product, if any, prepared by Supplier pursuant to the scope of work detailed in Schedule B shall become the property of Customer when prepared and shall be delivered to Customer upon request and, in any event, upon the termination of this Agreement for any reason. Supplier may keep copies or samples thereof for its internal use (but not disclosure to others), but Customer shall retain all intellectual property therein. Supplier hereby irrevocably assigns to Customer all right, title and interest in such items, and, at Customer's option and expense, shall execute any documents reasonably requested by Customer for the assignment, registration, or other protection of any related proprietary right. Notwithstanding anything in the foregoing, Supplier shall retain all right, title and interest in any work product prepared by Supplier that falls outside the scope of work detailed in Schedule B, unless otherwise agreed to by the parties.

**9.** **Confidentiality.** Supplier, its employees and agents, shall treat any information, (including any technical information, experience or data) regarding Customer or its Affiliates plans, programs, plants, processes, costs, equipment, operations, or customers, which may be disclosed to, or come within the knowledge of, Supplier its employees and agents in the performance of this Agreement, as confidential, and will not use or disclose this information to others, during the term of this Agreement, and for three (3) years thereafter, except as is necessary to perform the Services hereunder, without Customer's prior written consent. The provisions of this Article shall not apply to any information referred to in this Section which (i) has been published and has become part of the public knowledge through no effort by Supplier, its employees, or agents, (ii) has been furnished or made known to Supplier or Supplier's Affiliates by third parties (other than those acting directly or indirectly for or on behalf of Customer or Customer Affiliate) as a matter of legal right and without restriction on disclosure, (iii) was in Supplier's possession prior to disclosure by Customer or its Affiliates and was not acquired by Supplier or Supplier's Affiliates, its employees and agents directly or indirectly from Customer or its Affiliates or, (iv) is required by law or by any other governmental regulatory authority to be disclosed.

Any information, which is supplied by the Supplier to Customer or a Customer Affiliate under this Agreement, will be similarly restricted. Customer and Customer Affiliate will not disclose such information to others or publish it in any form at any time; provided, however, that notwithstanding the foregoing, Customer may disclose any such information to its Affiliates, employees, and consultants, to any regulatory agencies or instrumentality's when such disclosure is necessary, or otherwise required by law. Customer will cooperate with the Supplier in an effort to minimize the amount of such information, which will be disclosed in any such case, and to make reasonable efforts to secure confidential treatment of such information.

In no event shall Customer's or its Affiliates' names and/or logo or the name and/or logo of it's parent company be used, whether written or verbal, duplicated, reproduced by any means whatsoever without the prior written permission of the Customer.
All inquiries by any governmental, business, or other entity, including media, regarding any Services performed or to be performed by Supplier for Customer shall be directed by Supplier to Customer for response.

**10.** **Force Majeure.** Neither party shall be liable for its failure to perform hereunder to the extent circumstances arise which are beyond its reasonable control and which could not have been avoided by the exercise of due diligence and foresight including, but not limited to, excessive snowfall.

4



The party prevented from performance shall diligently take all steps reasonably available to overcome the cause of such inability to perform and shall resume its performance as soon as commercially practicable.

**11.    Indemnification.**

11.1 Generally. Supplier will fully indemnify, defend at its expense and hold harmless the Customer and its Affiliates, directors, officers, employees, and agents (the "Indemnitee") from and against any and all claims, demands, suits, losses, costs, fees, damages or expenses it may suffer, or for which it may be held liable, whether including, without limitation, reasonable expenses and attorney's fees incurred in the connection therewith, by reason of (A) any patent, trademark, or copyright infringement claim, or any design, device, process or procedure used, installed or provided by the Supplier or its agents or subcontractors under this Agreement; (B) any work-related accident or injury affecting an employee, agent or subcontractor of the Supplier, arising directly from the Service performed under this Agreement; (C) any claim by an agency or instrumentality of the federal, state or any local government, or by an employee, agent or subcontractor of the Supplier alleging that (i) the Indemnitee is required to maintain worker's compensation or unemployment or any other type of insurance upon any employee, agent or subcontractor of the Supplier; (ii) the Indemnitee is liable for tax payments or withholding with respect to any employee, agent or subcontractor of the Supplier; (iii) any employee, agent or subcontractor of the Supplier is entitled to receive employee benefits from the Indemnitee, including, without limitation, vacation, deferred compensation, medical, pension, 401(k) or any other benefit available to the Indemnitee's employees; and (iv) the Indemnitee is liable to any party, due to the negligent performance of Services or omissions by an employee, agent or subcontractor of the Supplier; (D) bodily injury, including death, to any person or persons due to the negligent, reckless or willful actions or omissions of the Supplier or its agents or subcontractors; (E) damage to or destruction of any property, due to the negligent, reckless or willful actions or omissions of the Supplier, or its agents or subcontractors. Individual employees, agents and subcontractors of the Supplier who are performing Services for the Indemnitee under this Agreement shall be considered to be employees, agents or subcontractors of the Supplier for all purposes under this Agreement, notwithstanding any judicial or administrative determination that such employees, agents or subcontractors of the other party should be regarded as employees under applicable law. All actions of the employees, agents and subcontractors of the Supplier under this Agreement shall be deemed to be actions of the Supplier under these indemnities and this Agreement. Notwithstanding anything in the foregoing, under no circumstances shall Supplier have any indemnification obligations or be liable for the negligence of third parties other than Supplier's employees, agents or subcontractors.

11.2    Taxes. Supplier similarly agrees to fully indemnify, defend and hold Customer harmless against liability or expense on account of all contributions, assessments, and taxes now or hereafter imposed by any governmental authority with respect to the compensation of Supplier.

**12.    Termination.**

12.1    Cause. Customer, reserving to itself the right to receive such other damages and remedies as it may have pursuant to this Agreement or at law or in equity, has the right to terminate this Agreement, by giving written notice of termination to Supplier of the occurrence of any of the following:

(a)    Supplier defaults in the observance or performance of any covenant, agreement or condition contained in this Agreement if within ten (10) days after the giving of written notice to Supplier of such failure of performance, Supplier has not cured such failure or if such failure of performance cannot be cured in ten (10) days, if Supplier has not commenced curing such failure of performance promptly and within such ten (10) day period is not effectuating such cure with haste and does not cure such failure of performance within a reasonable time, not to exceed, thirty (30) days from receipt of the notice specified herein.

5

(b)        In the event that Supplier is declared to be bankrupt or insolvent, Supplier makes an assignment for the benefit of creditors, Supplier shall file a voluntary petition in bankruptcy or insolvency or an involuntary petition is filed against Supplier, or a receiver shall be appointed for Supplier and such appointment or bankruptcy or insolvency proceedings, petition, declaration or assignment is not set aside within thirty (30) days.

(c)        There has been a material adverse change in the financial condition of Supplier that affects the ability of Supplier to perform.

12.2    Convenience. Customer may terminate this Agreement for any reason at any time ("Termination for Convenience") or Customer may similarly terminate any specific portion of the Services for any reason and at any time. Termination for Convenience shall take place fifteen (15) days from issuance of written notice by Customer. In the event the Supplier has not defaulted on a material term of this Agreement, Customer agrees to pay for all Services rendered and reasonable costs incurred prior to the termination date pursuant to this Agreement, provided, however, that such payment shall not result in total payment(s) to the Supplier exceeding the maximum amount payable under the terms of the applicable Purchase Order. This provision shall not be deemed to limit or otherwise affect Customer's right to terminate this Agreement for breach or default by the Supplier.

**13.    Employee Solicitation.** During the term of this Agreement and for a period of one (1) year thereafter, except with the prior written consent of the Customer, Supplier shall not offer employment to any employee of the Customer or Customer's current or future Affiliates with whom Supplier has had contact in connection with the negotiation, execution, or performance of this Agreement, and Supplier shall not induce or attempt to induce, directly or through an agent or third party, any such employee to leave the employ of the Customer or its Affiliates. As used herein, the term "Affiliate" shall mean any person or entity controlling, controlled by, or under common control with the Customer through majority stock or other ownership interest, direct or indirect. Nothing in this clause shall limit Supplier from employing any person who contacts Supplier on his or her own initiative and without any solicitation by Supplier specifically directed to such employee.

**14.    Miscellaneous.** This Agreement and the contract documents as defined herein constitute the entire agreement between the parties and supersede all prior or contemporaneous communications or agreements, written or oral, with respect to the Services. Any reference to Supplier shall be deemed a reference to Supplier, its employees and subcontractors and those under their direction and control. Supplier shall not assign this Agreement (or any monies due hereunder) nor subcontract its obligations without the prior written consent of Customer. Any such attempted assignment or other transfer without such consent shall be void. This Agreement may be amended only by a writing signed by the parties. The failure of either party to enforce any provision of this Agreement shall not constitute a waiver thereof nor of the right to seek any other remedy. No waiver shall be valid unless in writing signed by the waiving party. Addresses for notice shall be as set forth in the preamble or as changed by notice. This Agreement shall be governed by the laws of the state of New York without regard to conflict of law principles. Any dispute shall be resolved in courts located in the state of New York, and the Parties consent to their personal jurisdiction. All sections or provisions of this Agreement with terms containing obligations or duties which by their nature are to be or may be performed beyond any termination hereof, shall survive the termination of this Agreement without regard to the reason for termination, including, without limitation, Sections 3, 4, 5, 6, 8, 9, 11, 13, and14.

**15.    Ethics.** Supplier shall comply with the AVANGRID Suppliers' Code of Ethics ("Suppliers' Code of Ethics") in connection with its performance under this Agreement. The Suppliers' Code of Ethics can be found at the AVANGRID website (www.avangrid.com).

**16.    Performance Monitoring.** Customer will evaluate Suppliers performance by utilizing Supplier Corrective Action Reports and Supplier Performance Evaluation Reports which shall be made available to Supplier upon request. The Supplier must provide upon request the OSHA incident rate and Experience Modification Rate for Customer's review. The Customer will evaluate the Supplier's

6



performance upon the conclusion of the Services by completing the specified report. The Customer will continuously monitor the Supplier's performance.

**17.    Continuous Improvement.** Continuous improvement is the foundation of this Agreement.    Supplier likewise will use its best efforts to improve continuously its performance in all areas. In particular, Supplier will evaluate opportunities for cost/price reductions on items and services ordered and to be ordered and communicate them promptly to Customer. Supplier has specifically identified target cost reductions of 2% beyond the prices shown in Schedule B for the Term, and agrees to work diligently with Customer personnel toward attainment of this objective. Supplier is expected to advance its economies of production, service, service delivery, material handling and technical prowess at least as fast as other reasonable competitors in its industry, and to offer the price and performance benefits of those improvements to Customer, as soon as they become available.

**18.    No Dispute.** Supplier covenants that it is not aware of any pending billing dispute or other contractual dispute (pursuant to current contracts or contracts no longer in effect) or any pending or threatened litigation between Supplier and/or any of Supplier's Affiliates and Customer and/or and of Customer's Affiliates.

**19.    Supplier Security Requirements.** Supplier shall comply with Customer's Supplier Security Requirements in their performance of Services for Customer under this agreement.

Supplier shall be familiar with and shall comply with the requirements of the NERC CIP- 004 for projects or services at or relating to critical cyber assets and critical company operating facilities ("Critical Infrastructure"). The specific CIP Standard follows:

CIP-004 Excerpt:
R3. Personnel Risk Assessment –-The Supplier shall have a documented personnel risk assessment program, in accordance with federal, state, provincial, and local laws, and subject to existing collective bargaining unit agreements, for personnel having authorized cyber or authorized unescorted physical access. A personnel risk assessment shall be conducted pursuant to that program prior to such personnel being granted such access except in specified circumstances such as an emergency. The personnel risk assessment program shall at a minimum include:

R3.1. The Supplier shall ensure that each assessment conducted include, at least, identity verification (e.g., Social Security Number verification in the U.S.) and seven- year criminal check. The Supplier may conduct more detailed reviews, as permitted by law and subject to existing collective bargaining unit agreements, depending upon the criticality of the position.

R3.2. The Supplier shall update each personnel risk assessment at least every seven years after the initial personnel risk assessment or for cause.

R3.3. The Supplier shall document the results of personnel risk assessments of its personnel having authorized cyber or authorized unescorted physical access to Critical Cyber Assets, and that personnel risk assessments of contractor and service vendor personnel with such access are conducted pursuant to Standard CIP-004.

**20.    Utilization of Small Business Concern.** Supplier and subcontractors of all tiers shall make a good faith effort to comply with section 52.219-8 of the Federal Acquisition Regulation. This policy requires that small business concerns, veteran-owned small business concerns, service-disabled veteran-owned small business concerns, HUBZone small business concerns, small disadvantaged business concerns, women-owned small business, Alaskan Native Corporation, and Indian tribe concerns shall have the maximum practicable opportunity to participate in the performance of Services.

**21.    Small Business Subcontracting Plan.** Some or all of the Goods and Services provided hereunder may be used in a contract with the federal government and, therefore, may be

7

subject to the requirements of FAR section 52.219-9. If applicable, each Supplier (except small business concerns) whose contract is expected to exceed $650,000 ($1,500,000 for construction) and has subcontracting possibilities is required to submit an acceptable subcontracting plan to the Customer. The plan shall include spending goals with businesses that are defined by the U.S. Small Business Administration as small, women-owned small, veteran-owned small, service-disabled veteran-owned small, HUBZone, small disadvantaged (SDB), Alaskan Native Corporations, and Indian tribes. If the Supplier fails to submit a plan within the time limit prescribed by the Customer, Customer may terminate this Agreement.

The Supplier assures that the clause entitled "Small Business Subcontracting Plan" will be included in all subcontracts, that offer further subcontracting opportunities, and all subcontractors (except small business concerns) who receive subcontracts in excess of $650,000 ($1,500,000 for construction) will be required to adopt a plan similar to this plan.

**22.    Notices.** Along with all other correspondence requirements included in this Agreement, any notice, request, approval or other document required or permitted to be given under this Agreement shall be in writing and shall be deemed to have been sufficiently given when delivered in person or deposited in the U.S. Mail, postage prepaid, return receipt requested, addressed as specified herein or to such other address or addresses as may be specified from time to time in a written notice given by such party. The parties shall acknowledge in writing the receipt of any such notice delivered in person.

All communications to Avangrid Service Company shall be directed to:

Avangrid Service Company
Contract Administration
89 East Avenue
Rochester, NY 14649
Phone: 585-724-8028
Fax: 585-771-2820

All communications to Supplier shall be directed to:

| | |
|---|---|
| Supplier Name | Unlimited Technology Inc. |
| Contact Name | Brent Franklin |
| Title | President |
| Email Address | bfranklin@utiglobal.com |
| Street Address | 20 Senn Drive |
| City, St, Zip | Chester Springs PA 19425 |
| Phone | (484) 348-1015 |

With a copy to:

| | |
|---|---|
| Supplier Name | Professional Security Broadband, Inc. |
| Contact Name | Jeremy Reich |
| Title | General Counsel |
| Email Address | jreich@psb.com |
| Street Address | 43 River Road |
| City, St, Zip | Nutley, NJ 07110 |
| Phone | (516) 208-2883 |
| Fax | (973) 661-3540 |

8



IN WITNESS WHEREOF, Customer and Supplier have each caused this Agreement to be signed and delivered by its duly authorized representative as of the date first given above.

Avangrid Service Company

_____
Signature

R.D. KUMP
_____
Print Name

CEO
_____
Title

9/19/16
_____
Date


Unlimited Technology, Inc.

_____
Signature

John P. Hopkins
_____
Print Name

Chief Executive Officer
_____
Title

9/14/2016
_____
Date


Avangrid Service Company

_____
Signature

MARTA MORONO
_____
Print Name

CORPORATE CONTROLLER    LEGAL APPROVED
_____
Title

9/21/2016
_____
Date


SCHEDULES:

| Schedule A: | Companies |
| Schedule B: | Scope of Services |
| Schedule C: | Terms and Conditions |
| Schedule D: | Pricing Terms |
| Schedule E: | Special Conditions |
| Schedule F: | Notices |
| Schedule G: | Insurance Requirements |
| Schedule H: | Background Check Requirements |
| Schedule I: | Data Security Rider |

9

## SCHEDULE A

### Companies

All AVANGRID companies are subject to this AGREEMENT FOR SERVICES, as is AVANGRID intent to include all Operating Companies within this Project scope of services.

For the purpose of consolidating all AVANGRID Operating Companies, Avangrid Service Company (ASC) will be the one executing this AGREEMENT FOR SERVICES on behalf of all AVANGRID Operating Companies.

10

## SCHEDULE B

### Scope of Services

To be defined during the beginning of the Project. An Amendment to Schedule B will be executed by that point.

Until a more specific scope of services is defined by both parties, RFP documentation applies.

11

## SCHEDULE C

### Terms and Conditions

### TABLE OF CONTENTS

**Agreement Article - Description**                                    **Page**

ARTICLE 1 – CONTRACT DOCUMENTATION AND DESCRIPTION OF SERVICES ...............................14

ARTICLE 2 - CONTRACT PRICE.............................................................................................................14

ARTICLE 3 - REIMBURSABLE ITEMS....................................................................................................15

ARTICLE 5 – TAXES ................................................................................................................................16

ARTICLE 6 – CHANGES ..........................................................................................................................16

ARTICLE 7 - CLAIMS/DISPUTES ...........................................................................................................17

ARTICLE 8 – AUDIT ................................................................................................................................17

ARTICLE 9 - RIGHTS, PRIVILEGES, REMEDIES..................................................................................17

ARTICLE 10 - NON WAIVER OF RIGHTS ..............................................................................................17

ARTICLE 11 - SET-OFF ...........................................................................................................................17

ARTICLE 12 - CONFLICTING DOCUMENTS .........................................................................................18

ARTICLE 13 - INDEPENDENT SUPPLIER .............................................................................................18

ARTICLE 14 – SUBCONTRACTS ............................................................................................................18

ARTICLE 15 - THIRD PARTY BENEFITS ...............................................................................................18

ARTICLE 16 – SAFETY ...........................................................................................................................18

ARTICLE 17 - ACCIDENT AND LOSS PREVENTION ...........................................................................19

ARTICLE 18 – INSURANCE ....................................................................................................................19

ARTICLE 19 – INDEMNIFICATION........................................................................................................19

ARTICLE 20 – WARRANTY ....................................................................................................................19

ARTICLE 21 - APPROVAL/ACCEPTANCE.............................................................................................20

ARTICLE 22 - FORCE MAJEURE ...........................................................................................................20

ARTICLE 23 - TITLE AND LIENS ...........................................................................................................20

ARTICLE 24 - PROGRESS AND COMPLETION .....................................................................................20

ARTICLE 25 - EMERGENCIES................................................................................................................21

ARTICLE 26 - WORK STOPPAGE ..........................................................................................................21

ARTICLE 27 - TERMINATION ................................................................................................................21

ARTCILE 28 – TERM AND SURVIVAL...................................................................................................22

ARTICLE 29 - REMOVAL OF EQUIPMENT ...........................................................................................22

ARTICLE 30 - FINAL PAYMENT ............................................................................................................22

ARTICLE 31 - ASSIGNMENT ..................................................................................................................22

12

ARTICLE 32 - SEVERABILITY.............................................................................................22

ARTICLE 33 - NON WAIVER OF RIGHTS .....................................................................22

ARTICLE 34 - OWNERSHIP OF PLANS ........................................................................22

ARTICLE 35 - KEY PERSONNEL....................................................................................23

ARTICLE 36 - PUBLIC RELEASE OF INFORMATION ...............................................23

ARTICLE 37 - LIMITATION OF LIABILITY .................................................................23

ARTICLE 38 – CONFIDENTIALITY ...............................................................................23

ARTICLE 39 - EQUAL EMPLOYMENT OPPORTUNITY COMPLIANCE ................24

ARTICLE 40 - SURETY BOND ........................................................................................24

ARTICLE 41 - GOVERNING LAW ..................................................................................24

ARTICLE 42 - PERFORMANCE MONITORING...........................................................25

ARTICLE 43 - CONTINUOUS IMPROVEMENT...........................................................25

ARTICLE 44 - NO DISPUTE ............................................................................................25

ARTICLE 45 - SECURITY REQUIREMENTS ...............................................................25

ARTICLE 46 - EMPLOYEE SOLICITATION ................................................................26

ARTICLE 47 – ETHICS.....................................................................................................26

ARTICLE 48 – COMPLIANCE WITH LAWS GENERALLY .......................................26

ARTICLE 49 – UTILIZATION OF SMALL BUSINESS CONCERNS .........................26

ARTICLE 50 – SMALL BUSINESS SUBCONTRACTING PLAN................................26

ARTICLE 51 - GRATUITIES PROHIBITED ..................................................................27

13

## ARTICLE 1 – CONTRACT DOCUMENTATION AND DESCRIPTION OF SERVICES

Pursuant to that certain Master Services Procurement Agreement (the "Master Agreement") between AVANGRID Services Company and Unlimited Technology, Inc.    ("Supplier"), the entity named (hereinafter, the "Company") in the given Purchase Order (the "Purchase Order"), engages the Supplier, and the Supplier hereby agrees to perform the Services.

The provision of the Services shall be governed by the following documentation:

(i)       The Purchase Order (exclusive of its pre-printed terms and conditions on the back thereof);

(ii)      These Terms and Conditions;

(iii)     The Scope of Services document attached to the Master Agreement as Schedule B, as it may be amended, modified or supplemented for the Purchase Order; and

(iv)      The Master Agreement, including all Schedules other than those described in subsections (i), (ii), and (iii) above.

In the event of any inconsistency among the aforementioned documentation, the order of precedence shall be as set forth in subsections (i), (ii), (iii), and (iv), above.

All work shall be invoiced in accordance with the Pricing Schedule included in Schedule D, attached hereto and made a part hereof (unless otherwise agreed to in writing by the Company).

Supplier further agrees to do the following:

A       Supplier, through its experience and the normal course of business, has included full provision for local wage rates, travel and subsistence rates, allowances and conditions, if any, as well as allowances for any other measures necessary to complete the work   in a satisfactory manner in accordance with this Agreement.

B.      Supplier has read, understands and shall comply with Schedule E, hereby referred to as "Special Conditions", attached hereto and made a part hereof.

C.      Upon execution (for purposes hereof execution means when Supplier has begun to provide Services pursuant to the Purchase Order) of a Purchase Order:

   1)    Supplier has examined all available records pertaining to the work.

   2)    Supplier further states that the Agreement Price and detailed schedule for completion of the work are based on Supplier's known knowledge and judgment of the conditions and hazards involved, and not upon a representation of the Company.  The Company assumes no responsibility for any understandings or representation made by any of their representatives during or prior to execution of this Agreement unless such understandings or representations are expressly stated in this Agreement and the Agreement expressly provides that the responsibility is assumed by the Company.

## ARTICLE 2 - CONTRACT PRICE

The total price for the Services (made up of the costs, fees and expenses arising under Article 3 below) shall be set forth in the Purchase Order and shall be considered fixed unless stated otherwise (time and equipment, for example) on the face of the Purchase Order.

14

## ARTICLE 3 - REIMBURSABLE ITEMS

The Supplier shall be reimbursed for the following items for Services performed under this Agreement:

**A.     Fees**

Supplier shall be paid at the rates per hour specified in Schedule D to the Master Agreement for time spent in the actual performance of Services hereunder, including the preparation of reports, UNLESS a predetermined firm lump sum price has been agreed upon by both parties for all or part of the work, the criteria of which would take precedence as referenced therein. Time spent in Normal Commuting is not a billable expense. The term "Normal Commuting" means Supplier's first trip to any Work Location in a given day and Supplier's last trip from any Work Location in a given day. The term "Work Location" shall mean any location at which Services are or are to be performed by the Supplier. The term "Supplier's Base" shall mean the location or respective locations (which shall be disclosed to Customer in advance) from which Supplier will normally travel to Work Locations to perform Services. The Supplier agrees whenever possible, to coordinate travel arrangements that will maximize time spent in performing Services for the Company.

(i)     Company will not reimburse Supplier for additional expenses invoiced separately under a fixed bid project. The Supplier must include all the expected expenses from the quoted project within the fixed bid proposal.

(ii)     Company reserves the right to renegotiate or reject expenses when the Supplier's local office personnel are not utilized for the awarded project but meet the required job classification/criteria to complete the project and Supplier utilizes resources from other Supplier's offices.

**B.     Travel Expenses**

Company will pay or reimburse Supplier for actual cost of travel expenses incurred during the course of travel undertaken at Company's request for the performance of Services, including travel from Work Location to Work Location, not including Normal Commuting, as follows:

(i)     The Supplier will be reimbursed the automobile mileage at the then current IRS allowed rate. For mileage incurred in actual and necessary travel by private automobile for mileage to the Work Location, plus the actual cost of all parking, highway, and/or bridge charges paid enroute.

(ii)     The Supplier will be paid or reimbursed for travel by commercial airlines in coach class and at discounted fares, if possible, except when such coach and/ or discounted airline accommodations are not reasonably available to meet necessary work requirements or would

a)     require circuitous routing;

b)     require travel during unreasonable hours;

c)     greatly increase the duration of the flight;

d)     result in additional costs which would offset the transportation savings; or

e)     offer accommodations which are not reasonably adequate for the medical needs of the traveler.

Company will pay or reimburse Supplier for such reasonable additional airline travel expenses as are necessary to avoid or overcome the problems cited in the foregoing sentence.

(iii)     Company will pay or reimburse Supplier for the actual cost of necessary local transportation (cab, bus, streetcar, rental car, etc.). The Supplier agrees to furnish documentation, if requested, for any such charges in excess of $25.00 with its invoices therefore under this Agreement.

15



(iv)    Company will pay or reimburse Supplier for the actual cost of reasonable meals and hotel accommodations unless a predetermined per diem has been agreed to and is listed in Schedule D to the Master Agreement.

(v)    Company will not reimburse Supplier's meal expenses for travel when an individual leaves their home base and returns to their respective home base within the same day.

## ARTICLE 4 - PAYMENTS

**A.**    Payments of any undisputed portions of an invoice will be due within 30 days after the receipt by Company of a properly completed invoice.  The submission of invoices by Supplier to Customer shall be consistent with mutually agreed to progress billing as set forth more fully in the attached schedules

**B.**    An original and copy of each invoice are to be mailed to the "Bill to Location" provided in the Purchase Order.

Each invoice shall show the Purchase Order Number, Supplier work location, payment terms and the job name and other information, which may be required or reasonably requested by Company.

The following documentation must accompany each invoice:

(i)    Summary statements listing employee name, job classification, hours charged and hourly billing rates (both straight time and overtime if applicable) and total charges for the invoice period.

(ii)    Copies of expense account summary sheets for each individual performing Services will be provided.  The summary sheet will summarize lodging, meals, transportation and any other expenses. The period of time will also be shown.  Supplier shall retain copies of supporting documents for such expense accounts, and these will be made available for Company review upon written request by Company.  Supplier shall preserve all pertinent records supporting payment for Services hereunder for a period of two (2) years after final payment for the Services.

(iii) Other supporting documentation that Customer may reasonably request from time to time.

## ARTICLE 5 – TAXES

The price does not include sales/use taxes. The responsibility for remitting sales tax shall be determined by the Parties as mutually agreed to from time to time.
Except as agreed to by the Parties, Supplier shall be responsible for payment of and assumes exclusive liability for any and all contributions or taxes imposed by or required under the laws of the State of New York or any other state or Federal law, or the Federal Social Security Act or any other act, now or hereafter in effect, upon or in respect to, wages, salaries, benefits or other compensation paid to employees engaged upon or in connection with the Services.
Except as agreed to by the Parties, Company shall withhold from any payments due Supplier hereunder any amounts that it is required to withhold pursuant to any Federal or State tax laws.

## ARTICLE 6 – CHANGES

No changes in the Scope of Services are authorized unless made by Company and sustained by written Supplement agreed to by the parties.  Changes made by Supplier, unless authorized by an executed

16

Supplement, shall be made at the sole risk of Supplier, there being no financial recourse against Company. A Supplement is a written Purchase Order Supplement, signed by the Company and issued after the execution of this Agreement, authorizing an addition, deletion, or revision in the Services or an adjustment in the Contract Price or the Schedule.

No changes in the Agreement will be made without an Agreement Supplement. Unless otherwise agreed, all Supplements shall be governed by the conditions of this Agreement.

## ARTICLE 7 - CLAIMS/DISPUTES

A.    Any claims by Supplier relating to this Agreement, must be submitted in writing within fourteen (14) calendar days from the time Supplier first learns of the events that give rise to the claim. Failure to provide such notification shall be deemed waiver of such claim.

B.    Any dispute or claims by the Supplier shall not affect the diligent prosecution by Supplier of the Services.

## ARTICLE 8 – AUDIT

Supplier shall check all material and labor entering into the Services and shall keep full and detailed accounts as may be necessary to provide proper financial management under this Agreement. At all reasonable times and upon seven days written notice, the Company shall have access to the Supplier's offices, work and records pertinent to all charges, for inspection, audit and review. Supplier shall permit such examination and make appropriate adjustments as may be required by the results of the audit. This provision shall remain in effect for two (2) years following final payment under this Agreement.

## ARTICLE 9 - RIGHTS, PRIVILEGES, REMEDIES

All rights, privileges and remedies afforded each of the parties hereto by this Agreement shall be deemed cumulative and the exercise of any one or more of such rights or remedies shall not be deemed a waiver of any other right, privilege or remedy provided for herein or available at law or in equity.

## ARTICLE 10 - NON WAIVER OF RIGHTS

Any failure by the Parties to enforce or require the strict performance of the terms or conditions of this Agreement shall not constitute a waiver of such terms or conditions and shall not affect or impair such terms or conditions in any way.

## ARTICLE 11 - SET-OFF

In the event Supplier owes money to the Company or has defaulted under this Agreement or under any other agreements with the Company, or Supplier has failed to pay any amount owed to the Company (collectively, the "Obligations"), the Company may, at its option, setoff and/or net any or all such Obligations against any amounts owed by the Company to the Supplier. Should any payment be withheld or set-off per this Article 11, Customer shall promptly provide Supplier with a written explanation detailing the reason behind the withheld payment or set-off and provide supporting materials rationalizing the dollar amount withheld or set-off.

17

## ARTICLE 12 - CONFLICTING DOCUMENTS

To the extent, if any, that the specifications, drawings or other documents that may be referenced herein conflict with the provisions of this Agreement, this Agreement shall take precedence and govern.

## ARTICLE 13 - INDEPENDENT SUPPLIER

Supplier is and shall always remain an independent contractor in its performance of this Agreement. With the exception of staff augmentation engineering services required by Company, where Supplier's personnel work out of Company's offices under Company's direction, the provisions of this Agreement shall not be construed as authorizing or reserving to Company any right to exercise any control or direction over the operations, activities, employees or agents of Supplier in connection with this Agreement. Unless otherwise agreed to by the parties, neither party to this Agreement shall have any authority to employ any person as agent or employee for or on behalf of the other party to this Agreement for any purpose, and neither party to this Agreement, nor any person performing any duties or engaging in any work at the request of such party, shall be deemed to be an employee or agent of the other party to this Agreement.

Company shall carry no worker's compensation insurance, health insurance or accident insurance to cover the Supplier, or any of its agents, employees or subcontractors. Company shall not pay any contributions to Social Security, unemployment insurance, federal or state withholding taxes, or provide any other contributions or benefits which might be expected in an employer/employee relationship. The Supplier agrees to report and pay any contributions for taxes, unemployment insurance, Social Security and any other required payments himself or herself.

## ARTICLE 14 – SUBCONTRACTS

Unless otherwise agreed to by the Parties, If Supplier shall cause any part of the work to be performed by a sub-contractor, the provisions of this Agreement shall apply to such sub-contractor and its officers, agents or employees in all aspects as if they were employees of Supplier, and Supplier shall not thereby be discharged from any of its obligations and liability hereunder, but shall be liable hereunder for all acts and omissions of the sub-contractors. Nothing shall create any contractual relationship between Company and any subcontractor or any sub-subcontractor.

The Supplier shall submit a list of those work items which it plans to subcontract and the names of Supplier's subcontractor proposed for the work which Supplier may amend from time to time. Supplier's subcontractor may not be changed except at the request of or with the written approval of the Company. The Company shall promptly notify the Supplier in writing if, after due investigation, Company has reasonable objection to any subcontractor on such list and does not accept it. Failure of the Company to make objection promptly shall constitute acceptance of such subcontractor.

## ARTICLE 15 - THIRD PARTY BENEFITS

Except as may be specifically provided for herein, no provision of this Agreement is intended or is to be construed to be for the benefit of any third party.

## ARTICLE 16 – SAFETY

Company may at any time suspend the work or any part thereof, immediately and verbally for reasons of safety. In the event of any work stoppage, Supplier shall reasonably protect such work as may be liable to sustain injury.

18

The Company's Safety Rules and Regulations for Supplier's attached hereto and made a part hereof, as Attachment A and shall apply to all work performed under this Agreement.

### ARTICLE 17 - ACCIDENT AND LOSS PREVENTION

For the protection of workers and the public, the Supplier will take precautions, consistent with industry best practices, for the safety of all persons and property at, on, or near the work site and will erect and maintain safeguards, consistent with industry best practices, as required by the conditions and progress of the work.

### ARTICLE 18 – INSURANCE

Supplier shall maintain insurance in accordance with the requirements as set forth in Schedule [G]. Supplier must maintain applicable insurance. An insurance certificate must be mailed to Customer prior to starting Services.

### ARTICLE 19 – INDEMNIFICATION

Supplier will indemnify, defend at its expense and hold harmless the Company and its Affiliates, directors, officers, employees, and agents (the "Indemnitee") from and against any and all claims, demands, suits, losses, costs, fees, damages or expenses it may suffer, or for which it may be held liable, whether including, without limitation, reasonable expenses and attorney's fees incurred in the connection therewith, by reason of (A) any patent, trademark, or copyright infringement claim, or any design, device, process or procedure used, installed or provided by the Supplier or its agents or subcontractors under this Agreement; (B) any work-related accident or injury affecting an employee, agent or subcontractor of the Supplier, arising directly from the work performed under this Agreement; (C) any claim by an agency or instrumentality of the federal, state or any local government, or by an employee, agent or subcontractor of the Supplier alleging that (i) the Indemnitee is required to maintain worker's compensation or unemployment or any other type of insurance upon any employee, agent or subcontractor of the Supplier; (ii) the Indemnitee is liable for tax payments or withholding with respect to any employee, agent or subcontractor of the Supplier; (iii) any employee, agent or subcontractor of the Supplier is entitled to receive employee benefits from the Indemnitee, including, without limitation, vacation, deferred compensation, medical, pension, 401(k) or any other benefit available to the Indemnitee's employees; and (iv) the Indemnitee is liable to any party, due to the negligent performance of Services or omissions by an employee, agent or subcontractor of the Supplier; (D) bodily injury, including death, to any person or persons due to the negligent, reckless or willful actions or omissions of the Supplier or its agents or subcontractors; (E) damage to or destruction of any property, due to the negligent, reckless or willful actions or omissions of the Supplier, or its agents or subcontractors. Individual employees, agents and subcontractors of the Supplier who are performing services for the Indemnitee under this Agreement shall be considered to be employees, agents or subcontractors of the Supplier for all purposes under this Agreement, notwithstanding any judicial or administrative determination that such employees, agents or subcontractors of the other party should be regarded as employees under applicable law. All actions of the employees, agents and subcontractors of the Supplier under this Agreement shall be deemed to be actions of the Supplier under these indemnities and this Agreement. Notwithstanding anything in the foregoing, under no circumstances shall Supplier have any indemnification obligations or be liable for the negligence of third parties other than Supplier's employees, agents or subcontractors.

### ARTICLE 20 – WARRANTY

The Supplier warrants that the Services performed under this Agreement shall be performed in accordance with any specifications set forth in a Purchase Order or elsewhere herein, and otherwise in accordance with sound and generally accepted industry practice by those who render these types of

19

services with that degree of skill and care as required by customarily accepted professional practices and procedures, at the time such services are performed. If the Supplier's services are faulty, the Supplier shall for a period of one (1) year after completion of services, without labor charge and adders or other fee to Company, re-perform such Services to the extent necessary to correct the fault therein. This provision shall not be construed to affect or limit the liability of the Supplier to third parties, Supplier's obligation to Company pursuant to the Indemnification clause contained herein or any other remedy which may be available to Company under applicable law.

## ARTICLE 21 - APPROVAL/ACCEPTANCE

All work under this Agreement shall be subject to the Company's inspection and approval before payment.

## ARTICLE 22 - FORCE MAJEURE

Supplier shall not be charged with any liability for failure to perform when such failure is due to any cause beyond the control and without the fault or negligence of Supplier, provided that if adverse weather is the cause of delay or failure, Supplier shall use its best efforts to remedy the delaying cause or condition and recommence performance, and furnish the Company with prompt written notice when it appears that such cause will result in non-performance or shall threaten to impair Company's ability to operate. Company shall have the right at its option and without being under any liability to Supplier to cancel by notice in writing to Supplier the portion or portions of the work so affected. Correspondingly, Company shall be excused for failure of performance herein due to any cause beyond its control and without its fault or negligence.

## ARTICLE 23 - TITLE AND LIENS

Supplier represents and warrants that it has title to all equipment or material furnished hereunder free and clear of all liens and encumbrances. Complete legal and equitable title to each item of equipment or material covered by this Agreement shall pass to the Company immediately upon receipt of payment for equipment or material. Passage of title pursuant to this provision shall not release or waive any continuing or subsequent responsibility of Supplier under this Agreement.

Supplier shall take all action reasonably necessary to discharge, remove, or satisfy any lien filed against any property of the Company, or any portion thereof, arising from any work, labor, services, or materials claimed to have been performed or furnished for, or on behalf of, the Supplier or any person or entity by or through the Supplier. Supplier shall forthwith take such action necessary to discharge, remove, or satisfy any such lien filed against the property of the Company, including but not limited to posting of a bond. If the Supplier shall fail to discharge, remove, or satisfy any such lien within fifteen (15) days after notice of the existence of such lien has been provided by the Company, the Company shall have the right, but not the obligation, to pay the amount of such lien, or discharge the same by deposit or bonding, and the amount so paid or deposited, or the premium paid for such bond, with interest at the maximum allowable by law, may be set-off against any payment due Supplier under this Agreement.

## ARTICLE 24 - PROGRESS AND COMPLETION

It is expressly understood by the Supplier that TIME IS OF THE ESSENCE in the performance of this Agreement. The Supplier shall begin the work on the date of commencement set forth in the Agreement. The Supplier shall carry the work forward expeditiously with adequate forces and shall complete it by the time work is to be completed as stated in the Agreement.

20

If the Supplier is delayed at any time in the progress of the work, written notice thereof, including an explanation of the cause and the anticipated duration of the delay, shall be given promptly to the Company by the Supplier, but in no event later than five (5) days after such delay becomes apparent. Failure to give such notice promptly and within such time limit shall be deemed sufficient reason for denial by Company of an extension of time for performance and may be deemed a default.

Failure of Supplier's subcontractor or materials and equipment suppliers to meet schedules shall not be cause for an extension of time. Supplier acknowledges that it has sole responsibility for expediting the efforts of its subcontractors, suppliers, and others.

## ARTICLE 25 - EMERGENCIES

The Supplier shall perform any work and shall furnish and install any materials and equipment necessary during an emergency affecting the safety of persons and property. In all cases, Supplier shall notify the Company of the emergency as soon as practicable, but shall not wait for instructions before proceeding to properly protect both life and property. Any additional compensation or extension of time claimed by the Supplier on account of emergency work shall be determined by mutual agreement of the parties.

## ARTICLE 26 - WORK STOPPAGE

Supplier's personnel shall not honor any union picket lines or strikes nor take part in any work slowdown or stoppage nor refuse to report for work, unless such action is protected by any state or federal labor relations law. Notwithstanding the preceding sentence, it shall be the obligation of the Supplier to supply a qualified work force. Company may terminate this Agreement if Supplier fails to provide a qualified work force within twenty-four (24) hours of Company's notification to Supplier that a qualified work force has not been supplied.

## ARTICLE 27 - TERMINATION

Company may for any reason, with or without cause, on fifteen (15) days written notice to Supplier terminate all or any part of the unperformed portion of this Agreement without liability to Company except as stated in this Article. In full discharge of any obligations to Supplier in respect of this Agreement and such termination, Company shall pay Supplier, in accordance with the payment terms of the Agreement, only for Services performed and reasonable costs incurred prior to receipt by Supplier of notice of termination; provided, however, that such payment shall not result in a total payment to the Supplier exceeding the maximum amount payable to the Supplier pursuant to this Agreement. Termination shall not relieve Supplier of any obligation which may arise out of Services performed prior to termination. Unless overhead costs were specifically requested by Company, in no event shall Company be liable to Supplier for lost profit or overhead in respect of Services not performed prior to termination, unabsorbed overhead or anticipated profits on uncompleted portions of this Agreement.

In the event Supplier is in default of any of its obligations under this Agreement, Company shall have the right, on ten (10) days written notice to Supplier, to terminate this Agreement for such default; provided, however, that Supplier shall have the right to cure by submitting a plan acceptable to the Company to cure the default during the ten (10) day notice period in order to avoid termination. and providing that such default is, in fact, cured within thirty (30) days after Supplier first received notice of the default from Company. In the event of such termination, the preceding paragraph of this Article shall not apply and Company shall have all rights and remedies provided by law or equity and under this Agreement. In addition, in such event, Company may retain from any money otherwise due for Services rendered prior to termination an amount which Company reasonably determines is adequate to cover all damage resulting from the Supplier's default. In the event that Supplier demonstrates that a cancellation for default is erroneous, the cancellation shall, at Company's option, be withdrawn or be deemed to have been issued as a termination for convenience pursuant to the preceding paragraph and the rights and

21

obligations of the parties hereto shall in such event be governed accordingly. The value of Services performed not in accordance with this Agreement shall be subject to audit, assessment and approval by Company.

**ARTICLE 28 – TERM AND SURVIVAL**

This Agreement shall remain in effect unless otherwise terminated as provided herein, or upon receipt by Company of Supplier's Release and Certificate Form and Final Payment is made as set forth in Article 30 below. Notwithstanding the foregoing, Articles 4, 7, 9, 10, 13, 14, 17, 18, 19, 22, 31, 37, 38, 39, 47 and all other terms which contain obligations or duties which by their nature are to be or may be performed beyond any termination hereof, shall survive the termination of this Agreement without regard to the reason for termination.

**ARTICLE 29 - REMOVAL OF EQUIPMENT**

In the case of termination of this Agreement for any reason whatsoever, the Supplier, if notified to do so by the Company, shall promptly remove any part or all of Supplier's equipment and supplies from the property of the Company, failing which the Company shall have the right to remove such equipment and supplies at the expense of the Supplier.

**ARTICLE 30 - FINAL PAYMENT**

Final payment under this Agreement shall not be made until successful completion and acceptance of the work by the Company and when requested by Company, Supplier's delivery of a completed Release and Certificate Form, the form of which shall be provided to Supplier at the time of the request.

**ARTICLE 31 - ASSIGNMENT**

Supplier shall not assign all or any of its rights or obligations under this Agreement except with the prior written consent of Company. Any assignment made without such consent shall be void ab initio.

**ARTICLE 32 - SEVERABILITY**

If any provision of this Agreement is unenforceable under any applicable law or is held invalid, such holding shall not affect any other provision hereof, and this Agreement shall be construed as if such unenforceable or invalid provision had never been contained herein.

**ARTICLE 33 - NON WAIVER OF RIGHTS**

Any failure by the Company to enforce or require the strict performance of the terms or conditions of this Agreement shall not constitute a waiver of such terms or conditions and shall not affect or impair such terms or conditions in any way.

**ARTICLE 34 - OWNERSHIP OF PLANS**

All drawings, plans, specifications, reports, designs, design data, technical and scientific data, findings, recommendations and memoranda of every description whether furnished to or prepared by Supplier under this Agreement and pursuant to the scope of work detailed in Schedule B shall (x) be delivered to Company upon completion of the work or termination or cancellation of this Agreement, (y) be deemed to

22

have been prepared by Supplier for Company on a work-made-for-hire basis, and (z) shall be the property of Company and may be used by Company for any purpose whatsoever without any claim on the part of Supplier for additional compensation.  To the extent any of the foregoing are not deemed a work for hire by operation of law, Supplier hereby irrevocably assigns, transfers, and conveys to the Company without further consideration all of its right, title, and interest in such drawings, plans, specifications, reports, designs, design data, technical and scientific data, findings, recommendations and memoranda of every description, including all rights of patent, copyright, trade secret or other proprietary rights in such materials.

Except as specifically authorized by this Agreement, or as otherwise authorized in writing by Company, information and other data developed or acquired by or furnished the Supplier in the performance of this Agreement shall be used only in connection with the work under this Agreement. Notwithstanding anything in the foregoing, Supplier shall retain all right, title and interest in any work product prepared by Supplier that falls outside the scope of work detailed in Schedule B, unless otherwise agreed to by the parties.

## ARTICLE 35 - KEY PERSONNEL

Personnel assigned to perform work hereunder who are designated as "Key" Personnel in this Agreement shall devote their working time to the work as required by the Agreement Schedule of Activities and shall not be removed, without the prior written consent of Company, until their assignments are completed. The Company shall have the right to reject replacements for personnel.

## ARTICLE 36 - PUBLIC RELEASE OF INFORMATION

Date, photographs, sketches, advertising and other information relating to the work under this Agreement, which Supplier desires to release or publish, shall be submitted to the Company for approval two (2) weeks prior to the desired release date.  As a part of the approval request, Supplier shall identify the specific media to be used as well as other pertinent details of the proposed release.  All releases must have the prior written approval of the Company which approval may be withheld without reason or explanation to Supplier.

## ARTICLE 37 - LIMITATION OF LIABILITY

Except as expressly provided herein (including Supplier's indemnification obligations), to the fullest extent permitted by law, the Parties shall not be liable for any special, indirect or consequential damages resulting in any way from the performance of the services hereunder.

## ARTICLE 38 – CONFIDENTIALITY

Supplier, its employees and agents, shall treat any information, (including any technical information, experience or data) regarding Company or Company's plans, programs, plants, processes, costs, equipment, operations, of Company (or Affiliates), which may be disclosed to, or come within the knowledge of, Supplier its employees and agents in the performance of this Agreement, as confidential, and will not use or disclose this information to others, during the term of this Agreement, and for three (3) years thereafter, except as is necessary to perform the services hereunder, without Company's prior written consent.  The provisions of this Article shall not apply to any information referred to in this Section which (i) has been published and has become part of the public knowledge through no effort by Supplier, its employees, or agents, (ii) has been furnished or made known to Supplier or Supplier's Affiliates by third parties (other than those acting directly or indirectly for or on behalf of Company) as a matter of legal right and without restriction on disclosure, (iii) was in Supplier's possession prior to disclosure by Company and was not acquired by Supplier or Supplier's Affiliates, its employees and agents directly or

23

indirectly from Company or, (iv) is required by law or by any other governmental regulatory authority to be disclosed.

Any information, which is supplied by the Supplier to Company will be similarly restricted, including clauses (i) through (iv) in the paragraph above. Company will not disclose such information to others or publish it in any form at any time; provided, however, that notwithstanding the foregoing, Company may disclose any such information to its Affiliates, employees, and consultants, to any regulatory agencies or instrumentality's when such disclosure is necessary, or otherwise required by law.

Each party agrees that they will cooperate with the other in an effort to minimize the amount of such information, which will be disclosed in any such case, and to make reasonable efforts to secure confidential treatment of such information.

In no event shall Company's name and/or logo or the name and/or logo of its Affiliates be used, whether written or verbal, duplicated, reproduced by any means whatsoever without the prior written permission of the Company.

All inquiries by any governmental, business, or other entity, including media, regarding any work performed or to be performed by Supplier for Company shall be directed by Supplier to Company for response.

## ARTICLE 39 - EQUAL EMPLOYMENT OPPORTUNITY COMPLIANCE

To the extent, if any, that the provisions of the following executive order and statutes, as amended or supplemented, along with their implementing regulations, apply to the performance of the Services by Supplier, the Supplier will comply with the applicable executive order, statutes and regulations : Section 202 of Executive Order 11246 (41 CFR § § 60, et seq.); Section 402 of the Vietnam Era Veterans Readjustment Act (41 CFR § § 60-250.1, et seq.); Section 503 of the Rehabilitation Act of 1973 (41 CFR § § 741.1, et seq.); and New York Executive Law §§ (5 NYCRR § § 140.1, et seq.). These regulations may require the Supplier to develop an Affirmative Action Compliance Program and file a standard Form 100 Report (EEO-1), or other reports, as prescribed.

## ARTICLE 40 - SURETY BOND

The Company shall have the right, upon 30 days' written notice, to require the Supplier to furnish a bond covering faithful performance of this Agreement and the payment of all obligations arising hereunder (i.e., Performance Bonds, Mechanics Liens), including any damages that may be payable under Article 27. The Company shall be entitled to approve the amount, which shall not exceed $1,000,000, form, premium cost, and surety Company issuing such surety bond. In the event Customer requires any bond, Supplier may, at its sole option, elect to terminate this Agreement for convenience in lieu of providing a bond upon written notice to Customer.

## ARTICLE 41 - GOVERNING LAW

The Supplier will comply with all applicable federal, state and local laws, rules, ordinances and regulations of any governmental entity, board or agency having jurisdiction over the work or the premises.

All questions concerning the interpretation, validity and enforceability of this Agreement and of its terms and conditions, as well as questions concerning the sufficiency or other aspects of performance under the terms or conditions of this Agreement, shall be governed by the law of the State of New York, without reference to its conflict of law provision and any action or proceeding brought in connection therewith, will be brought in the appropriate court located in the State of New York.

24

## ARTICLE 42 - PERFORMANCE MONITORING

Company will evaluate Supplier's performance by utilizing Supplier Corrective Action Reports and Supplier Performance Evaluation Reports which shall be made available to Supplier upon request. The Supplier must provide upon request the OSHA incident rate and Experience Modification Rate for Company's review. The Company's Project Manager will evaluate the Supplier's performance upon the conclusion of every project by completing the specified report. The Company will continuously monitor the Supplier's performance. Performance by a Supplier that is less than desirable may potentially eliminate this Supplier from bidding on future projects and/or lump sum projects.

## ARTICLE 43 - CONTINUOUS IMPROVEMENT

Continuous improvement is the foundation of this Agreement. Supplier likewise will use its best efforts to improve continuously its performance in all areas. In particular, Supplier will evaluate opportunities for cost/price reductions on items and services ordered and to be ordered and communicate them promptly to Company. Supplier has specifically identified target cost reductions of 2% beyond the prices shown in Schedule D for the Initial Term, and agrees to work diligently with Company personnel toward attainment of this objective. Supplier is expected to advance its economies of production, service, service delivery, material handling and technical prowess at least as fast as other reasonable competitors in its industry, and to offer the price and performance benefits of those improvements to Company, as soon as they become available."

## ARTICLE 44 - NO DISPUTE

Supplier represents and warrants that it is not aware of any pending billing dispute or other contractual dispute (pursuant to current contracts or contracts no longer in effect) or any pending or threatened litigation between Supplier and/or any of Supplier's affiliates and Company and/or and of Company's affiliates.

## ARTICLE 45 - SECURITY REQUIREMENTS

Supplier shall comply with Company's Security Requirements in their performance of Services as provided herein.

Supplier shall be familiar with and shall comply with the requirements of the NERC CIP- 004 for projects or services at or relating to critical cyber assets and critical company operating facilities ("Critical Infrastructure"). The specific CIP Standard follows:

CIP-004 Excerpt:
R3. Personnel Risk Assessment --The Supplier shall have a documented personnel risk assessment program, in accordance with federal, state, provincial, and local laws, and subject to existing collective bargaining unit agreements, for personnel having authorized cyber or authorized unescorted physical access. A personnel risk assessment shall be conducted pursuant to that program prior to such personnel being granted such access except in specified circumstances such as an emergency. The personnel risk assessment program shall at a minimum include:

R3.1. The Supplier shall ensure that each assessment conducted include, at least, identity verification (e.g., Social Security Number verification in the U.S.) and seven- year criminal check. The Supplier may conduct more detailed reviews, as permitted by law and subject to existing collective bargaining unit agreements, depending upon the criticality of the position.

25

R3.2. The Supplier shall update each personnel risk assessment at least every seven years after the initial personnel risk assessment or for cause.

R3.3. The Supplier shall document the results of personnel risk assessments of its personnel having authorized cyber or authorized unescorted physical access to Critical Cyber Assets, and that personnel risk assessments of contractor and service vendor personnel with such access are conducted pursuant to Standard CIP-004.

## ARTICLE 46 - EMPLOYEE SOLICITATION

During the term of this Agreement and for a period of one (1) year thereafter, except with the prior written consent of the Company, Supplier shall not offer employment to any employee of the Company or Company's current or future Affiliates with whom Supplier has had contact in connection with the negotiation, execution, or performance of this Agreement, and Supplier shall not induce or attempt to induce, directly or through an agent or third party, any such employee to leave the employ of the Company or its Affiliates. As used herein, the term "Affiliate" shall mean any person or entity controlling, controlled by, or under common control with the Company through majority stock or other ownership interest, direct or indirect. Nothing in this clause shall limit Supplier from employing any person who contacts Supplier on his or her own initiative and without any solicitation by Supplier specifically directed to such employee.

## ARTICLE 47 – ETHICS

Supplier shall comply with the AVANGRID Suppliers' Code of Ethics ("Suppliers' Code of Ethics") in connection with its performance under this Agreement. The Suppliers' Code of Ethics can be found at the Avangrid Services Company website (www.avangrid.com).

## ARTICLE 48 – COMPLIANCE WITH LAWS GENERALLY

Supplier will comply with all laws, rules and regulations of any governmental entity, board or agency having jurisdiction over the Services, including, without limitation, State, Federal or local laws, rules and regulations and any applicable Executive Orders (State or Federal) in the performance of the Services.

## ARTICLE 49 – UTILIZATION OF SMALL BUSINESS CONCERNS

Supplier and subcontractors of all tiers shall make a good faith effort to comply with section 52.219-8 of the Federal Acquisition Regulation. This policy requires that small business concerns, veteran-owned small business concerns, service-disabled veteran-owned small business concerns, HUBZone small business concerns, small disadvantaged business concerns, women-owned small business, Alaskan Native Corporation, and Indian tribe concerns shall have the maximum practicable opportunity to participate in the performance of Services.

## ARTICLE 50 – SMALL BUSINESS SUBCONTRACTING PLAN

Some or all of the Goods and Services provided hereunder may be used in a contract with the federal government and, therefore, may be subject to the requirements of FAR section 52.219-9. If applicable, each Supplier (except small business concerns) whose contract is expected to exceed $650,000 ($1,500,000 for construction) and has subcontracting possibilities is required to submit an acceptable subcontracting plan to the Customer. The plan shall include spending goals with businesses that are defined by the U.S. Small Business Administration as small, women-owned small, veteran-owned small, service-disabled veteran-owned small, HUBZone, small disadvantaged (SDB), Alaskan Native

26

Corporations, and Indian tribes.  If the Supplier fails to submit a plan within the time limit prescribed by the Customer, Customer may terminate this Agreement.

The Supplier assures that the clause entitled "Small Business Subcontracting Plan" will be included in all subcontracts, that offer further subcontracting opportunities, and all subcontractors (except small business concerns) who receive subcontracts in excess of $650,000 ($1,500,000 for construction) will be required to adopt a plan similar to this plan.

## ARTICLE 51 - GRATUITIES PROHIBITED

The Supplier shall not, under any circumstances, offer or extend any gratuity or special favor to any employee or agent of the Company or its Affiliates or do anything which might reasonably be interpreted as an attempt to influence any employee or agent of the Company in the conduct of their duties.

27

## SCHEDULE E

### Special Conditions

Intentionally Omitted

29

## SCHEDULE F

### Notices

Along with all other correspondence requirements included in this Master Agreement, any notice, request, approval or other document required or permitted to be given under this Master Agreement shall be in writing and shall be deemed to have been sufficiently given when delivered in person or deposited in the U.S. Mail, postage prepaid, addressed as specified herein or to such other address or addresses as may be specified from time to time in a written notice given by such party.  The parties shall acknowledge in writing the receipt of any such notice delivered in person.

All communications to Avangrid Services Company shall be directed to:

Avangrid Service Company
Contract Administration
89 East Avenue
Rochester, NY 14649
Phone: 585-724-8028
Fax: 585-771-2820

All communications to Supplier shall be directed to:

| | |
|---|---|
| Supplier Name | Unlimited Technology, Inc. |
| Contact Name | Brent Franklin |
| Title | President |
| Email Address | bfranklin@utiglobal.com |
| Street Address | 20 Senn Drive |
| City, St, Zip | Chester Springs, PA 19425 |
| Phone | (484) 348-1015 |

With a copy to:

| | |
|---|---|
| Supplier Name | Professional Security Broadband, Inc. |
| Contact Name | Jeremy Reich |
| Title | General Counsel |
| Email Address | jreich@psb.com |
| Street Address | 43 River Road |
| City, St, Zip | Nutley, NJ 07110 |
| Phone | (516) 208-2883 |
| Fax | (973) 661-3540 |

30



## SCHEDULE G

### Insurance Requirements

Before commencing Services, the Supplier shall procure and maintain at its own expense for a period of two years beyond completion of the Services, the insurance types, limits, terms, and conditions listed in Section 1 below.  The amounts as specified are minimums only.  The actual amounts above the minimums shall be determined by the Supplier.  In addition, for any Services that are authorized to be subcontracted, the supplier shall require each subcontractor to procure and maintain all insurance as outlined in section one unless otherwise agreed to by the Parties.

**IF YOU DO NOT HAVE A CURRENT CERTIFICATE ON FILE WITH CUSTOMER** prior to commencement of Services, Certificates of Insurance evidencing supplier's and/or subcontractor's possession of insurance as outlined in Section 1 shall be filed with Customer for its review.

Certificates of Insurance should be mailed to the Procurement Department at the following address:
**Avangrid Service Company**
**Procurement Department/Insurance Cert.**
**89 East Avenue**
**Rochester, NY  14649-0001**

1.      **Required Insurance Coverage's and Minimum Amounts**

Each insurance policy shall be placed with an insurance company licensed to write insurance in the State where the Services are to be performed and shall have an A.M. Best's Rating of not less than "B+" and a policyholder surplus of at least $25,000,000.

Each insurance policy, except Workers' Compensation and Employers' Liability, shall be endorsed to add Customer as an additional insured.  All insurance where Customer is an additional insured must contain provisions which state that the policy will respond to claims or suits by Customer against the Supplier/Consultant/ Labor supplier/etc.

Each policy shall be endorsed to provide a breach of warranty clause.

In the event Supplier and/or Subcontractor has a policy(ies) written on a "claims-made" basis, such insurance shall provide for a retroactive date not later than the commencement of Services under this agreement.  In addition, the Supplier and/or Subcontractor will guarantee future coverage for claims arising out of events occurring during the course of this agreement.

All of the insurance required hereunder will be primary to any or all other insurance coverage in effect for Customer.

1.1     Workers' Compensation and Employers' Liability Insurance in accordance with the statutory requirements of the State of New York.  For Services that are conducted outside of New York State, the minimum limit for Employers' Liability Insurance should be $500,000 each accident, $500,000 disease-policy limit, $500,000 disease-each employee.

1.2     Automobile Liability insuring any auto, all owned autos, hired autos, and non-owned autos with a bodily injury and property damage combined single limit of $5,000,000 per occurrence.

1.3     General Liability (Comprehensive or Commercial Form), including coverage for Premises/Operations, Underground/ Explosion & Collapse Hazard, Products/Completed Operations, Contractual Liability specifically insuring the attached Indemnity Agreement, Independent Contractors, Broad Form Property Damage, and Personal Injury, in the amount of $5,000,000 per occurrence and $5,000,000 aggregate.

31

The amount of insurance may be satisfied by purchasing primary coverage in the minimum (or greater) amounts specified or by purchasing a separate excess Umbrella Liability policy together with lower limit primary coverage.

Each General and/or Umbrella Liability Insurance policy shall contain a "separation of insureds" clause, providing that except with respect to the limits of insurance and any rights or duties specifically assigned to the first Named Insured, this insurance applies as if each named insured were the only named insured; and separately to each insured against whom claim is made or suit is brought.

None of the requirements contained herein as to types, limits and approval of insurance coverage to be maintained by Supplier or Subcontractors are intended to, nor shall they in any manner limit or qualify the liabilities and obligations assumed by Supplier or Subcontractor under this agreement.

32

## SCHEDULE H

### Background Check Requirements

<u>Domestic Background Checks</u>

Contractor, at its expense, shall conduct a background check for each employee, agent, representative, contractor, or independent contractor (collectively, "<u>Representatives</u>"), as well as for the Representatives of its subcontractors, who will provide work or services to the Company or who will have access to Company computer systems, either through on-site or remote access (collectively, "<u>Contractor Representatives</u>"). Contractor Representatives, for the purpose of this requirement, include such temporary staff as office support, custodial service, and third party vendors used by Contractor to provide, or assist in the provision of, work or services to the Company hereunder. Contractor's obligations with respect to required background checks shall include those obligations specified for Contractor in the AVANGRID Services Company –Contractor Background Check Rule, as such Rule may be revised and\or supplemented from time to time, which Policy is incorporated  herein and made part of this Agreement by reference (the "Rule"). Background checks are to be conducted using the Contractor's background check vendor consistent with the process developed with the Company under this Agreement. The minimum Background Check process shall include, but not be limited to, the following checks:

    a. Social Security Number Verification
    b. Motor Vehicle Report
    c. Prohibited Parties Database Search\Debarment Lists
    d. County Criminal History Search in each county where a Contractor or Contractor Representative has resided during the seven (7) years preceding the search.
    e. National Sex Offender Registry.

The Background Check must be completed prior to initial access by Contractor Representative(s) and must, at minimum, meet the criteria specified in <u>Attachment A</u> of this Rule and be repeated every two (2) years for Contractor(s) and Contractor Representative(s) under continuing engagements. Any Contractor Representative who separates employment or other commercial relationship with the Contractor must undergo another Background Check prior to renewed access to the Company.  The Company Department charged with managing the relationship with the Contractor hereunder (the "<u>Company Liaison</u>") shall have the right to require more frequent Background Checks of Contractor Representatives or to require checks from other or additional sources than those listed above, and shall have the right to require that the Contractor furnish Background Check results to them. The Company reserves the right to audit Contractor's Background Check process using either a third-party auditor or representatives from the Company's Audit Department or the Company Liaison.  All Contractor Representatives are responsible to self-disclose any misdemeanor or felony conviction(s) that occur during the course of their assignment hereunder within three (3) business days of the conviction. The conviction must be reported to the Contractor and the Company Liaison. If reported first to the Contractor, the Contractor shall notify the Company Liaison and the Company Director of Security within three (3) days of learning of the conviction.  If, at any time during the term of this Agreement, it is discovered that any Contractor Representative has a criminal record that includes a felony or misdemeanor conviction, the Contractor is required to inform the Company Liaison who will assess the circumstances surrounding the conviction, time frame, nature, gravity, and relevancy of the conviction to the job duties to determine whether the Contractor Representative will be placed on, or continue in, the assignment with the Company, and consistent with, and to the extent permitted by, applicable state law.  The Company may withhold its consent in its sole and absolute discretion. The failure of the Contractor to comply with the terms of this provision shall constitute good cause for termination of this Agreement by the Company, in whole or in part.

Foreign Background Checks

Contractor, at its expense, shall conduct a background check for each employee, agent, representative, contractor, or independent contractor (collectively, "Representatives"), as well as for the Representatives of its subcontractors, who will provide work or services to the Company or who will have access to Company computer systems, either through on-site or remote access (collectively, "Contractor Representatives"). Contractor Representatives, for the purpose of this requirement, include such temporary staff as office support, custodial service, and third party vendors used by Contractor to provide, or assist in the provision of, work or services to the Company hereunder. Contractor's obligations with respect to required background checks shall include those obligations specified for Contractor in the AVANGRID Services Company –Contractor Background Check Rule, as such Rule may be revised and\or supplemented from time to time, which Rule is incorporated  herein and made part of this Agreement by reference (the "Rule"). Background checks are to be conducted using the Contractor's background check vendor consistent with the process developed with the Company under this Agreement. The minimum Background Check process shall include, but not be limited to, the following checks:

**NERC CIP Access. If applicable (i.e., when AVANGRID determines that the Contractor engagement is such that compliance with NERC CIP Standards is required), the background check needs to include an identity verification and 7-year criminal history check as more particularly set forth below.**

- For someone who has resided and/or worked outside of the United States of America in the last 7 years, the contractor should perform an International Background Check to show the absence or existence of a criminal record. International background checks should verify known data such as employment, education, criminal and civil records, travel and immigration records, as well as address and identity verification

- For someone who has resided and worked only in the United States of America for the last 7 years, their passport is sufficient.

**Non CIP Access. To comply, the background check needs to include the following:**

- For someone who has resided and/or worked outside of the United States of America in the last 7 years, the vendor should include identity verification and perform an **International Background Check** to show the absence or existence of a criminal record. The international background check should verify known data such as employment, education, criminal and civil records, travel and immigration records, as well as identity.

- For someone who has resided and worked only in the United States of America for the last 7 years, a **certificate duly signed** by the vendor is sufficient if it states that its employee(s) assigned to work for AVANGRID Services Company  have the necessary academic and professional experience.

The Background Check must be completed prior to initial access by Contractor Representative(s) and must, at minimum, meet the criteria specified in Attachment A of this Rule and be repeated every two (2) years for Contractor(s) and Contractor Representative(s) under continuing engagements. Any Contractor Representative who separates employment or other commercial relationship with the Contractor must undergo another Background Check prior to renewed access to the Company.  The Company Department charged with managing the relationship with the Contractor hereunder (the "Company Liaison") shall have the right to require more frequent Background Checks of Contractor Representatives or to require checks from other or additional sources than those listed above, and shall have the right to require that the Contractor furnish Background Check results to them. The Company reserves the right to audit Contractor's Background Check process using either a third-party auditor or representatives from the Company's Audit Department or the Company Liaison.  All Contractor Representatives are

34



responsible to self-disclose any misdemeanor or felony conviction(s) that occur during the course of their assignment hereunder within three (3) business days of the conviction. The conviction must be reported to the Contractor and the Company Liaison. If reported first to the Contractor, the Contractor shall notify the Company Liaison and the Company Director of Security within three (3) days of learning of the conviction. If, at any time during the term of this Agreement, it is discovered that any Contractor Representative has a criminal record that includes a felony or misdemeanor conviction, the Contractor is required to inform the Company Liaison who will assess the circumstances surrounding the conviction, time frame, nature, gravity, and relevancy of the conviction to the job duties to determine whether the Contractor Representative will be placed on, or continue in, the assignment with the Company, and consistent with, and to the extent permitted by, applicable state law. The Company may withhold its consent in its sole and absolute discretion. The failure of the Contractor to comply with the terms of this provision shall constitute good cause for termination of this Agreement by the Company, in whole or in part.

35

# Contractor Certification Form

The undersigned agent of **Unlimited Technology, Inc.** certifies that the employees, contractors, or subcontractors listed below meet the requirements agreed to in Attachment B of the Rule.

It is the responsibility of the vendor to notify Avangrid Services Company of all personnel changes to include additions as well as voluntary or involuntary terminations. Additions and voluntary terminations are to be communicated within seven (7) calendar days and involuntary terminations must be communicated immediately.

| Employee Name | Employer | Date of Last Background Check |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

Further, I attest that the employees, contractors, or subcontractors listed above working for AVANGRID Services Company are in good standing and have been in good standing since their last background check.

_____     _____
Signature                                                    Date


_____
Printed Name and Position


[End of Schedule H – Background Check Requirements]

36

## SCHEDULE I

### Data Security Rider

**1.1. Privacy and Data Security.**

(a)　　To the extent that **Unlimited Technology, Inc.** (sometimes hereinafter referred to as "VENDOR") is regularly afforded access in any way to "Personal Data" or "Company Data" as defined below, this Rider shall apply with respect to Personal Data and Company Data.

(b)　　The following definitions are relevant to this Rider:

(i)　　"Personal Data" means any information that can be used to identify, locate, or contact an individual, including an employee, customer, or potential customer of CUSTOMER (also sometimes hereinafter referred to as "Company"), including, without limitation: (A) first and last name; (B) home or other physical address; (C) telephone number; (D) email address or online identifier associated with an individual; (E) "Sensitive Data" as defined below; (F) ZIP codes; (G) employment, financial or health information; or (H) any other information relating to an individual, including cookie information and usage and traffic data or profiles, that is combined with any of the foregoing.

(ii)　　"Sensitive Data" is that subset of Personal Data, including Social Security number, passport number, driver's license number, or similar identifier, or credit or debit card number, whose unauthorized disclosure or use could reasonably entail enhanced potential risk for the data subject.

(iii)　　"Company Data" means any information that relates to the operation or functionality of plants, factories, networks, or grids of the Company or to which the Company has access, including, without limitation, Critical Infrastructure Information and internal financial information.

(iv)　　"Critical Infrastructure Information" means engineering, vulnerability, or detailed design information about proposed or existing critical infrastructure (physical or virtual) that (A) relates details about the production, generation, transmission, or distribution of energy; (B) could be useful to a person planning an attack on critical infrastructure; (C) is exempt from mandatory disclosure under the Freedom of Information Act; and (D) gives strategic information beyond the location of the critical infrastructure.

(v)　　"Processing" (including its cognate, "process") means any operation, action, error, omission, negligent act, or set of operations, actions, errors, omissions, or negligent acts that is performed upon Personal Data or Company Data, whether or not by automatic means, including, without limitation, collection, recording, organization, storage, access, adaptation, alteration, retrieval, consultation, use, disclosure, dissemination, exfiltration, taking, removing, copying, making available, alignment, combination, blocking, deletion, erasure, or destruction.

(vi)　　"Data Security Breach" means: (A) the loss or misuse (by any means) of Personal Data or Company Data; (B) the inadvertent, unauthorized and/or unlawful Processing, corruption, modification, transfer, sale or rental of Personal Data or Company Data; or (C) any other act or omission that compromises the security, confidentiality, or integrity of Personal Data or Company Data.

(vii)　　"Technical and Organizational Security Measures" means security measures, consistent with the type of Personal Data or Company Data being Processed and the services being provided by VENDOR, to protect Personal Data or Company Data, which measures shall implement industry accepted protections which may include physical, electronic and procedural safeguards to protect the Personal Data or Company Data supplied to VENDOR against any Data Security Breach, and any security requirements, obligations, specifications or event reporting procedures set forth in any Schedule to this Agreement. As part of such security measures, VENDOR shall provide a reasonably secure environment for all Personal Data and Company Data and any hardware and software (including

37

servers, network, and data components) to be provided or used by VENDOR as part of its performance under this Agreement on which Personal Data and Company Data is contained to the extent the same are located on VENDOR's premises.

(viii)    "Losses" shall mean all losses, liabilities, damages, and claims and all related or resulting costs and expenses (including, without limitation, reasonable attorneys' fees and disbursements and costs of investigation, litigation, settlement, judgment, interest and penalties).

(c)    Personal Data and Company Data shall at all times remain the sole property of CUSTOMER, and nothing in this Agreement will be interpreted or construed as granting VENDOR any license or other right under any patent, copyright, trademark, trade secret, or other proprietary right to Personal Data and Company Data.

(d)    VENDOR shall not use independent contractors or provide Personal Data or Company Data to independent contractors or other personnel that are not full-time employees of VENDOR without CUSTOMER's prior written approval before doing so.

(e)    VENDOR shall Process Personal Data and Company Data only on the instruction of CUSTOMER and in accordance with this Agreement and privacy and security laws applicable to VENDOR's services or VENDOR's possession or Processing of Personal Data and\or Company. CUSTOMER hereby instructs VENDOR, and VENDOR hereby agrees, to Process Personal Data or Company Data as necessary to perform VENDOR's obligations under this Agreement and for no other purpose.

(f)    VENDOR shall not create or maintain data which are derivative of Personal Data or Company Data except for the purpose of performing its obligations under this Agreement and as authorized by CUSTOMER.

(g)    As a condition to starting work, VENDOR's employees shall acknowledge in writing their agreement to comply with the terms of the Company's Acceptable Use Requirements set forth in Schedule C hereto, as such Acceptable Use Requirements may be modified or supplemented from time-to-time upon notice from the Company.

(h)    At any and all times during which VENDOR is Processing Personal Data or Company Data, VENDOR shall:

(i)    Comply with all applicable privacy and security laws to which it is subject, and not, by act or omission, place CUSTOMER in violation of any privacy or security law known by VENDOR to be applicable to CUSTOMER;

(ii)    Have in place appropriate and reasonable Technical and Organizational Security Measures to protect the security of Personal Data and Company Data and prevent a Data Security Breach, including, without limitation, a breach resulting from or arising out of VENDOR's internal use, Processing or other transmission of Personal Data and Company Data, whether between or among VENDOR's subsidiaries and affiliates or any other person or entity acting on behalf of VENDOR;

(iii)    Safely secure or encrypt all Sensitive Data and Company Data during storage or transmission;

(iv)    Except as may be necessary in connection with providing Support Services (and provided that immediately upon the need for such Personal Data and Company Data ceasing, such Personal Data is immediately destroyed or erased), not use or maintain any Personal Data or Company Data on a laptop, hard drive, USB key, flash drive, removable memory card, smartphone, or other portable device or unit;

38



(v)     Notify CUSTOMER no later than one (1) day from the date of obtaining actual knowledge of any Data Security Breach and, at VENDOR's cost and expense, assist and cooperate with CUSTOMER concerning any disclosures to affected parties and other remedial measures as requested by CUSTOMER or required under applicable law;

(vi)    Not permit any officer, director, employee, agent, other representative, subsidiary, affiliate, independent contractor, or any other person or entity acting on behalf of VENDOR to Process Personal Data or Company Data unless such Processing is in compliance with this Agreement and is necessary in order to carry out VENDOR's obligations under this Agreement;

(vii)   Not disclose Personal Data or Company Data to any third party (including, without limitation, VENDOR's subsidiaries and affiliates and any person or entity acting on behalf of VENDOR) unless with respect to each such disclosure: (A) the disclosure is necessary in order to carry out VENDOR's obligations under this Agreement; (B) such third party is bound by the same provisions and obligations set forth in this Agreement; (C) VENDOR has received CUSTOMER's prior written consent; and (D) VENDOR shall remain responsible for any breach of the obligations set forth in this Agreement to the same extent as if VENDOR caused such breach; and

(viii)  Establish policies and procedures to provide all reasonable and prompt assistance to CUSTOMER in responding to any and all requests, complaints, or other communications received from any individual who is or may be the subject of any Personal Data or Company Data Processed by VENDOR to the extent such request, complaint or other communication relates to VENDOR's Processing of such Personal Data.

(ix)    Establish policies and procedures to provide all reasonable and prompt assistance to CUSTOMER in responding to any and all requests, complaints, or other communications received from any individual, government, government agency, regulatory authority, or other entity that is or may have an interest in the Personal Data or Company Data, exfiltration of Personal Data or Company Data, disclosure of Personal Data or Company Data, or misuse of Personal Data or Company Data to the extent such request, complaint or other communication relates to VENDOR's Processing of such Personal Data or Company Data.

(x)     Not transfer any Personal Data or Company Data across a country border, unless directed to do so in writing by CUSTOMER, and VENDOR agrees that CUSTOMER is solely responsible for determining that any transfer of Personal Data or Company Data across a country border under this Contract complies with the applicable data protection laws and this Contract.

(i)     At the time of the signing of this agreement, and at the time of any CUSTOMER request, VENDOR shall provide evidence that it has established and maintains Technical and Organizational Security Measures governing the Processing of Personal Data and Company Data appropriate to the Processing and the nature of the Personal Data and Company Data to be protected.  To the extent VENDOR maintains Personal Data and Company Data at its location, CUSTOMER shall have the right to conduct onsite inspections and/or audits (with no advance notice to VENDOR) of VENDOR's information security protocols, and VENDOR agrees to cooperate with CUSTOMER regarding such inspections or audits; provided, any such inspections or audits shall be conducted during normal business hours and in a manner so as to minimize any disruptions to VENDOR's operations.  VENDOR will promptly correct any deficiencies in the Technical and Organizational Security Measures identified by CUSTOMER to VENDOR.

(j)     VENDOR shall return, delete, or destroy, or cause or arrange for the return, deletion, or destruction of, all Personal Data and Company Data subject to this Agreement, including all originals and copies of such Personal Data and Company Data in any medium and any materials derived from or incorporating such Personal Data and Company Data, upon the expiration or earlier termination of this Agreement, or when there is no longer any legitimate business need (as determined by CUSTOMER) to retain such Personal Data and Company Data, or otherwise on the instruction of CUSTOMER, but in no event later than ten (10) days from the date of such expiration, earlier termination, expiration of the

39

legitimate business need, or instruction. If applicable law prevents or precludes the return or destruction of any Personal Data or Company Data, VENDOR shall notify CUSTOMER of such reason for not returning or destroying such Personal Data and Company Data and shall not Process such Personal Data and Company Data thereafter without CUSTOMER's express prior written consent. VENDOR's obligations under this Agreement to protect the security of Personal Data and Company Data shall survive termination of this Agreement.

(k)     To the extent that VENDOR is afforded regular access in any way to "Cardholder Data" as defined below and for so long as it has such access, the following requirements shall apply with respect to the Cardholder Data; provided, that the parties do not anticipate that VENDOR will have access to any Cardholder Data:

(i)     VENDOR represents that it is presently in compliance, and will remain in compliance with the Payment Card Industry Data Security Standard ("PCI Standard"), and all updates to PCI Standard, developed and published jointly by American Express, Discover, MasterCard and Visa ("Payment Card Brands") for protecting individual credit and debit card account numbers ("Cardholder Data").

(ii)     VENDOR acknowledges that Cardholder Data is owned exclusively by CUSTOMER, credit card issuers, the relevant Payment Card Brand, and entities licensed to process credit and debit card transactions on behalf of CUSTOMER, and further acknowledges that such Cardholder Data may be used solely to assist the foregoing parties in completing a transaction, supporting a loyalty program, providing fraud control services, or for other uses specifically required by law, the operating regulations of the Payment Card Brands, or this Agreement.

(iii)     To the extent Cardholder Data is regularly maintained on the premises or property of VENDOR, VENDOR shall maintain a business continuity plan addressing the possibility of a potential disruption of service, disaster, failure or interruption of its ordinary business process, which business continuity plan provides for appropriate back-up facilities to ensure VENDOR can continue to fulfill its obligations under this Agreement.

(iv)     VENDOR agrees that, in the event of a Data Security Breach arising out of or relating to VENDOR's premises or equipment contained thereon, VENDOR shall afford full cooperation and access to VENDOR's premises, books, logs and records by a designee of the Payment Card Brands to the extent necessary to perform a thorough security review and to validate VENDOR's compliance with the PCI Standards; provided, that such access that be provided during regular business hours and in such a manner so as to minimize the disruption of VENDOR's operations.

(l)     To the extent VENDOR is provided regular access to Personal Data, Company Data, or Cardholder Data, VENDOR represents that the security measures it takes in performance of its obligations under this Agreement are, and will at all times remain, at the highest of the following (collectively referred to herein as "Security Best Practices"): (a) Privacy & IT Security Best Practices (as defined by ISO 27001/27002); and (b) any security requirements, obligations, specifications, or event reporting procedures set forth in Attachment A.

(m)     In addition to any other insurance required to be provided by VENDOR hereunder, VENDOR shall also provide the Cyber-Insurance coverage meeting the requirements specified in Attachment B, attached hereto and made part hereof. Vendor shall also comply with the terms and conditions in Attachment B as they relate to any insurance required to be provided by VENDOR pursuant to this Agreement.

(n)     Notwithstanding anything in the Agreement to the contrary, VENDOR shall indemnify, defend and hold CUSTOMER harmless from and against all Losses suffered or sustained by the CUSTOMER, its affiliates, and their respective employees, officers, representatives, or contractors, or by any third party or entity, caused by, resulting from, or attributable to VENDOR's breach or violation of any

40



of the terms and conditions of this Data Security Rider. VENDOR's obligation to indemnify, defend, and hold CUSTOMER harmless shall survive termination or expiration of the Agreement.

(o)    Failure by VENDOR to comply with any requirement of this section shall constitute a material breach of the contract.

41

**Schedule I - Attachment A**

**Specific Security Requirements or Procedures**

Intentionally left blank

42

**Schedule I - Attachment B**

**Cyber-Insurance Requirements**

(a) Vendor shall during the term of this Agreement have and maintain the following insurance coverage:

    (i)    Cyber Errors and Omissions Policy providing coverage, on a per occurrence basis, for acts, errors, omissions, and negligence of employees and contractors giving rise to potential liability, financial and other losses relating to data security and privacy, including cost of defense and settlement, in an amount of at least $10 million dollars, which policy shall include coverage for all costs or risks associated with:

        (1)  violations of data privacy or data security laws and regulations; and

        (2)  cyber risks, including denial-of-service attacks, risks associated with malware and malicious code, whether designed to interrupt a network or provide access to private or confidential information; and

        (3)  and other risks specific to the work performed by Vendor as shall be identified by Company.

    (ii)    Such coverage shall be furnished by an insurance company with an A.M. Best Financial Strength Rating of A- or better, and which is otherwise reasonably acceptable to Customer.

    (iii)    The Cyber E&O Policy shall be endorsed to name Customer, its affiliates and their respective employees, officers, agents, and representatives as additional insured(s).

(b) Vendor warrants that the scope of all coverage furnished to the Customer as additional insured pursuant to this Agreement shall be identical to that furnished to the Vendor as named insured, other than responsibility to pay the policy deductible, self-insured retention, or retrospective premium, and shall include coverage for any indemnification and hold harmless agreements made by the Vendor pursuant to the Data Security Rider.

(c) All insurance coverage(s) provided by Vendor pursuant to this Schedule I – Attachment B shall be primary with respect to any other insurance or self-insurance which may be maintained by the Customer. Each policy of insurance required to be provided by Vendor pursuant to this Agreement shall contain a "separation of insureds" clause, providing that except with respect to the limits of insurance and any rights or duties specifically assigned to the first Named Insured, this insurance applies as if each named insured were the only named insured; and separately to each insured against whom claim is made or suit is brought.

(d) The Vendor (as named insured) shall pay any deductible, self-insured retention, or retrospective premium with respect to any claim or occurrence made under any of the insurance policies or coverage to be provided by the Vendor pursuant to this Agreement. Vendor's failure to pay the applicable deductible, self-insured retention, or retrospective premium shall constitute a material breach of this Agreement, with damages equal to at least the amount of insurance lost or not provided due to such breach.

43

**Schedule I - Attachment C**

**Acceptable Use Requirements**

**Requirements**

**1.0    Electronic Resources**

1.1    Third Party Workers shall be responsible for the appropriate use and security of information (data) when using any **Avangrid Services Company (ASC)** electronic resource.

    a.    Appropriate use shall include using authorized ASC electronic resources as intended by ASC in accordance with duties and responsibilities.

        i.    Using ASC electronic resources in violation of these requirements, or any negligent or unlawful activity shall be considered inappropriate use.

1.2    Within each ASC business area and/or department the determining authority and responsibility for issuance of an electronic resource shall rest with the Business Area Leader, department/ hiring manager and, in some instances, the Information Technology department (ex: laptops).

1.3    Third Party Workers shall be prohibited from introducing any unauthorized electronic resources or software into the ASC environment, including without limitation any electronic resources or software that could disrupt any operations or compromise security.

1.4    Third Party Workers shall not store ASC owned information/data on devices that are not issued by ASC unless explicitly and contractually agreed by both parties.

1.5    ASC electronic resources shall be protected from misuse, including, but not limited to: theft, unauthorized access, fraudulent manipulation and alteration of data, attempts to circumvent security controls, and any activity that could compromise the confidentiality, integrity, or availability of information (data).

1.6    Third Party Workers shall immediately report lost, compromised, or stolen electronic ASC resources to the IT Service Desk and their ASC department manager.

1.7    Any ASC electronic resources assigned to or in the possession of a Third Party Worker shall be returned to a designated individual within his/her ASC department when it is determined by department management that the use of those resources is no longer necessary or upon completion of the engagement for which this device was provided.

1.8    Authorized Third Party Workers may remotely access the ASC IT managed corporate network utilizing only approved hardware, software and access control standards.

    a.    Remote access requests shall be approved by management and are restricted to computing resources that authorized users require to perform their job responsibilities.

44

    1.9    Third Party Workers shall not share or disclose their ASC credentials (log on ids and/or passwords) with others.

**2.0    Electronic Messaging**

    2.1    Conducting ASC business that results in the storage of ASC owned information/data on personal or non-ASC controlled environments, including devices maintained by a third-party with whom ASC does not have a contractual agreement shall be prohibited.

    2.2    All information created, sent, or received via ASC's e-mail system(s), network(s), internet or intranet, including all e-mail messages and electronic files shall be the property of ASC.

    2.3    Third Party Workers shall:
        a.  Use caution to ensure that the correct e-mail address is used for the intended recipient(s) (e.g., with the use of auto fill, reply all, etc.).

            i.  Forging, misrepresenting, obscuring, suppressing, or replacing a user identity on any ASC electronic communication to mislead the recipient about the identity of the sender shall be prohibited.

        b.  Not send spam via e-mail, text messages, pages, instant messages, voice mail or other forms of electronic communication.

        c.  Posting to a public newsgroup, bulletin board, blog, listserv with an ASC e-mail or IP address is strictly prohibited.

            i.  Avoid Representing or appearing to represent the opinions of ASC is prohibited unless appropriately authorized to do so.

    2.4    ASC's electronic messaging is intended to support legitimate business requirements. Limited use of ASC electronic messaging facilities for personal purposes shall be regarded as acceptable provided that:

        a.  Messages are not used for private business or other commercial purposes, including the sale or purchase of goods or services, or engaging with other clients.

        b.  Use does not interfere with the normal performance of workers' duties,

        c.  There is no breach of the prohibitions identified in these requirements,

        d.  Messaging does not violate applicable laws, regulations, the Code of Ethics, or ASC policies.

    2.5    ASC's electronic messaging shall not be used for transmitting, retrieving or storing any messages, files or attachments which constitute:

        a.  Harassing or unwanted messages (including insults and 'jokes'), including offensive messages which relate to gender, race, sexual orientation, religion, disability or other similar subject matter.

        b.  Defamatory messages which adversely affect the reputation of a person or company.

45

     c.  Messages that violate copyright, trademark, or other intellectual property rights of another party.

     d.  Obscene materials of an offensive or sexual nature.

     e.  Offensive material that might reasonably be expected to cause distress or other personal offense to the recipient.

     f.  Messages in violation of applicable laws, regulations, the Code of Ethics, or ASC policies.

2.6    Third Party Workers shall not disclose their passwords to others or permit others to use their e-mail accounts.

2.7    Third Party Workers shall never assume the privacy or confidentiality of electronic messages.

     a.  This includes information (data) protected by local, national or international security and privacy regulations and standards as well as data protected by confidentiality agreements.

     b.  Third Party Workers shall restrict transmission of such protected information to the extent feasible and utilize security procedures made available by ASC, and in accordance with contractual agreements.

## 3.0    Wireless Communications

3.1    All wireless infrastructure devices that reside at ASC sites and connect to an ASC network, or provides access to sensitive or confidential information shall:

     a.  Be installed, supported and maintained by Iberdrola or its designee

     b.  Use ASC approved authentication protocols, infrastructure, and encryption protocols

     d.  Maintain a hardware address that can be registered and tracked

3.2    Under no circumstances are unauthorized wireless communication devices allowed to directly connect to the internal ASC corporate network.

3.3    Internet access through wireless technology (hotspots) not belonging to ASC shall only be used if contractually agreed by ASC and the Third Party Worker.

46



**4.0     BYOD (Bring Your Own Device)**

4.1     ASC does not support the use of personally owned devices (POD)[1] by Third Party Workers to perform business functions, except:

a.      Short term engagements for professional services or consulting services where Third Party Workers will use third party owned equipment in the performance of contractually agreed upon duties, tasks and deliverables.

**5.0     End Point Data Storage Devices**

5.1     ASC does not recommend the use of third party or user -owned End Point Data Storage Devices (EPSD) due to security risks.  In the event that an EPSD is required, the ASC Corporate Security Office shall distribute an approved device upon receipt of an approved ITSM request (Rider A – Acceptable Use End Point Storage Device)

a.      It is expected that Third Party Workers engaged in professional services or consulting services shall utilize contractually agreed methods for file storage and sharing as their primary/preferred means for file storage.

b.      EPSD applies to the storage of data on devices that can be connected either by a USB drive, data cable or by wireless connection direct to any computing equipment within ASC, e.g. USB sticks, drives, thumb nails, pen drives, flash drives.

**6.0     Clear Desk & Screen**

6.1     Third Party Workers shall take steps to ensure a clear desk, screen and workplace by:

a.      Locking away business critical and/or sensitive information, e.g. on paper or on electronic storage media, when not required (or not in use), and when the office (or work space) is unoccupied.

b.      Shredding business critical and/or sensitive documentation when no longer needed, consistent with the Company's record retention policies.

c.      Logging off or protecting computing resources (desktops, laptops, terminals, etc.) with a screen and/or keyboard locking mechanism, controlled by a password, token or similar user authentication mechanism when unattended and when not in use.

d.      Using photocopiers and other reproduction technology (e.g. scanners, digital cameras) only as necessary and authorized to do so.

e.      Removing materials containing business critical, sensitive or classified information from printers, fax machines, copier rooms, and conference/meeting rooms immediately.

---

[1] PODs are information and communications technology devices (e.g. smart phones, lap tops) owned by employees or by third parties (such as suppliers, consultants and maintenance contractors).

47

**7.0    Monitoring**

7.1    ASC reserves the right to use monitoring controls, including software, to ensure compliance with this Acceptable Use Requirements document. ASC may record and/or monitor one or more Third Party Workers' ASC's owned computer and/or internet activity for any reason and without prior notice.

7.2    Under no circumstances is personal or third party computing equipment allowed to directly connect to the internal AVANGRID Services Company-IT managed corporate network, either by wired connection or via approved wireless protocol. AVANGRID Services Company IT reserves the right to monitor and remove unauthorized connections without prior notice.

**8.0    Return of Electronic Resources**

8.1    Voluntary Termination
   a.    Third Party Workers shall return all ASC electronic resources assigned to them or in their possession, to a designated individual, within twenty-four (24) hours of notice of termination or before their documented last day of work.    ASC business management shall make that determination.    This includes return of facility access badges.

8.2    Involuntary Termination
   a.    b.  Third Party Workers shall return all electronic resources assigned to them or in their possession immediately upon notice of termination.    This includes return of facility access badges.

**9.0    Compliance & Reporting**

9.1    A violation of the ASC Acceptable Use Requirements by a temporary Third Party Worker, contractor or consultant may result in termination of their contract or assignment with ASC.

9.3    Suspected requirements violations, system intrusions, virus outbreaks and other conditions which might jeopardize ASC's information or computing resources shall be immediately reported to the IT Service Desk.

48



## Acknowledgement Statement - Third Party Worker On-Boarding

By signing and dating this document I agree that I have had the opportunity to review these requirements and ask any questions regarding its content.  I understand the contents of these requirements.  I hereby acknowledge that I am responsible for complying with these requirements in addition to all other rules, policies, and procedures established by ASC.

Name: _____

Company Name: _____

Signature: _____    Date: _____

Or:  Online Acknowledgement:

49



**Acceptable Use Requirements – Procedural Guidance**

The intent of this procedural guidance is to document requirements as it pertains to the Acceptable Use of ASC's Electronic Resources, Electronic Messaging, and the Internet/Intranet by Third Party Workers.

All Third Party Workers shall be required to read and acknowledge their understanding of the ASC Acceptable Use Requirements.

**Definitions**

**Acceptable Use:**   For purposes of these requirements document, acceptable use is the corporate organizational rules governing the use of electronic resources, electronic messaging, and Internet/Intranet usage.

**Electronic Resources:**  computing and telecommunications devices that can execute programs or store data; examples of which may include, but are not limited to: computers, mobile computing devices, smartphones, portable wireless network access devices and storage devices (USB or otherwise connected).

**Electronic Messaging:**  includes email, IM, audio-video conferencing and any other one-to-one, one-to-many, or many-to-many personal communications. (ASC e-mail system, network, or Internet/Intranet access).

**Third Party Worker:** means contract employees, employees of suppliers or contractors, employees of consultants, or any other third party worker.

Questions pertaining to the contents of the ASC Acceptable Use Requirements shall be directed, in writing, to the CSO at: Corporate.SecurityUSA@Iberdrolausa.com.  Responses shall be made in writing.

[End of Schedule I – Data Security Rider]

50

