UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

======================================

AVANGRID NETWORKS, INC. and                    Dock # 22-CV-09622 (ATT)
AVANGRID SERVICE COMPANY,
                                    Plaintiffs

        -against-

SECURITY LIMITS, INC. and PAULO SILVA,
                            Defendants.

======================================

## DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO RULE 12(b (6 MOTION

Respectfully submitted

Edward J. Troy, Esq.
Attorney for Defendants
888 East Jericho Turnpike
P.O. BOX 267
Huntington Station, NY 11746
631-239-68817
edwardtroy@etroyesq.com

## TABLE OF CONTENT

Table of Authorities …………………………………………… iii

PRELIMINARY STATEMENT ……………………………… 1

STATEMENT OF FACTS ………………………………… 2

**POINT I**-DEFENDANTS HAVE PLEADED SPECIFIC,
NON-CONCLUSORY RICO PREDICATE ACTS …………..10

**POINT II**-THE COUNTERCLAIM INTERPOSED
BY DEFENDANTS IS LEGALLY SUFFICIENT ……………12

**POINT III** - THE CLAIMS PLEADED IN THE
COUNTERCLAIM ARE NOT TIME BARRED ……………..14

**POINT IV-** SILVA AND SLI HAVE SUFFERED
DAMAGESDIRECTLY LINKED TO THE RICO ACTS ……18

**CONCLUSION** …………………………………………..21

## PRELIMINARY STATEMENT

This Memorandum of Law is being submitted on behalf of the Defendants/ Counterclaimants, Paulo Silva and Security Limited, Inc. (hereinafter, individually referred to as "Silva" and "SLI" and jointly as "Defendants") in opposition to the F.R.C.P. Rule 12(b) 6 motion to dismiss the Defendants' Counterclaim in this matter. That counterclaim was interposed in the answer filed on Defendants' behalf. The subject of that Counterclaim is an allegation of a Civil RICO claim and a Conspiracy to commit that Civil RICO claim.

Defendants acknowledge that they previously commenced a civil RICO action in this Court in late November 2021. The complaint was never served and was voluntarily discontinued without prejudice after Avangrid filed a retaliatory extortion-and-defamation suit against Mr. Silva. Defendants planned to promptly seek dismissal of that suit under the applicable anti-SLAPP statute because none of its allegations was true; it functioned as crisis management to blunt the publicity of a RICO filing at the expense of Mr. Silva's reputation.

Security Limits Inc. and Mr. Silva do not have the resources of a $134-billion enterprise like Avangrid and its parent, Iberdrola, S.A., and could not responsibly litigate on multiple fronts. Hence, approximately three years later, Defendants were finally able to reassert the RICO claims as counterclaims in this action.

Subsequently, the plaintiffs, obviously displeased with the Defendants' success in a defamation case brought in New Mexico State District Court, continued to harass Silva and SLI. Not satisfied with the dismissal of their SLAPP[1]

---
[1] Strategic Litigation Against Public Participation

suit in New Mexico, which was affirmed by the New Mexico Court of Appeals and in which the New Mexico Supreme Court denied their Writ of Certiorari, the plaintiffs continued their strategy of harassment. In furtherance of that harassment, the plaintiffs commenced this action and inserted "data theft" aware that Mr. Silva attempted to return all assets to Avangrid prior to his abrupt termination.

Pursuant to the requirements of the F.R.C.P. Rule 13, Silva and SLI were required to assert their mandatory counterclaim. For all intent and purposes, the Defendants were satisfied that the New Mexico litigation settled the matters between the parties. Plaintiffs were not by any measure satisfied with the status of the relationship and the unresolved issues. Rather, Silva was convinced that the better use of his time and efforts were to develop his own data center. Defendants are certain that they were wronged and by being named in another suit recognized that the counterclaim should be filed.

## STATEMENT OF FACTS

In deciding a motion to dismiss a pleading under F.R.C.P. Rule 12(b)(6), the District Court must accept as true allegations in the subject pleading. A Rule 12(b)6 motion is to be decided on the presumption that the allegations of the pleading are true, and all inferences are to be drawn in favor of the non-movant. A FRCP 12(b)(6) motion to dismiss asks the court to test the legal sufficiency of the complaint's factual and legal allegations. In ruling on it, the court must construe the complaint in the light most favorable to the plaintiff, accept all well-pleaded allegations in the complaint as true, and draw all reasonable inferences in favor of the plaintiff. Having done so, the court then asks whether the complaint's

allegations contain sufficient facts to state a legal claim for relief that is plausible on its face.

There is the "business" history and the "litigation" history. The business history began with Mr. Silva seeking a contract from Avangrid for the design and construction of secure private cloud infrastructure for Avangrid and its various subsidiaries. Although devoid of the pleadings, the State of New York recently issued its Final Audit Report (number 23-M-0103) on the findings of the New York's retained third-party auditor. That audit was prepared for the Public Service Commission and studied the practices and procedures of New York State Electric & Gas Corporation and Rochester Gas and Electric Corporation, (hereinafter. "NYSEGC" and "RG&E", respectively). These entities are owned and operated by Avangrid. The audit was more concerned with the manner in which the two utilities, which are subsidiaries of Avangrid Network, were managed and the billing and allocations of resources among the various Avangrid companies.

While Silva and SLI concede that the report was not affixed to the pleading, we would ask the Court to consider the findings of the auditors as they confirm the allegations contained in the counterclaim. Since it is a matter of public record, prepared for and released by a public agency, defendants would ask that the Court take judicial notice of the report and consider this audit. Annexed hereto is the coversheet we received with the record, together with a 25-page Executive Summary. The full report is 439 pages long. If possible, it will be uploaded to Pacer. For now, it can be located on the State's website.

Although a 12(b) 6 motion is addressed solely to the pleading, materials outside the record may be considered if several conditions are met. For example,

even if a document is 'integral' to the complaint, it must be clear on the record that no dispute exists regarding the authenticity or accuracy of the document. It must also be clear that there exists no material disputed issue of fact regarding the relevance of the document." *Faulkner v. Beer*, 463 F.3d at 134 (citations omitted). *Kermanshah v. Kermanshah*, 580 F. Supp. 2d 247, 258–59 (S.D.N.Y. 2008).

There can be no serious disagreement that this audit was prepared for the State of New York, it directly relates to the issues in this case, and Avangrid was aware of the audit. In fact, Avangrid submitted a response to New York State's Public Service Commission on April 4, 2025. Defendants, therefore, submit that there is no surprise or prejudice to Avangrid in the Court taking judicial notice of these findings.

In the alternative, if the Court is unwilling to consider this audit report, the defendants would ask for leave to file a Second Amended Answer with Counterclaims to include these findings.

That Final Audit Report made several damning findings that are consistent with the allegations of the Counterclaim. These findings were:

1. Avangrid responses to many audit inquiries were contradictory, lacking specificity, and misleading.

2. Avangrid has a vertical corporate and governance structure where NYSEG and RG&E and their respective Boards of Directors are located under layers of holding companies and their governance boards. This structure prohibits transparency and ignores the unique strategic, operating and regulatory environment in which the New York utilities operate. Core utility functions are performed by two unregulated service companies – AMC and ASC.

3. Service Level Agreements (SLAs) between NYSEG, RG&E, and other Avangrid affiliates do not provide sufficient controls to meet the needs of the two New York utilities, the NYPSC or NYSEG and RG&E customers.

4

4. The budgeting and finance processes at Avangrid are not transparent and lack sufficient support. Avangrid prioritizes corporate earnings, not the needs of NYSEG and RG&E.

5. Avangrid's management of gas operations for NYSEG and RG&E fails to adequately address public safety and compliance risks. There are data inconsistencies, delayed pipeline replacements, and issues of non-compliance with regulatory requirements.

6. Avangrid's "regional" utility operating model results in a lack of management focus on the needs of NYSEG's and RG&E's electric infrastructure.

7. Avangrid's project management processes are deficient, lacking transparency, adherence to internal procedures, and accountability for capital spending.

8. Avangrid's cybersecurity programs are underdeveloped, characterized by delayed progress in program and controls implementation, fragmented organizational responsibilities, and significant vulnerabilities that leave NYSEG and RG&E at risk of cyberattacks, regulatory penalties and operational failures.

9. Performance-management processes at Avangrid hinder operational effectiveness, accountability and alignment with NYSEG and RG&E objectives.

Concededly this case is not a suit specifically involving NYSEGC or RG&E, however, it involves their controlling companies Avangrid Inc. and Avangrid Networks Inc. Likewise, this is not a suit merely related to two RFPs[2]. As the counterclaim alleges, this RICO claim alleges that the plaintiffs, through their subsidiaries and Parent corporation are engaged in a scheme to overcharge ratepayers in various states through the misallocation of expenses. It further alleges that the plaintiffs, with the assistance of others, submit false claims to Public Service Commissions to grossly inflate capital expenditures (CAPEX), in reimbursements of costs and guaranteed returns on "investments".

Furthermore, when plaintiffs did expend funds on capital expenditures, plaintiffs did not use the equipment they obtained for the purposes stated. The

---

[2] On page 18 of plaintiff's brief, it is alleged that this is "an isolated dispute over two RFPs".

plaintiffs also misused the equipment by using property that was charged to New York ratepayers in other jurisdictions. This equipment's cost was then allocated in the new jurisdiction for applications for rate hikes in those States. o

The Defendants are not averse to companies making money and legitimate returns on their investments. Plaintiffs occupy a unique role as a private company, but with a state granted monopoly. This unique role gives plaintiffs wide latitude to misappropriate property, misallocate funds, inflate expenses and generally tell the State how and where they made expenditures. Defendants are averse to theft, avarice and stealing. It is in this context that one must consider the instant claims.

After a business dispute arose between the parties, Silva spoke at the public comment portion of the Public Utilities Commission in New Mexico. The hearing was being held to determine whether the PUC would permit Avangrid to purchase the energy company that supplies the State of New Mexico. In retaliation, Avangrid commenced suit against Silva and SLI in the District Court of New Mexico.

That suit alleged that Silva's comments defamed plaintiffs' corporations. Silva and SLI retained New Mexico counsel and moved to dismiss under the New Mexico expedited SLAPP statute. That motion to dismiss was granted by the District Court[3]. In her findings, the District Judge held that Avangrid was seeking to punish Silva and SLI for expressing their opinion at a public hearing on a matter of great public concern. That, the Court reasoned, was an attempt to retaliate against the Defendants' public participation. The Judge directed a dismissal of the

---

[3] It is interesting that Avangrid's counsel, in a submission to the Court, requested that the Court incorporate and consider the entire record for those proceedings. Under New Mexico law, there is a quasi-immunity for statements made in legal proceedings and public hearings. Therefore, while Avangrid was arguing that the public comment section is not a "proceeding", the request to include the entire record made no sense.

case and the entry of judgment in favor of the defendants. The District Court Judge was so adamant that this was a naked attempt to punish Silva, that leave to file an amended pleading was denied. The dismissal was with prejudice.

The plaintiffs appealed that judgment to the New Mexico Court of Appeals. That Court, without permitting oral argument, issued a unanimous decision, affirming the judgment. Next, plaintiffs sought a hearing in the New Mexico Supreme Court, but the Writ of Certiorari was denied. The Court of Appeals remanded the matter to the District Court for a hearing on an award of attorney fees. Approximately $71,000 was awarded as fees.

Rather than leave the defendants alone, the plaintiffs filed this suit, alleging Defendants attempted to extort the plaintiffs through direct contact with plaintiff's counsel and through their attorney (not me). They also asserted that Defendants committed breach of contract, tortious interference with contract, and other claims. Having been sued in federal court on claims associated with contracts between the parties, it seemed prudent to interpose the counterclaim as a mandatory counterclaim, pursuant to F.R.C.P. Rule 13. A failure to assert a mandatory counterclaim may result in a waiver of those claims.

By no means are the defendants alleging a lack of interest or a lack of belief in the validity of their claims. Rather, the Defendants believed their time and effort were better spent in business pursuits. To a business, litigation is a costly waste of time. However, having been named again, Silva and SLI determined that they needed to join the fight.

For all intents and purposes, the defendants' counterclaim asserts that the plaintiffs are a criminal enterprise. Although the Plaintiffs may wear designer

wardrobes, and fly in corporate jets, their motivation is to generate as much income or revenue as possible, whether the laws, rules and regulations are followed.

An example of activities seemingly unrelated to Silva and SLI, but still a predicate act, is the recent delisting of Avangrid from public stock exchanges. The management of the parent company, Iberdrola, Inc., a Spanish company that improperly exercises control over companies involved in the United States energy market, is currently being sued in the S.D.N.Y. before Judge Furman in a matter styled *Goldschein v. Avangrid, Inc. et al.,* 25-CV-00772. That action is brought under the Security and Exchange Act of 1934 and alleges that there was a scheme developed, and deployed, in which the members of the "unaffiliated committee" assigned to represent the private shareholders were presented and described as impartial. They were not. Rather the proxies had long-standing relationships with Iberdrola. Also, these proxies were sitting on the Boards of affiliated Avangrid companies.

Likewise, a similar complaint is being litigated in the Supreme Court of the State of New York, Commercial Division, Part 3, styled, *In re AVANGRID, INC. SHAREHOLDER Litigation,* Index #659327/2024[4], in which there are similar allegations regarding the improper use of Avangrid and/or Iberdrola personnel and affiliated board members to act as alleged fiduciaries on behalf of the private shareholders. As a practical matter, it is significant that Iberdrola went private, since Iberdrola and Avangrid are free from the reporting requirements of the Security Exchange Commission (e.g. filing form 10(5), reporting officer and

---

[4] This case is active and there has been a dispute over who should be the nominal plaintiff, and which firm should be the lead counsel.

director compensation, etc,) and the disclosure requirements of the listing

Exchanges. Individual state utility commissions may have certain requirements,

but they generally lack the resources necessary to fully audit a company.[5] The lack

of resources, and the lack of transparency can prohibit proper oversight of

Avangrid.

Since a Rule 12(b)6 motion is to be decided on the presumption that the

allegations of the pleading are true, and all inferences are to be drawn in favor of

the non-movant, we respectfully submit that the issues of the delisting of the

company by illegal means must be accepted as true. In ruling on it, the court must

construe the complaint in the light most favorable to the plaintiff, accept all well-

pleaded allegations in the complaint as true, with significant mapping to artifacts,

and draw all reasonable inferences in favor of the plaintiff. Having done so, the

court then asks whether the complaint's allegations contain sufficient facts to state

a legal claim for relief that is plausible on its face.

The fact that two Courts in New York are litigating this issue shows that the

issue raises questions of facts. I do not understand counsel's argument that the

payments by Avangrid to the former Governor of Maine were not unusual and

there is reasonable explanation for his bonus is unavailing to support this motion. It

is also questionable for the plaintiffs to claim that Silva and SLI have not suffered

any damages. As pleaded and supported by disclosed emails, SLI alleges that

Avangrid mounted a retaliatory litigation campaign that derailed a pending

---

[5] As an aside, I handle matters with the New York Liquidation Bureau. Since insurance is not within the federal domain (insurance companies cannot file for bankruptcy), the States are charged with determining the solvency and liquidity of carriers licensed in their States. It is not unusual for an Insurance Department in another State to request that the New York Department of Financial Services audit a carrier on another State's request.

venture-capital transaction and inflicted additional reputational and economic harm on SLI and Mr. Silva, losses already detailed in the complaint. Because Avangrid's litigation expenses are recoverable through base-rate mechanisms and thus passed on to ratepayers, it bears little, if any, marginal cost for filing meritless suits. This ratepayer-funded litigation posture, coupled with Avangrid's outsized resources, creates a profound asymmetry: Avangrid can prosecute aggressive claims without internalizing the costs, while SLI and Mr. Silva shoulder out-of-pocket expenses, the loss of the venture-capital deal, lost business opportunities, and reputational injury. Taken as true at this stage, these allegations underscore Avangrid's leverage and support the plausibility of Defendants' claims. This issue cannot be resolved on this motion. Defendants are ratepayers in New York, through the ownership and operation of a data center in upstate New York. They also conduct business in CT and ME, two states in which Avangrid own power plants and the defendants suffered increased economic costs which were contributed to by the acts of Avangrid's conspiracy. Second, the Supreme Court has held that a party under RICO need not be the damaged party.

Overcharges to the State and the lack of proper accounting for rate setting affects all ratepayers. The Defendants are ratepayers. They were also the subject of bid rigging schemes and the theft and disclosure of confidential information by Avangrid's' officers and agents.

## POINT I
## DEFENDANTS HAVE PLEADED SPECIFIC, NON-CONCLUSORY RICO PREDICATE ACTS

Contrary to Plaintiffs' assertions, the Counterclaims identify concrete

predicate acts with dates, participants, and factual context sufficient to satisfy Rule 9(b) where applicable. These include: (1) procurement coercion and bid manipulation through coordinated communications between Avangrid and Cipher in February 2020 to control the outcome of a security contract; (2) wrongful acquisition and use of SLI's proprietary runbook and bid materials in violation of contractual restrictions; (3) false and misleading representations to state utility commissions in New York and New Mexico to inflate capital expenditure recoveries; (4) retaliation through baseless litigation in New Mexico, culminating in an anti-SLAPP dismissal and fee award; and (5) misuse of confidential corporate governance processes in connection with Avangrid's recent delisting. Each alleged act is tied to specific factual allegations in the pleadings and is part of a pattern of racketeering activity extending over multiple years.

A review of the counterclaim shows that it sufficiently pleads the necessary elements for the Defendants' claim to withstand judicial scrutiny. The pleading identitfies the the basis of the plaintiffs' plan. (P . It supplies sufficient information to inform the parties of the nature of the claims. (P . Lastly, the counterclaim informs Avangrid as to the identity of the relevant people and the acts they undertook. "The core challenge in proving a conspiracy lies in its clandestine nature". A conspiracy, by its very nature, is a clandestine collaboration. If you are not in the conspiracy, you generally do not know about it.

With all due respect, as counsels in this matter share a good professional relationship, it is almost jaw-dropping to look at the pleading and claim it is insufficient. For example:

11

¶47[6]- In an email, Cipher discusses three options available to Avangrid to move forward with Phase 1 of their project and their overreliance on Silva and SLI. The scheme suggested was to "ramp-up and ramp down of Paulo to the project. That way we 'lock' Paulo to the project (till [sic] the end) while we show Avangrid/Iberdrola that we are progressively reducing Paulo dependency and take control."

¶¶162-170 lists the names, positions and activities of the non-named parties.

¶174 demonstrate that Avangrid falsely claimed that Vice Chairman Baldacci was an impartial member of the Proxy Unaffiliated Board.

¶¶175-178 demonstrate that the members of the Proxy Unaffiliated Board had years of contacts and payments from Avangrid and/or affiliated companies

¶182 information concerning the retention of as third-party to perform corporate espionage, with a recommendation to "liquidate" Dr. Dica, a Romanian involved in a dispute with Iberdrola.[7]

¶184 the head of security for Iberdrola was sentenced to a 19-year prison term for corporate espionage.

This is a pattern of activity that is presumptively criminal. At the very least, any inferences drawn from these facts support Silva's and SLI's claim that this is a criminal enterprise that is unrestrained by authorities, laws, or regulations. They lies, cheat, act to "lock out" a professional from his livelihood.

## POINT II
## THE COUNTERCLAIM INTERPOSED BY DEFENDANTS IS LEGALLY SUFFICIENT

---

[6] Cited paragraphs are references to paragraphs in the Amended Answer.
[7] The use of the term "liquidate" when discussing a person- not a stock- has a rather ominous meaning

Initially, there are two points that require closer examination because the movants have either ignore or misconstrued them. First, the movants seemingly take general propositions as stated in case law on the issue of Civil RICO and then add an unstated element or requirement. For example, counsel takes a general principal, such as the statement that, "Under the 'continuity' requirement, there must either be repeated racketeering activity extending over a substantial period of time or racketeering activity that by its nature projects into the future with a threat of repetition" and then counsel states that "[h]ere, an isolated dispute over two RFPs fails to show continuity of horizontal and vertical relatedness…"

Nowhere does the Court limit the predicate acts to the alleged wrong suffered by the defendants. The predicate acts that have been demonstrated are:

Billing irregularities.

Securities fraud;

SLAPP litigation in New Mexico;

Partial proxies used to take company public;

19 year-prison sentence for head of security.

Each of these acts are predicate acts for the enterprises' goal of, basically, strong arming companies or agencies that attempt to prevent theft by Avangrid. To date, these activities are continuing. In around May 2025, the State of Maine PUC was petitioned to disassociate from Avangrid. Some activist in Maine requested that Mr. Silva comment on his experiences with Avangrid. Avangrid apparently had counsel present for the hearing and opposing counsel telephoned me to inquire if I was involved in the hearing. I declined to disclose to counsel the nature of any meeting

13

or advice I gave to my clients. Counsel admonished me that there was a "fine line" involved in this activity.

Furthermore, it is obvious that Avangrid was not happy with the results of the litigation they commenced against the defendants in New Mexico. We are currently before this Court not because Mr. Silva or SLI commenced suit against Avangrid. Rather, Avangrid had not obtained its "pound of flesh" and filed suit in New York to further burden the defendants. The defendants were quite content to have the New Mexico litigation vindicate their rights. However, having been named as a defendant in this Court, the defendants were required to interpose all compulsory counterclaims.

The second issue that appears to be ignored or misconstrued in the fact that the counterclaim interposed by the defendants contained factual allegations which are supported by findings by two different investigations by State public utility commissions, to wit- New Mexico's rejection of a proposed merger, and New Yorks' recent audit findings. Avangrid is fully aware of these investigations and participated in both proceedings. There can be no surprise or lack of knowledge claimed. The pleading is sufficiently detailed to advise plaintiffs of the facts associated with the counterclaim.

## POINT III
## THE CLAIMS PLEADED IN THE COUNTERCLAIM ARE NOT TIME BARRED.

Plaintiffs' claim that the defendants' claims are time-barred are equally without merit. The Statute of Limitations has not expired. In this suit, Plaintiffs falsely alleges "extortion and data theft" despite those claims having been asserted in the New Mexico litigation. That litigation was dismissed with prejudice, and that

dismissal was affirmed on appeal, with the Supreme Court refusing to hear the matter. Mr. Silva's documented return of the "data" that was allegedly stolen materials continues Avangrid's retaliatory campaign and extends SLI's discovery of injury. This lawsuit followed Mr. Silva's good-faith attempts, including a November 2022 letter, to resolve disputes and prevent harm to his professional reputation and SLI's business operations.

The Statute of Limitations is not a Statute of Repose. The alleged expiration of the Statute of Limitations, if correct, merely bars the remedy, not the right. The possession of the right may be used as an offset. *In re Mid Atlantic Fund, Inc.*, 60 B.R. 604, 609-10 (Bankr. S.D.N.Y. 1986) (statutory limitation periods generally have no application to offsetting counterclaims and other matters of defense).

In New York, Statutes of Limitation are generally viewed as pertaining to the remedy rather than the right. The expiration of the time period prescribed in a Statute of Limitations does not extinguish the underlying right, but merely bars the remedy. *Casita, L.P. v. Glaser*, 2015 NY Slip Op. 30243(U). On December 11, 2024, the NY Supreme Court, Appellate Division, Second Department in *Getzel Schiff & Pesce, LLP v Shtatney,* 2024 NY Slip Op 06186 restated the rule that an otherwise untimely counterclaim may be used as an offset. *See,* NY CPLR 203(d).

This doctrine, applied in federal courts, is known as Recoupment and Set Off. The parameters of recoupment are derived from the common law pleading rules concerning counterclaims. *Coplay Cement Co. v. Willis & Paul Group*, 983 F.2d 1435, 1440 (7th Cir. 1993) (recoupment is the "ancestor" of the compulsory counterclaim presently set forth in Fed. R. Civ. P. 13(a)). In the context of recoupment "transaction" is a word of flexible meaning depending not so much on

the immediateness of connection of an occurrence or occurrences, as upon its logical relationship of the events. *Moore v. New York Cotton Exchange*, 270 U.S. 593, 610 (1926). By no means should the discussion of these equitable doctrines be interpreted as a concession regarding the timeliness of these counterclaims.

Furthermore, Avangrid's pattern of legal warfare against the defendants reached a critical point with its filing of the frivolous New Mexico lawsuit. That suit continued until as recently as March 3, 2025, under New Mexico Sup. Ct. Dock. # S-1-SC-40742. These were not isolated actions but were all taken in furtherance of a conspiracy to break Silva and SLI. Baseless litigation used to harass competitors may be extortion predicate acts under RICO. They do not enjoy the assumed immunity given to those who seek redress. *Professional Real Estate Investors, Inc., et al. v. Columbia Pictures Industries, Inc., et al.*, 505 US 49 (1993).

Not being content with burdening SILVA and SLI with what we believe is a frivolous suit , in May 2025, Avangrid injected the New York litigation into Maine regulatory proceedings in a manner constituting another RICO predicate act. On January 18, 2022, Central Maine Power (an Avangrid affiliate) submitted a report to the Maine PUC (Docket 2021-00391) that appended Avangrid's then-pending New Mexico complaint against SLI and Mr. Silva as Appendix A. That New Mexico case, an extortion and defamation suit, was later dismissed with prejudice under N.M. Stat. § 38-2-9.1. Thereafter, on May 19, 2025, Avangrid uploaded and affirmatively requested that the Maine PUC accept into the record the operative New York extortion and defamation lawsuit (the present SDNY action) while omitting SLI's answers and counterclaims, a selective presentation calculated to

16

discredit Mr. Silva before Maine legislators and regulators.

SLI discovered this through its routine monitoring of government compliance databases. The timing of Avangrid's Maine uploads coincided with consideration of a whistleblower-protection bill in the Maine Legislature, providing motive to tarnish SLI's credibility. These events are directly relevant to the sham-litigation and extortion predicates, as well as to the inapplicability of Noerr-Pennington and defamation privileges.

The counterclaim allegations of wire fraud are properly laid out. The pleadings allege a coordinated scheme to misappropriate SLI's proprietary information and to steer multiple procurements by misrepresenting the integrity of the RFP process. The scheme spans RFP Nos. 776388, 789546, 792241, 795776, 798582, and 7986546, including Phase II and AMI procurements, across New York, Massachusetts, Connecticut, and Maine; it was executed by overlapping personnel and extended into reputational warfare before courts and regulators. These allegations sufficiently plead relatedness and continuity at the pleading stage.

Furthermore, as to the Conspiracy claim, SLI plausibly alleges that Avangrid, Inc. and Avangrid Networks, together with Prosegur and its subsidiaries Cipher and PSM, UTI, and Black & Veatch, acting through Avangrid personnel David Lathrop, John Allen, and Tom Fitzgerald, agreed to obtain and deploy SLI's confidential designs and pricing, to force SLI into subordinate teaming roles, and to steer contract awards while maintaining the appearance of competitive tenders.

Overt acts include coordinated introductions and NDAs used to extract bid secrets; demands that SLI cede its prime bid to a favored contractor; unauthorized

dissemination of SLI's Ironclad runbooks to Iberdrola security and UTI to pre-bake requisitions; and replication and cross-use of SLI's bids and BAFOs- Best and Final Offers- across multiple procurements, including RFP Nos. 776388, 789546, 792241, 795776, and 798582. Prosegur's internal "Dashboard" memorialized a plan to keep SLI as a subcontractor, to "lock" Mr. Silva while reducing his role, and to coordinate messaging with Avangrid and Iberdrola, corroborating motive and agreement; the pleading also ties senior Iberdrola/Prosegur figures, including Ignacio Sánchez Galán, Antonio Asenjo Martín, Enrique Victorero, and Javier Tabernero, to related proceedings in Spain.

The conspiracy's object was to control the engineering bill of materials and runbooks to dictate SKUs and configurations and to predetermine awards to preferred vendors, in derogation of the procurement requirements applicable to New York utilities, see 16 N.Y.C.R.R. § 215.1(a)(2)– (5). Because the complaint adequately pleads a violation of 18 U.S.C. § 1962(c) and concerted action among Avangrid entities and outside primes, the § 1962(d) conspiracy claim is sufficiently stated. Given the adequately pleaded 1962(c) violation and concerted action among Avangrid entities and outside primes, the conspiracy claims should stand.

**POINT IV**
**SILVA AND SLI HAVE SUFFERED DAMAGES**
**DIRECTLY LINKED TO THE RICO ACTS**

Regarding the claims of Larceny and Hobbs Act Extortion, opposing counsel mistakenly asserts that Avangrid was free to contract with any entity following the issuance of multiple comparative Requests for Proposals (RFPs). However, Avangrid egregiously violated the explicit requirements under the New York Public

Service Commission (NY PSC) rules, specifically under 16 CRR-NY § 215.1, which mandates transparent, competitive bidding processes and clear public disclosures upon awarding contracts, in addition to its framework agreement, procurement policies and procedures.

Additionally, SLI explicitly detailed Avangrid's unauthorized use of the proprietary Ironclad® Runbook, intellectual property, and related materials without due compensation, explicitly violating agreed terms and resulting in Avangrid's unjust enrichment at SLI's expense. Furthermore, unjust enrichment claims can coexist with contractual claims where conduct falls outside the contract scope, per *Clark-Fitzpatrick v. Long Island R.R. Co.*, 70 N.Y.2d 382 (1987).

Avangrid representatives explicitly promised substantial financial commitment ($40 billion company status) and ongoing collaborative business, inducing significant reliance by SLI to its financial detriment. These promises were specific, actionable, and reasonably relied upon by SLI; however, the contract was abruptly stopped because of SLI's refusal to participate in the bid rigging scheme. Defendants have shared significant evidence over the years that clearly supports these claims, Avangrid already have possession of most of them. Reliance on promises made explicit and specific is actionable under promissory estoppel, per *Esquire Radio & Elec., Inc. v. Montgomery Ward & Co.*, 804 F.2d 787 (2d Cir. 1986).

SLI specifically identifies fraudulent interstate communications (emails and electronic submissions) explicitly including manipulated bid processes and deceptive regulatory filings intended to defraud SLI of business opportunities, notably RFP 776388 and Avangrid's misleading submissions to Maine's PUC

*[Compl. ¶ 228 and 229],* and the complaint details Avangrid's fraudulent financial reporting, highlighting systematic discrepancies in capital variance reports filed in Maine, New York, and Connecticut, evidencing ongoing RICO violations through mislabeling projects, inflating budgets, and manipulating CAPEX records by marking millions in equipment costs as "Varies" instead of properly indicating them as "In-Service.". The pleading clearly meets Rule 9(b) specificity requirements ("who, what, where, when, how") under federal mail and wire fraud statutes (18 U.S.C. §§1341, 1343), supported by *Gerstenfeld v. Nitsberg*, 190 F.R.D. 127 (S.D.N.Y. 1999).

The Counterclaims explicitly detail coercive threats made by Avangrid executives (e.g., David Lathrop and John Allen) threatening economic harm unless SLI acceded to partnership conditions favoring entities associated with Avangrid, constituting wrongful economic threats in interstate commerce explicitly actionable under Hobbs Act, 18 U.S.C. §195, whereby threats of economic harm conditioning business opportunities constitute actionable extortion under federal law. *United States v. Cain*, 671 F.3d 271 (2d Cir. 2012).

Avangrid's fraudulent CAPEX manipulation, inflated equipment pricing, and bid rigging artificially increased interstate electricity rates, impacting ratepayers, businesses, and federal facilities across multiple states. This misconduct directly caused Security Limits Inc. (SLI) clear, quantifiable damages through the loss of contracts valued at approximately $134 million (RFP 766388) and $34 million (OT-AMI sole-source), in addition to damages from malicious litigation. (*Summit Health, Ltd. v. Pinhas*, 500 U.S. 322 (1991)). Second, under RICO, the harmed party need not directly suffer damages nor prove personal reliance (Bridge v.

Phoenix Bond & Indem. Co., 553 U.S. 639 (2008)).

## **CONCLUSION**

For the reasons above herein stated, PAULO SILA and SECURITY
LIMITED, INC. respectfully pray that an Order issue, denying the instant motion,
brought under Rule 12(b) 6 in its entirety and direct that the movants respond to
the counterclaim within 21 days of the entry of said Order, or as soon as the Court
directs or, alternatively, grant Silva and SLI leave to serve a Second Amended
answer with counterclaims in compliance with this Court's direction, all together
with any other or further relief which to this Court seems just and proper.

Dated: August 15, 2025

*Edward J. Troy*
Edward J. Troy, Esq.

## APPENDIX

APPENDIX A – RICO STATEMENT (ABRIDGED OUTLINE)

1. Statutes: 18 U.S.C. § 1962(c), (d).


2. Defendants/Basis of Liability: Avangrid, Inc.; Avangrid Networks, Inc. –
direction and execution of a bid-rigging and reputational suppression scheme
through employees and controlled affiliates.


3. Other Wrongdoers: Named primes/contractors (e.g., B&V, Cipher/Prosegur) to
be particularized.


4. Victims/Injury: SLI (loss of trade secrets; diverted awards; reputational harm;
business losses); ratepayers (integrity of procurement/rate recovery).


5. Pattern: Predicates (extortion; wire/mail fraud; trade-secret misappropriation);
dates/participants/particulars to be filed under seal; common plan across
NY/CT/ME procurements and regulatory fora.


6. Enterprise: Avangrid corporate family and associated vendors (structure and
shared-services model); purpose to control awards and suppress whistleblowing.


7. Person/Enterprise Distinction: Persons are Avangrid entities; enterprise is an
association-in-fact including controlled affiliates and outside primes.


8. Enterprise Activities vs. Racketeering Acts: Use of ordinary procurement and
legal processes as instruments of the scheme (diversion, intimidation,
regulator-facing filings).


9. Benefits: Captured awards; rate recovery; suppression of competition.

10. Commerce: Interstate communications, equipment procurements, and multi-state utility operations.

## CERTIFICATION OF WORD COUNT

I hereby certify that the word count of this Memorandum of Law complies with limits of Rule III.D of this Court's Individual Practices. According to the word-processing system used to prepare this memorandum of law, the total word count, excluding the material excluded by rule, is 5,573.

/s/Edward J. Troy

Edward J. Troy, Esq.